BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division
Federal Programs Branch

JOHN A. SARCONE III
United States Attorney
Northern District of New York

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

CRISTEN C. HANDLEY
ELISABETH J. NEYLAN
Trial Attorneys
Civil Division
Federal Programs Branch

*Attorneys for the United States*

U.S. DISTRICT COURT – N.D. OF N.Y.
**FILED**

**Jun 12 - 2025**

John M. Domurad, Clerk

# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF NEW YORK
## (Albany Division)

| | |
|---|---|
| THE UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br><br>    v.<br><br>STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her Official Capacity; LETITIA A. JAMES, Attorney General of New York, in her Official Capacity.<br><br>    Defendants. | No.   1:25-cv-00744 (MAD/PJE)<br><br><br>**COMPLAINT** |

1

**INTRODUCTION**

1. Immediately following President Trump's January 20, 2025 Executive Order declaring a national emergency at our Southern border, *see* Proclamation 10,866, *Declaring a National Emergency at the Southern Border of the United States*, 90 Fed. Reg. 8327 (Jan. 20, 2025), the U.S. Department of Homeland Security ("DHS") and its component Immigration and Customs Enforcement ("ICE") issued new guidelines providing for the safe and effective enforcement of civil immigration laws at particular locations throughout the country, and specifically, at or near courthouses. *See* Memorandum from Acting Secretary of DHS Benjamine Huffman, Enforcement Actions in or Near Protected Areas (Jan. 20, 2025) ("DHS Memorandum"); Memorandum from Acting Director of ICE Caleb Vitello, Interim Guidance: Civil Immigration Enforcement Actions in or Near Courthouses (Jan. 21, 2025) ("ICE Memorandum"); Memorandum from Acting Director of ICE Caleb Vitello, Common Sense Enforcement Actions in or Near Protected Areas (Jan. 31, 2025).

2. Those guidelines recognize that federal agents should exercise discretion and common sense in carrying out their duties, including in deciding where arrests and other enforcement actions should be undertaken. In other words, there are no "bright line rules regarding where our immigration laws are permitted to be enforced," DHS Memorandum at 1, and instead, the location of a civil enforcement action is properly determined "on a case-by-case basis considering the totality of the circumstances," ICE Memorandum at 2.

3. Conducting an arrest at or near a courthouse often reduces the risk of flight and safety risks to the public, law enforcement officers, and targets themselves, in part because individuals are usually screened for weapons or other contraband before entering a courthouse.

*See* ICE Memorandum at 1. Indeed, criminal warrants are often executed at courthouses for this very reason. The same is equally true for immigration enforcement.

4. Contrary to this common-sense approach, the State of New York has issued a blanket prohibition, through its "Protect Our Courts Act," purporting to block civil immigration arrests and shield aliens, including those subject to lawful detention and removal orders, while they attend or travel to or from New York court proceedings. *See* N.Y. Civ. Rights Law § 28.1 (hereinafter, "POCA").[1] The prohibition applies to a remarkably broad class—i.e. any parties or witnesses to court proceedings and any of their "family or household member[s]," which the law defines to include unrelated individuals of essentially any relationship subjectively deemed more than "casual." *See id.* § 28.6(c); N.Y. Soc. Serv. Law § 459-a. New York has also issued an Executive Order prohibiting civil immigration arrests of any individuals "within state facilities," a broad category of buildings owned or leased by a New York executive entity. *See* N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170.1 (hereinafter, "Executive Order 170.1").

5. Through a separate Executive Order that singles out federal immigration officers for disfavored treatment, New York has forbidden its employees from sharing information critical for civil immigration enforcement purposes with these federal officers. *See id.* § 8.170 (hereinafter, "Executive Order 170"); *see also* Executive Order 170.1 (incorporating this information-sharing restriction).

---

[1] When New York Senate Bill 2019-S425A, now referred to as the POCA, was enacted, it amended the following New York laws: the Civil Rights Law by adding a new section 28; and the Judiciary Law by adding a section 4-a and a new paragraph (aa) to Subdivision 2 of Section 212. Of these amendments, the Civil Rights Law section 28 has had the most adverse effect on civil immigration enforcement actions.

6.	These laws pose intolerable obstacles to federal immigration enforcement and directly regulate and discriminate against the Federal Government, in contravention of the Supremacy Clause of the United States Constitution.

7.	On its face, the POCA prevents federal agents from conducting civil arrests not only on courthouse grounds—including public spaces within and around those grounds—but also at any location, however far from a courthouse, so long as the target is "going to" or "returning from" a courthouse. *See* POCA § 28.1. And the POCA is silent as to how an officer should know whether an individual is en route to or from a courthouse before attempting a civil arrest. Moreover, the POCA imposes criminal and civil penalties for violations of its obscure provisions. *See id.* § 28.2–4.

8.	Through these enactments, New York obstructs federal law enforcement and facilitates the evasion of federal law by dangerous criminals, notwithstanding federal agents' statutory mandate to detain and remove illegal aliens. *See, e.g.*, 8 U.S.C. § 1226(c) (requiring the mandatory detention of certain aliens who are removable due to criminal convictions or terrorist activities); *id.* § 1231(a) (requiring detention and removal of aliens who have a final order of removal).

9.	New York's enactments also regulate federal officials by purportedly requiring them to obtain criminal arrest warrants in order to take custody of removable aliens, even though Congress has authorized federal officials to effect such custody by *civil* arrest warrants. *See id.* § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States[.]"); *id.* § 1231(a).

10.	Further, New York is intentionally obstructing the sharing of information necessary to safely and effectively enforce immigration law, thereby impairing federal agents' apprehension

4

of dangerous criminals.  *See* Executive Order 170; Executive Order 170.1.

11.     Accordingly, these laws are invalid under the Supremacy Clause and must be enjoined.  The United States brings this declaratory and injunctive action to prohibit the State of New York from enforcing the POCA and Executive Orders 170 and 170.1.

## JURISDICTION AND VENUE

12.     This Court has jurisdiction over this action under 28 U.S.C. §§ 1331 and 1345.

13.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b), because at least one Defendant resides in this District and a substantial part of the acts or omissions giving rise to this action arose from events in this District.

14.     This Court has authority to provide the relief requested under its inherent equitable powers, as well as the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.

## PARTIES

15.     Plaintiff is the United States of America.  The United States is vested with plenary authority to regulate immigration under its statutory and constitutional authorities.  It is responsible for enforcing the federal immigration laws through its agencies—including the Departments of Justice, State, Labor, and Homeland Security, along with DHS's component agencies, including ICE and U.S. Customs and Border Protection ("CBP").

16.     Defendant New York is a State of the United States.

17.     Defendant Kathleen Hochul is the Governor of New York.

18.     Defendant Letitia A. James is the Attorney General of New York.

19.     All individual Defendants are being sued only in their official capacities.

## CONSTITUTIONAL AND STATUTORY BACKGROUND

20.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof[] . . .

shall be the supreme Law of the Land[] . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

21. Under the Supremacy Clause, a state law is preempted if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).

22. A state law is also invalid if it "discriminate[s] against the United States or those with whom it deals[,]" *South Carolina v. Baker*, 485 U.S. 505, 523 (1988), or purports to regulate the Federal Government, *see Mayo v. United States*, 319 U.S. 441, 445 (1943).

23. The United States has well-established preemptive authority to regulate immigration matters. *See* U.S. Const. art. I, § 8, cl. 4 (Congress has the power to "establish an uniform Rule of Naturalization."); *Arizona v. United States*, 567 U.S. 387, 394 (2012) ("The Government of the United States has broad, undoubted power over the subject of immigration and the status of aliens."). This authority derives from the United States Constitution, numerous acts of Congress, and binding U.S. Supreme Court precedent. *See Arizona*, 567 U.S. at 394. Indeed, Congress strengthened that authority this year with the enactment of the Laken Riley Act, S. 5, 119th Cong. (2025), which "mandates the federal detention of illegal immigrants who are accused of theft, burglary, assaulting a law enforcement officer, and any crime that causes death or serious bodily injury." Press Release, DHS, President Trump Signs the Laken Riley Act in Law (Jan. 29, 2025), https://www.dhs.gov/news/2025/01/29/president-trump-signs-laken-riley-act-law.

24. Accordingly, "Congress [has] the right, as it may see fit, to expel aliens of a particular class, or to permit them to remain," and "has undoubtedly the right . . . to take all proper means to carry out the system which it provides." *Fong Yue Ting v. United States*, 149 U.S. 698,

714 (1893); *see, e.g.*, *Harisiades v. Shaughnessy*, 342 U.S. 580, 588–89 (1952) (explaining that the United States has the "exclusive[]" control over "any policy toward aliens").

25. Thus, the Federal Government has devised an "extensive and complex" statutory scheme for the "governance of immigration and alien status." *Arizona*, 567 U.S. at 395; *see also* The Immigration and Nationality Act ("INA"), 8 U.S.C. §§ 1101, *et seq*.

26. Through this scheme, "Congress has specified which aliens may be removed from the United States and the procedures for doing so." *Arizona*, 567 U.S. at 396. Moreover, Congress has affirmatively outlawed any effort to "conceal, harbor, or shield from detection" any "alien in any place[.]" 8 U.S.C. § 1324(a)(1)(A)(iii); *see also* 18 U.S.C. § 1071 (prohibiting harboring or concealing "any person for whose arrest a warrant or process has been issued under the provisions of any law of the United States").

27. The immigration laws, taken together, codify the Executive's authority to inspect, investigate, arrest, detain, and remove aliens who are suspected of being, or are found to be, unlawfully in the United States. *E.g.*, 8 U.S.C. §§ 1182, 1225, 1226, 1226a, 1227, 1228, 1231, 1357.

28. Indeed, New York itself put it well: "The removal of undocumented immigrants is [an] exclusively federal function," and the Federal Government alone decides "not only *who* may be removed from the United States, but *how* such individuals should be identified, apprehended, and detained." *Amici Br. of New York et al.* at 3, *Arizona v. United States*, No. 11-182, 2012 WL 1054493 (U.S. Mar. 26, 2012).

29. Additionally, "[c]onsultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. "Absent any cooperation at all from

local officials," the immigration system—like other federal programs—"may fail or fall short of [its] goals[.]" *New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999).

30. The immigration laws thus provide for basic principles of cooperation between state and local governments and the Federal Government. *See, e.g.*, 8 U.S.C. § 1226(d)(1)(A) (federal authorities must "make available" to state and local authorities "investigative resources . . . to determine whether individuals arrested by such authorities for aggravated felonies are aliens"); *id.* § 1373(a) (state and local authorities "may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration agencies "information regarding the citizenship or immigration status, lawful or unlawful, of any individual"); *id.* § 1373(b) (similar). State and local governments do not have "an untrammeled right to forbid all voluntary cooperation by [their] officials" with federal immigration authorities. *New York*, 170 F.3d at 35.

## FACTUAL BACKGROUND

### New York's Protect Our Courts Act

31. New York first enacted the POCA in 2020. At the time, the POCA's sponsors explained that "[t]his new law is a powerful rebuke to the outgoing Trump administration and their immigration policies that have undermined our judicial system."[2] More recently, the law's sponsors and supporters have signaled their intent to introduce new legislation to strengthen the POCA and "[r]ais[e] penalties on federal officers" for POCA violations.[3]

---

[2] Brad Hoylman-Sigal, *Senator Brad Holyman Applauds Signing of "Protect Our Courts Act," Protecting Immigrants from Warrantless ICE Arrests When Attending Court Proceedings*, The New York Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our (citation omitted).

[3] *See* Rebecca Lewis, *After Wisconsin judge arrest, NY lawmakers look to strengthen immigrant protections in courthouses*, City & State New York (Apr. 28, 2025), https://www.cityandstateny.com/policy/2025/04/after-wisconsin-judge-arrest-ny-lawmakers-look-strengthen-immigrant-protections-courthouses/404889/ (citation omitted).

32. The POCA provides that "[a] person duly and in good faith attending a court proceeding in which such person is a party or potential witness, or a family or household member is a party or potential witness, is privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding, unless such civil arrest is supported by a judicial warrant or judicial order authorizing such civil arrest." POCA § 28.1.

33. Under the POCA, "family or household member" includes:

   i. persons related by consanguinity or affinity;
   ii. persons legally married to one another;
   iii. persons formerly married to one another regardless of whether they still reside in the same household;
   iv. persons who have a child in common regardless of whether such persons are married or have lived together at any time;
   v. unrelated persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household;
   vi. persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time; and
   vii. any other category of individuals deemed to be a victim of domestic violence as defined by the office of children and family services in regulation.

N.Y. Soc. Serv. Law § 459-a(2).

34. Under the POCA, "[f]actors that may be considered in determining whether a relationship is an 'intimate relationship' include, but are not limited to: the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship. Neither a casual acquaintance nor

ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an 'intimate relationship[.]'" *Id.* § 459-a(2)(f).

35. The POCA defines "civil arrest" as an arrest in which the sole or primary purpose is not to criminally prosecute the person subject to arrest for an alleged violation of state or federal law for which a term of imprisonment is authorized. *See* POCA § 28.6(a)(i).

36. An arrest for a violation of federal law is considered "criminal" only if the violation is one "for which a sentence of a term of imprisonment is authorized by law, and for which federal law requires an initial appearance before a federal judge, federal magistrate or other judicial officer, pursuant to the federal rules of criminal procedure that govern initial appearances[.]" *Id.* § 28.6(a)(i)(B).

37. The POCA also excludes from the definition of "civil arrest" an arrest "for contempt of the court in which the court proceeding is taking place or will be taking place." *Id.* § 28.6(a)(ii).

38. Violations of the POCA, or violations of an order issued by a state judge protecting an individual from civil arrest, expose the violator to criminal and civil liability. *Id.* § 28.2–3.

39. As to criminal liability, willfully arresting someone in violation of the POCA or a court order, or willfully assisting such an arrest, constitutes "contempt of the court and false imprisonment." *Id.* § 28.2.[4]

40. As to civil liability, the POCA authorizes the New York Attorney General and protected individuals to bring a civil action for equitable and declaratory relief, as well as costs

---

[4] Under New York law, criminal contempt and unlawful imprisonment in the first degree are Class E felonies, punishable by up to four years in prison; convictions for those crimes in the second degree are Class A misdemeanors, punishable by up to one year in prison. *See* N.Y. Penal Code §§ 70.00(2)(e), 70.15(1), 135.05, 135.10, 215.51, 215.52.

and attorney's fees, based on reasonable cause to believe that a violation of the POCA has occurred. *Id.* § 28.3–4.

**<u>Executive Orders 170 and 170.1</u>**

41.     On September 15, 2017, then-New York Governor Andrew Cuomo signed Executive Order 170, "State Policy Concerning Immigrant Access to State Services," which prohibits New York officers and employees from, among other activities, "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." Executive Order 170(B)(2).

42.     Executive Order 170 further provides: "Notwithstanding such prohibition, this Order does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." *Id.*

43.     Then-Governor Cuomo amended Executive Order 170 in 2018 through Executive Order 170.1, "State Policy Concerning Immigrant Access to State Services and Buildings." *See* Executive Order 170.1.

44.     Executive Order 170.1 reaffirms the State's policy that New York officers shall not "disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement unless required by law[,]" *see id.* at 1, and further provides that "federal immigration authorities" may not execute civil arrests "within state facilities" absent a judicial warrant or judicial order, "unless the civil arrest is related to a proceeding within such facility," *see id.* at 8.170.1(B).

45.     Executive Order 170.1 defines "state facilit[ies]" to mean "any building, or part thereof, owned or leased by any Affected State Entity," which is in turn defined to mean "(i) all

11

agencies and departments over which the Governor has executive authority, and (ii) all public benefit corporations, public authorities, boards, and commissions for which the Governor appoints the Chair, Chief Executive, or the majority of the Board Members, except the Port Authority of New York and New Jersey." *Id.* § 8.170.1(A)(1)–(2).

### New York's Obstruction of Federal Immigration Enforcement

46. The POCA and the challenged Executive Orders impede federal immigration enforcement in New York because their combined effect is to dictate where federal immigration officers can enforce civil immigration laws and prevent even the most basic coordination and information-sharing between New York law enforcement agencies and federal immigration officers.

47. The civil-arrest restrictions of the POCA and Executive Order 170.1 chill federal immigration enforcement and jeopardize public safety. Because of those restrictions, federal immigration authorities have refrained from apprehending aliens whom those authorities knew had scheduled appearances in New York court related to heinous crimes—including rape, sexual assault, and robbery. Instead, the aliens were paroled or released from state custody into the community. Consequently, federal authorities were required to engage in difficult and dangerous efforts, and needlessly expend significant additional resources, to try to apprehend those aliens in other locations. Many of those aliens still have not been apprehended by federal officials and thus remain at large today.

48. New York has no lawful interest in assisting these illegal aliens' evasion of federal law enforcement.

49. Besides prohibiting civil arrests of individuals while they are actually at or near a state courthouse, the POCA prohibits civil arrests of individuals while they are literally anywhere,

12

so long as they are "going to" or "returning from" a state courthouse. *See* POCA § 28.1. Because it is often impossible for federal authorities to know whether someone is on his or her way to or from a courthouse, or whether the individual is a "family or house member" under the POCA—which is defined broadly to include ex-spouses, former roommates, and anyone who is or ever has been "in an intimate relationship" regardless of co-habitation, *see* N.Y. Soc. Serv. Law § 459-a(iii), (v)-(vi)—federal immigration officials risk criminal and civil liability when carrying out their statutory responsibilities in New York.

50. Moreover, Executive Order 170.1 expands the POCA's civil-arrest restrictions beyond state courthouses to *any* New York state facility. This has similarly prevented ICE from effectuating civil arrests in the safe and controlled environments of government facilities.

51. The Executive Orders' information-sharing restrictions prevent basic coordination between New York and federal officials. Because of those restrictions, New York government divisions and entities do not share arrest reports, investigative reports, officer safety bulletins, or other information that cooperative state jurisdictions typically provide to ICE. As a result, ICE lacks ready access to information showing whether someone is currently under investigation by a New York authority, which can lead to potential conflicts between federal and state law enforcement activities.

52. The information-sharing restrictions also hinder ICE's ability to locate and apprehend criminal aliens in New York, including ICE's ability to apprehend aliens when they report for probation.

53. These restrictions further prevent New York officials from disclosing even basic logistical information, such as whether an alien wanted for violation of civil immigration laws has

been screened by security or is physically present in a state facility, because such information could be construed as "for the purpose of civil immigration enforcement" under the Executive Orders.

54. Accordingly, the challenged laws chill federal immigration activities and threaten the safety of the public—all to provide a safe haven for criminal illegal aliens in New York.

## CLAIMS FOR RELIEF

### COUNT ONE – VIOLATION OF THE SUPREMACY CLAUSE (PREEMPTION)

55. Plaintiff hereby incorporates paragraph 1 through 54 of the Complaint as if fully stated herein.

56. The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

57. New York's POCA and Executive Orders 170 and 170.1 "stand as an obstacle to the accomplishment and execution" of the federal immigration laws and are therefore conflict preempted. *Arizona*, 567 U.S. at 406 (citation omitted). Specifically, the POCA and Executive Order 170.1 purport to dictate the locations in which immigration officers perform their federal functions, including in public areas and areas far from courthouses, thereby impeding those officers' ability to discharge their official duties. *See, e.g.*, 8 U.S.C. §§ 1226a, 1226(c), 1231(a), 1357; *see also* 18 U.S.C. §§ 372, 1071.

58. The POCA's imposition of criminal and civil liability for violations is a further impediment to federal immigration activities. *See Cunningham v. Neagle*, 135 U.S. 1 (1890); *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).

59. Moreover, Executive Orders 170 and 170.1 frustrate the expectation of collaboration reflected in the immigration laws, *see, e.g.*, 8 U.S.C. §§ 1373(a)-(b), 1644, 1357(g)(10)(A)-(B), by barring state and local officials from sharing information with federal immigration officials—even when they wish to do so.

60. Accordingly, the POCA and Executive Orders 170 and 170.1 violate the Supremacy Clause.

### COUNT TWO – VIOLATION OF THE SUPREMACY CLAUSE
### (UNLAWFUL REGULATION OF THE FEDERAL GOVERNMENT)

61. Plaintiff hereby incorporates paragraphs 1 through 60 of the Complaint as if fully stated herein.

62. New York's POCA and Executive Order 170.1 violate the doctrine of intergovernmental immunity by unlawfully regulating the Federal Government. Under the Supremacy Clause, "the activities of the Federal Government are free from regulation by any state." *Mayo*, 319 U.S. at 445.

63. The POCA and Executive Order 170.1 attempt to dictate where federal agents can effectuate arrests, including in public areas, and require immigration officers to obtain judicial warrants where Congress has expressly authorized administrative warrants.

64. The POCA enforces its directives on federal officers through its threat of criminal and civil liability, in violation of federal officers' immunity from suit. *See Neagle*, 135 U.S. at 41; *Tanella*, 374 F.3d at 147.

65. Accordingly, the POCA and Executive Order 170.1 unlawfully regulate the Federal Government in violation of the Supremacy Clause.

## COUNT THREE – VIOLATION OF THE SUPREMACY CLAUSE
## (UNLAWFUL DISCRIMINATION AGAINST THE FEDERAL GOVERNMENT)

66. Plaintiff hereby incorporates paragraphs 1 through 65 of the Complaint as if fully stated herein.

67. Through their information-sharing restrictions, which prevent disclosure of immigration information only to federal immigration authorities, New York's Executive Orders 170 and 170.1 "single[] out" those authorities for disfavored treatment. *See Dawson v. Steager*, 586 U.S. 171, 178 (2019).

68. Such discriminatory targeting of the Federal Government is unlawful under the intergovernmental immunity doctrine. *See, e.g.*, *United States v. Washington*, 596 U.S. 832, 839 (2022) (A "state law discriminates against the Federal Government . . . if it singles them out for less favorable treatment or if it regulates them unfavorably on some basis related to their governmental status." (citations and alterations omitted)).

69. For this additional, alternative reason, Executive Orders 170 and 170.1 violate the Supremacy Clause.

## PRAYER FOR RELIEF

The United States respectfully requests the following relief:

A. That this Court enter a judgment declaring that New York's POCA and Executive Orders 170 and 170.1 violate the Supremacy Clause, and are therefore unlawful and unenforceable;

B. That this Court enter a permanent injunction barring Defendants—as well as any of their successors, agents, or employees—from enforcing New York's POCA and Executive Orders 170 and 170.1;

C. That this Court award the United States its fees and costs in this action; and

D. That this Court award any other relief it deems just and proper.

DATED: June 12, 2025

        BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division
Federal Programs Branch

JOHN A. SARCONE III
United States Attorney
Northern District of New York

ALEXANDER K. HAAS
Director

JACQUELINE COLEMAN SNEAD
Assistant Director

*/s/Cristen C. Handley*
Cristen C. Handley (MO Bar. No. 69114)
Elisabeth J. Neylan (N.Y. Bar Reg. No. 6125736)
Trial Attorneys
United States Department of Justice
Civil Division, Federal Programs Branch
1100 L St. NW
Washington, DC 20005
Tel:  (202) 305-2677
Fax:  (202) 616-8460
E-mail:  Cristen.Handley@usdoj.gov

*Attorneys for the United States*