UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

                    Plaintiff,

             v.

STATE OF NEW YORK; KATHLEEN HOCHUL,
Governor of New York, in her Official Capacity;
LETITIA A. JAMES, Attorney General of New York,
in her Official Capacity,

                    Defendants.

No. 25-cv-744 (MAD) (PJE)

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

LETITIA JAMES
*New York State Attorney General*
28 Liberty Street
New York, New York 10005

LINDA FANG
  *Special Litigation Counsel*
       *of Counsel*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ ii

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF THE CASE ........................................................................................ 3

    I.        STATUTORY AND REGULATORY FRAMEWORK ........................................... 3

        A.    New York's Common Law Privilege Against Civil Courthouse Arrests ................. 3

        B.    The Legislature Further Codifies New York's Common Law Privilege to
               Protect its Court System ......................................................................................... 3

        C.    The Governor Issues Executive Orders to Protect the State's Interests .................. 6

    II.       PROCEDURAL HISTORY ..................................................................................... 7

        A.    Prior Judgment Enjoining ICE's Courthouse Arrests ............................................ 7

        B.    This Lawsuit ........................................................................................................... 8

STANDARD OF REVIEW ............................................................................................. 9

ARGUMENT .................................................................................................................. 10

    I.        THE CHALLENGED STATE LAWS AND EXECUTIVE ORDERS
             ARE NOT PREEMPTED BY FEDERAL LAW ................................................... 10

        A.    The Federal Immigration Laws Do Not Contain Any Clear Statement of
               Congressional Intent to Displace the State's Police Powers or Longstanding
               State Common Law Protections Against Civil Courthouse Arrests ....................... 11

        B.    The State's Executive Orders Protecting Its Facilities and Directing State
               Officials to Refrain from Assisting with Federal Immigration Enforcement
               Do Not Pose Any Obstacle to Federal Law ........................................................... 17

    II.       THE SUBJECT STATE LAWS AND EXECUTIVE ORDERS
             DO NOT VIOLATE THE INTERGOVERNMENTAL IMMUNITY
             DOCTRINE ............................................................................................................ 21

CONCLUSION ............................................................................................................... 25

## TABLE OF AUTHORITIES

**Cases**                                                                                        **Page(s)**

*Adderley v. State of Fla.*, 385 U.S. 39 (1966) ............................................................................ 17

*Antonyuk v. James*, 120 F. 4th 941 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025) ...... 15, 16

*Arizona v. United States*, 567 U.S. 387 (2012) ........................................................................ 10

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ...................................................................................... 9

*Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281 (1970) .................................. 11

*Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338 (2006) .................................................................. 11

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ........................................................................ 9

*City of Chicago v. Sessions*, 888 F.3d 272 (7th Cir. 2018) .................................................... 12, 19

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018) ............................................................ 20

*City of New York v. United States*, 179 F.3d 29 (2d Cir. 1999) .................................................... 17

*City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289 (E.D. Pa. 2018) ...................................... 18

*CoreCivic, Inc. v. Governor of N.J.*, __ F.4th __,
   2025 WL 2046488 (3d Cir. July 22, 2025) ............................................................................ 22

*County of Ocean v. Grewal*, 475 F. Supp. 355 (D.N.J. 2020), *aff'd by
   Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*,
   8 F.4th 176 (3d Cir. 2021)* ................................................................................................ 19

*Davis v. Michigan Dep't of Treasury*, 489 U.S. 803 (1989) ...................................................... 22

*Dawson v. Steager*, 586 U.S. 171 (2019) .................................................................................. 23

*Doe v. U.S. Immigration & Customs Enforcement*,
   490 F. Supp. 3d 672 (S.D.N.Y. 2019) ............................................................................ passim

*Gregory v. Ashcroft*, 501 U.S. 452 (1991) ................................................................ 10, 11, 12, 14

*Hale v. Wharton*, 73 F. 739 (C.C.W.D. Mo. 1896) .................................................................... 13

*Hines v. Davidowitz*, 312 U.S. 52 (1941) .................................................................................. 10

**Cases**                                                                                                          **Page(s)**

*Kaufman v. Kaye*, 466 F.3d 83 (2d Cir. 2006) ................................................................ 11

*Marsh v. Rosenbloom*, 499 F.3d 165 (2d Cir. 2007) ........................................................ 10

*McHenry Cnty. v. Raoul*, 44 F.4th 581 (7th Cir. 2022) ..................................... 21, 24, 25

*Murphy v. National Collegiate Athletic Ass'n.*, 584 U.S. 453 (2018) .......................... 10

*New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*,
    514 U.S. 645 (1995) ...................................................................................................... 11

*New York State Telecomms. Ass'n., Inc. v. James*, 101 F.4th 135 (2d Cir. 2024) ....................... 11

*New York v. United States*, 505 U.S. 144 (1992) .......................................................... 17

*North Dakota v. United States*, 495 U.S. 423 (1990) .............................................. 21, 22

*Parker v. Marco*, 136 N.Y. 585 (1893) .......................................................... 3, 12, 13, 16

*Person v. Grier*, 66 N.Y. 124 (1876) .............................................................. 3, 12, 13, 16

*Printz v. United States*, 521 U.S. 898 (1997) ................................................................ 20

*Ryan v. U.S. Immigration & Customs Enforcement*, 974 F.3d 9 (1st Cir. 2020).............. 11, 15, 16

*State of New York v. U.S. Immigration & Customs Enforcement*,
    431 F. Supp. 3d 377 (S.D.N.Y. 2019) .................................................................... passim

*State of New York v. U.S. Immigration & Customs Enforcement*,
    466 F. Supp. 3d 439 (S.D.N.Y. 2020) ................................................................ 4, 8, 16

*State of New York v. U.S. Immigration & Customs Enforcement*,
    No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023) ............................................ 8

*Stewart v. Ramsay*, 242 U.S. 128 (1916) ...................................................................... 13

*Texas v. U.S. Dep't of Homeland Security*, 123 F.4th 186 (5th Cir. 2024) ................................ 22

*United States Forest Serv. v. Cowpasture River Pres. Ass'n.*, 590 U.S. 604 (2020).................... 14

*United States v. California*, 314 F. Supp. 3d 1077 (E.D. Cal. 2018)..................................... 21, 23

*United States v. California*, 921 F.3d 865 (9th Cir. 2019)....................................................... passim

**Cases**                                                                    **Page(s)**

*United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010).......................... 24

*United States v. Salerno*, 481 U.S. 739 (1987) .......................................... 17

*United States v. State of Illinois*, No. 25-cv-1285,
    2025 WL 2098688 (N.D. Ill. July 25, 2025) ..................................... passim

*United States v. Texas*, 507 U.S. 529 (1993) ....................................... 11, 15

*Velazquez-Hernandez v. U.S. Immigration & Customs Enforcement*,
    500 F. Supp. 3d 1132 (S.D. Cal. 2020) ............................................ 14

*VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179 (2d Cir. 2010) .......................... 17

*Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863 (W.D. Wash. 2020) ............ 15

*Washington v. United States*, 460 U.S. 536 (1983) ....................................... 23

*Wyeth v. Levine*, 555 U.S. 555 (2009) ............................................... 11

**Statutes**

8 U.S.C. § 1226.................................................................... 14

8 U.S.C. § 1357............................................................... 14, 20, 24

8 U.S.C. § 1373.................................................................... 19

8 U.S.C. § 1644.................................................................... 19

Civil Rights Law § 28........................................................... 5, 12, 16

Civil Rights Law §§ 23-27............................................................ 3

Judiciary Law § 212.............................................................. 5, 6

Judiciary Law § 4-a............................................................... 6

**Other Authorities**

Assembly's Mem. in Support, *in* Bill Jacket for ch. 322 (2020) ........................ 4, 5, 12

Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the
    Crimmigration Crisis*, 127 Yale L. J. Forum 410 (Oct. 24, 2017)..................... 13, 16

**Other Authorities**                                                              **Page(s)**

ICE Out of Our Courts Coalition, *Safeguarding the Integrity of Our Courts:*
    *The Impact of ICE Courthouse Operations in New York State* ................................................ 4

New York State Bar Ass'n., Memorandum Urging Enactment, dated Oct. 13, 2020,
    *in* Bill Jacket for ch. 322 (2020) ................................................................................................ 4

The Federalist Papers No. 28 (C. Rossiter ed. 1961) .................................................................. 10

**Regulations**

Exec. Order No. 170, 9 N.Y.C.R.R. § 8.170 (2017) ........................................................ 6, 7, 18, 20

Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1 (2018) ........................................................ 7, 17

**Constitutional Provisions**

N.Y. Const. art. XXXV (1777) .................................................................................................... 3

## PRELIMINARY STATEMENT

In 2020, the New York Legislature codified the State's longstanding common law privilege prohibiting civil courthouse arrests of parties and witnesses by enacting the Protect Our Courts Act ("POCA"), Ch. 322, Laws of 2020. It did so to protect the effective functioning of the State's court system—a core aspect of the State's sovereignty—in response to direct and significant harms caused by federal immigration authorities' targeted use of state courthouses for civil immigration arrests. These harms included a decreased reporting and prosecuting of crime due to witnesses' and victims' reluctance to access the justice system, and a drain on scarce judicial resources caused by civil immigration arrests that disrupted court proceedings and impaired court functions. For similar reasons, New York's Governor issued executive orders in 2017 and 2018 prohibiting civil immigration arrests in state facilities, such as hospitals and schools, absent a judicial warrant or order, and directing state employees to refrain from involvement with federal civil immigration enforcement unless required by law, and focus on their state-law duties.

Plaintiff now seeks to invalidate these state-law provisions and executive orders based on sweeping theories of conflict preemption and intergovernmental immunity, and plaintiff's apparent view that federal officials have unfettered authority to seize noncitizens wherever they may be and may freely commandeer state facilities and personnel to do so. These claims make no allowance for New York's sovereign interests, seek to evade Tenth Amendment's prohibitions, and have no basis in law. This Court should accordingly reject them and dismiss the complaint in its entirety.

First, the provisions of POCA and the executive orders challenged here do not conflict with federal law and are not preempted. No provision of the federal immigration laws evinces the necessary clear congressional intent to displace the State's sovereign authority to protect the

effective operations of its judicial system and its facilities from undue disruption, and to prescribe the duties of its employees. Nor do the federal immigration laws contain any clear statement of Congress's intent to abrogate New York's settled common law privilege against civil courthouse arrests, one which has long protected parties and witnesses from civil arrests in court and while traveling to and from. As other courts in New York have already concluded, the State's common law privilege applies with full force to civil immigration arrests, and Congress's silence as to whether civil immigration arrests may occur in or near state courthouses did not displace these common law protections. *See State of New York v. U.S. Immigration & Customs Enforcement*, 431 F. Supp. 3d 377, 389 (S.D.N.Y. 2019) (Rakoff, J.); *Doe v. U.S. Immigration & Customs Enforcement*, 490 F. Supp. 3d 672, 690 (S.D.N.Y. 2019) (Nathan, J.). It thus follows that POCA's codification of this common law rule is likewise not preempted by federal law. And the State's constitutionally permissible determination that the State's interests are best served by not involving its officials in civil immigration enforcement cannot be invalidated under preemption principles.

Second, the challenged state laws and executive orders do not violate the intergovernmental immunity doctrine. The restrictions are narrowly tailored to protect the State's sovereign interests and do not regulate the federal government because immigration authorities have ample options for conducting civil immigration arrests aside from the protected places identified by POCA and the civil-arrest executive order. That the challenged provisions may make federal immigration enforcement activities more burdensome than they would be with state assistance fails to state an intergovernmental immunity claim. Where the Tenth Amendment affords the State the option to decline to assist in enforcing the federal immigration laws, this Court should reject plaintiff's attempt to use the intergovernmental immunity doctrine as an end run around the Tenth Amendment's anticommandeering proscriptions.

## STATEMENT OF THE CASE

### I.    STATUTORY AND REGULATORY FRAMEWORK

#### A.    New York's Common Law Privilege Against Civil Courthouse Arrests

New York law has long recognized a privilege "to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home." *Person v. Grier*, 66 N.Y. 124, 125 (1876). This privilege originates from English common law, *see Orchard's Case* (1828) 38 Eng. Rep. 987, 987, and "was adopted into American common law after independence," *State of New York v. U.S. Immigration & Customs Enforcement*, 431 F. Supp. 3d 377, 389 (S.D.N.Y. 2009) ("*State of New York I*"). *See* N.Y. Const. art. XXXV (1777) (adopting English common law). The privilege serves the dual purposes of protecting the "authority and dignity" of the court, and encouraging individuals to come forward voluntarily, both of which were deemed necessary "to promote the due and efficient administration of justice." *Parker v. Marco*, 136 N.Y. 585, 589 (1893) (citing *Person*, 66 N.Y. at 125).

Over time, New York courts have "enlarged the right of the privilege" to cover not just disruptive civil arrests but also the service of summons, and extended the privilege to residents and non-residents alike "during their attendance at court and for a reasonable time in going and returning." *Parker*, 136 N.Y. at 589. In 1909, the New York Legislature codified portions of the privilege in article 3 of the Civil Rights Law, prohibiting civil arrests of persons in "civil actions or special proceedings" and of witnesses "while going to, remaining at, and returning from" legal proceedings. *See* Civil Rights Law §§ 23-27.

#### B.    The Legislature Further Codifies New York's Common Law Privilege to Protect its Court System

Prior to 2017, the U.S. Immigration and Customs Enforcement ("ICE") generally prohibited its officials from engaging in civil enforcement action at courthouses except in "very

limited circumstances." *State of New York v. U.S. Immigration & Customs Enforcement*, 466 F. Supp. 3d 439, 441 (S.D.N.Y. 2020) ("*State of New York II*"). ICE departed from that policy in 2017, after the start of the first Trump administration. *See id.* at 442 (recounting ICE's changed policy). As a result of this policy change, civil immigration arrests at state courthouses in New York increased some 1200% over three years. Assembly's Mem. in Support, *in* Bill Jacket for ch. 322 (2020), at 8. This startling rise in civil courthouse arrests unsurprisingly "instilled significant fear in immigrant communities across New York State" and caused New Yorkers to be "afraid to access the justice system or respond to court summonses" regardless of their immigration status. *See id.*

In 2020, the Legislature responded to the damaging impact of ICE's new policies targeting state courthouses by further codifying New York's longstanding civil arrest privilege in POCA. The legislative record was replete with evidence of the concrete harms caused by ICE's courthouse arrests: a decrease in crime reporting and use of legal services; an increase in disruptions and delays to court proceedings; a growing reluctance by victims and witnesses to attend court proceedings; and an increasing difficulty in bringing criminal prosecutions as reported by local prosecutors. *See, e.g.*, New York State Bar Ass'n., Memorandum Urging Enactment, dated Oct. 13, 2020 at 13-14, *in* Bill Jacket for ch. 322 (2020); ICE Out of Our Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* at 7-17, 21-45, 48-63 (detailing negative impacts of ICE courthouse operations on victims of crime and domestic violence, prosecutors, and public defenders), *available at* https://tinyurl.com/yc6j977p (last visited Aug. 2, 2025). There was also ample evidence before the Legislature that civil courthouse immigration arrests increased burdens for state courts and court staff, by requiring adjournments when witnesses or parties failed to appear, and expenditure of resources by court

4

staff to address "otherwise unnecessary disruptions" caused by the civil arrests. *See* Br. of Former Judges as Amicus Curiae at 12-13 & nn. 37-38 (citing reports that more than half of judges surveyed nationwide reported disruptions and recounting "drain on scarce judicial resources" as a result from ICE arrests), *filed as* ECF No. 34 *in State of New York v. U.S. Immigration & Customs Enforcement*, No. 19-cv-8876 (S.D.N.Y.). Moreover, other accounts found that the prevalence of ICE courthouse arrests severely eroded public trust in the judicial system, as many individuals reported believing that state judges and prosecutors "were helping ICE to arrest people." *Id.* at 8 & n.16.

To protect "the operations of [the State's] judicial system," and "to promote public safety," the Legislature amended provisions of the Civil Rights Law and the Judiciary Law through POCA. *See* Assembly's Mem. in Support, *in* Bill Jacket for ch. 322 (2020), at 8. POCA amended the Civil Rights Law to provide that individuals attending a court proceeding, including a party, witness, or "a family member or household member [who] is a party or potential witness," are "privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding." Civil Rights Law § 28(1). The civil arrest prohibition does not apply to arrests authorized by a judicial warrant or order. *Id.* POCA further provides that willful violations of the civil-arrest prohibition, including willful assistance of a prohibited civil arrest, constitutes "contempt of court and false imprisonment," *id.* § 28(2), and authorizes private parties and the Attorney General to enforce the prohibitions through civil actions for "equitable and declaratory relief," *id.* § 28(3)(a)-(b).

POCA separately amended the Judiciary Law by directing the chief administrator of the State's unified court system to promulgate rules for administering POCA's protections. *See* Judiciary Law § 212(aa). For example, court officials must require "any representative of a law

enforcement agency" to identify themselves when entering a state courthouse for any purpose related to their official duties and must document "every enforcement action taken inside the courthouse." *Id.* § 212(aa)(i)(A), (B), (F). Recognizing that all arrests have the potential for disrupting court proceedings, POCA further directed state court officials to promulgate rules prohibiting *any* arrest "by a representative of a law enforcement agency in a courtroom" except in "extraordinary circumstances" or with leave of court. *Id.* § 212(aa)(i)(D). POCA also empowers judges "to issue appropriate judicial orders to protect the privilege from civil arrest, in accordance with article 3 of the civil rights law," "[i]n order to maintain access to the court and open judicial proceedings for all persons . . . and to prevent interference with the needs of judicial administration." *Id.* § 4-a.

### C.    The Governor Issues Executive Orders to Protect the State's Interests

On September 15, 2017, then-Governor Andrew Cuomo issued Executive Order No. 170. Exec. Order No. 170, 9 N.Y.C.R.R. § 8.170 (2017). To build trust with immigrant communities, and in recognition that "the reporting of unlawful activity by immigrant witnesses and victims is critical to strengthening ties between immigrants and law enforcement, reducing crime, and enhancing the State's ability to protect the safety of all of its residents," Executive Order 170 directs state law enforcement officers to refrain from inquiring about an individual's immigration status unless "such inquiry is relevant to the [criminal] illegal activity under investigation." *Id.* § 8.170(B)(3). The Order also prohibits state law enforcement officers from using state "resources, equipment or personnel for the purpose of" investigating or arresting individuals "suspected or wanted only for violating a civil immigration offense." *Id.* § 8.170(B)(3)(b). Executive Order 170 similarly directs other state employees not to inquire about an individual's immigration status unless the status "is necessary to determine [the individual's] eligibility for a program, benefit, or

the provision of a service." *Id.* § 8.170(B)(1). And the directive prohibits state officers and employees from disclosing personal, non-immigration status information about individuals "to federal immigration authorities for the purpose of federal civil immigration enforcement," unless the disclosure is required by law, and clarifies that the Order does not prevent state employees from sharing or receiving "citizenship or immigration status" information about any individual. *Id.* § 8.170(B)(2).

On April 25, 2018, then-Governor Cuomo issued Executive Order 170.1, in response to federal immigration authorities' increased targeting of sensitive places for enforcement activities and the corresponding "chilling effect" on residents' access to state programs, benefits, and services. Exec. Order No. 170.1, 9 N.Y.C.R.R. § 8.170.1 (2018). Based on the State's "recognized interest in maintaining the safety and security of its facilities to ensure that all residents have equal access to State programs, benefits, and services," Executive Order 170.1 provides that civil arrests by federal immigration authorities may be made "within state facilities," such as state hospitals, schools, and government offices, only when authorized by a judicial warrant or order, or where the arrest "is related to a proceeding [occurring] within such facility." 9 N.Y.C.R.R. § 8.170.1(B).

## II.    PROCEDURAL HISTORY

### A.    Prior Judgment Enjoining ICE's Courthouse Arrests

In 2019, the State of New York and Eric Gonzalez, the Kings County District Attorney, commenced a suit in the U.S. District Court for the Southern District of New York to enjoin ICE's changed policy of permitting civil immigration arrests of noncitizens and their family members in state courthouses. The suit asserted claims under the Administrative Procedures Act and the Tenth Amendment.

The district court denied ICE's motion to dismiss: it concluded that a common law

privilege against civil courthouse arrests existed, and expressly rejected ICE's claim that the federal immigration laws had abrogated that common law privilege. *See State of New York I*, 431 F. Supp. 3d at 392-93. Following discovery, upon the parties' cross motions for summary judgment, Judge Rakoff found that ICE's policy of conducting civil courthouse arrests was "illegal" because it exceeded ICE's statutory authority, which did not include the power to conduct civil courthouse arrests. *State of New York II*, 466 F. Supp. 3d at 449-50. The court then permanently enjoined "ICE from conducting any civil arrests on the premises or grounds of New York State courthouses, as well as such arrests of anyone required to travel to a New York State courthouse as a party or witness to a lawsuit." *Id.*

ICE appealed to the Second Circuit but "formally revoked" the enjoined policy before the appeal was heard. *See* Letter from T. Onozawa, dated Jan. 20, 2023, *filed as* ECF No. 122 *in State of New York v. U.S. Immigration & Customs Enforcement*, No. 20-2622 (2d Cir.). Upon the request of the parties, the circuit dismissed the appeal "as moot and/or waived," vacated the judgment below, and directed that the trial court dismiss the case. *State of New York v. U.S. Immigration & Customs Enforcement*, No. 20-2622, 2023 WL 2333979, at *1 (2d Cir. Feb. 28, 2023).

The Legislature enacted POCA after the district court's grant of summary judgment in favor of plaintiffs and before the Second Circuit dismissed ICE's appeal.

**B.    This Lawsuit**

Prior to May 27, 2025, ICE's policies expressly acknowledged and abided by state-law protections and restrictions on civil arrests in or near courthouses. For example, ICE specifically recognized that a civil immigration arrest may be carried out in or near a courthouse in certain cases only "where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." *See* Memorandum from Caleb Vitello, Acting Director of

ICE, dated Jan. 21, 2025 at 2, *available at* https://tinyurl.com/tcfsdt5a (last visited Aug. 2, 2025). *See* Compl. ¶ 1 (referencing memo). On May 27, 2025, however, this policy was modified and the specific provision barring civil immigration arrests prohibited by state law was removed. *Compare* Memorandum from Todd M. Lyons, Acting Director of ICE, dated May 27, 2025 at 2, *available at* https://tinyurl.com/389vfxsj (last visited Aug. 2, 2025) *with* Vitello Memorandum at 2, *supra*.

Shortly thereafter, on June 12, 2025, plaintiff commenced the instant action in this Court seeking to invalidate and enjoin POCA and Executive Orders 170 and 170.1, purportedly based on preemption (Count I) and the intergovernmental immunity doctrine (Counts II (challenging POCA and Executive Order 170.1) and III (challenging Executive Orders 170 and 170.1)). The gist of plaintiff's claims is that POCA's prohibitions on civil courthouse arrests and the Executive Orders "impede federal immigration enforcement in New York," and are thus invalid under the Supremacy Clause. Compl. ¶¶ 46, 57. The complaint names the State of New York, and Governor Kathy Hochul and Attorney General Letitia James, in their respective official capacities, as defendants. Plaintiff seeks a declaration invalidating POCA and Executive Orders 170 and 170.1 in their entireties, and an injunction barring their enforcement. *Id.* at 16.

## STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, the pleading must contain sufficient factual allegations which state a facially plausible claim for relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A claim is "plausible on its face" when it is supported by enough "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). In the context of a Rule 12(b)(6) motion, courts must generally accept all well-pled factual allegations as true but need not credit conclusory statements or legal conclusions. *See Iqbal*, 556 U.S. at 678.

**ARGUMENT**

I.    **THE CHALLENGED STATE LAWS AND EXECUTIVE ORDERS ARE NOT PREEMPTED BY FEDERAL LAW**

Federalism, a central tenet of the Constitution, is grounded in the concept that both federal and state governments "have elements of sovereignty the other is bound to respect." *Arizona v. United States*, 567 U.S. 387, 398-99 (2012). The Constitution's structure of dual sovereigns, like "the separation and independence of the coordinate branches of the Federal Government," was intended by the Founders as a further check against "the risk of tyranny and abuse from either front." *Gregory v. Ashcroft*, 501 U.S. 452, 458-59 (1991) (quoting The Federalist Papers No. 28, pp. 180-81 (C. Rossiter ed. 1961)). Where each sovereign enacts laws that conflict, the Constitution's Supremacy Clause operates as a "rule of decision," preempting the conflicting state law in favor of a validly enacted federal law. *Murphy v. National Collegiate Athletic Ass'n.*, 584 U.S. 453, 477 (2018).

The only theory of preemption asserted by plaintiff in this case is the obstacle branch of conflict preemption. *See* Compl. ¶¶ 46, 57-59. This theory of preemption requires plaintiff to demonstrate that "state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). To invalidate a state enactment based on conflict preemption "in areas of law traditionally occupied by the states," however, "the conflict between state law and federal policy must be a 'sharp' one." *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007).

Here, plaintiff alleges that POCA and the executive orders "imped[e]" federal officers' discharge of their official duties, and "frustrate the expectation of collaboration reflected in the immigration laws." Compl. ¶¶ 57-59. Plaintiff's conclusory allegations cannot withstand a motion to dismiss because there exists no conflict—sharp or otherwise—between the challenged state laws

10

and executive orders and the federal immigration laws enacted in the Immigration and Nationality Act ("INA").

> **A.**  **The Federal Immigration Laws Do Not Contain Any Clear Statement of Congressional Intent to Displace the State's Police Powers or Longstanding State Common Law Protections Against Civil Courthouse Arrests**

Courts have consistently recognized that there is a general presumption against preemption. *See, e.g.*, *New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co.*, 514 U.S. 645, 654 (1995). This presumption "is especially strong" with respect to state laws that implicate a State's traditional police powers, *see Balbuena v. IDR Realty LLC*, 6 N.Y.3d 338, 356 (2006), and is only overcome where Congress's intent to preempt is "clear and manifest," *New York State Telecomms. Ass'n., Inc. v. James*, 101 F.4th 135, 148 (2d Cir. 2024) (quoting *Wyeth v. Levine*, 555 U.S. 555, 565 (2009)) (cleaned up); *Gregory*, 501 U.S. at 460 (Congress's ability to "legislate in areas traditionally regulated by the States" is "an extraordinary power" that courts "must assume Congress does not exercise lightly"). Separately, courts must further presume that Congress intends to incorporate and retain "long-established and familiar" state common law principles intact unless a statute "speak[s] directly to the question addressed by the common law." *United States v. Texas*, 507 U.S. 529, 534 (1993) (cleaned up). Both of these settled presumptions compel the dismissal of plaintiff's preemption challenge to POCA.

The provisions of POCA challenged here are presumed to be valid because they concern the State's rights to manage its "judicial systems for the decision of legal controversies"—a core feature of its inherent sovereignty. *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285 (1970); *Ryan v. U.S. Immigration & Customs Enforcement*, 974 F.3d 9, 30 (1st Cir. 2020) ("the operation of a functioning judiciary is unmistakably a fundamental exercise of state sovereignty"); *Kaufman v. Kaye*, 466 F.3d 83, 87 (2d Cir. 2006) (a State has the right to manage

"the internal workings" of its courts without federal interference).

POCA's provisions prohibit the civil arrests of parties and potential witnesses, except where such arrests are authorized by a judicial warrant or order, "while going to, remaining at, and returning from" state court proceedings. Civil Rights Law § 28(1). These protections were enacted to protect the State's "compelling" interest in its judicial system. *See Gregory*, 501 U.S. at 472. The legislative record contains ample evidence of the serious impairments experienced by the State's judicial system from disruptive civil courthouse arrests that were intended to be remedied by POCA. *See* supra at 4-5. The Legislature further determined that public safety is enhanced by protecting parties and witnesses from civil arrests in connection with their attendance at court proceedings, to encourage victims and witnesses to come forward to participate in the justice system. Assembly Mem. in Supp., *in* Bill Jacket for ch. 322 (2020), at 8; *see also City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018) (noting that fear among immigrant communities that any contact with government officials "will bring the scrutiny of federal immigration authorities" may deter crime reporting). Indeed, ICE's own prior policies urging discretion in conducting enforcement activities expressly acknowledged the potential that such activities may "deter[] individuals from reporting crimes and from pursuing actions to protect their civil rights." *See* Memorandum from John Morton, Director of ICE, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs* at 2, dated June 17, 2011, *filed as* ECF No. 27-3 *in State of New York*, No. 19-cv-8876 (S.D.N.Y.).

Furthermore, the challenged provisions of POCA are separately presumed to be valid because they codified New York's "very ancient" privilege protecting parties and witnesses from civil arrests in courthouses, and while traveling to and from court proceedings. *See Parker*, 136 N.Y. at 589; *Person*, 66 N.Y. at 125 ("It is the policy of the law to protect suitors and witnesses

from arrests upon civil process while coming to and attending the court and while returning home."). By the beginning of the twentieth century, "the exemption of persons from the writ of arrest and of summons while attending upon courts of justice, either as witnesses or suitors," was "firmly rooted in the jurisprudence of the United States." *Hale v. Wharton*, 73 F. 739, 740 (C.C.W.D. Mo. 1896) (collecting cases); *Stewart v. Ramsay*, 242 U.S. 128, 130-31 (1916) (recounting that courts have "consistently sustained" the civil arrest privilege, which "is founded in the necessities of the judicial administration"); *see also* Christopher N. Lasch, *A Common-Law Privilege to Protect State and Local Courts During the Crimmigration Crisis*, 127 Yale L. J. Forum 410, 424-31 (Oct. 24, 2017) (discussing historical origins of privilege). So too in New York.

At common law, the privilege served two purposes. First, prohibiting disruptive civil arrests was "necessary for the maintenance of [the court's] authority and dignity and in order to promote the due and efficient administration of justice." *Parker*, 136 N.Y. at 589; *State of New York I*, 431 F. Supp. 3d at 389 (civil arrest privilege served "to enable courts to function properly"). Second, the privilege served to encourage parties to come forward, as without it, "[w]itnesses might be deterred, and parties prevented from attending, and delays might ensue or injustice be done." *Person*, 66 N.Y. at 126. Both of these purposes are implicated by civil immigration arrests, which, as the legislative record shows, had precisely the detrimental impacts sought to be addressed by the common law civil arrests privilege. *See* supra at 4-5 (discussing evidence that ICE's targeting of state courthouses for civil arrest activity discouraged voluntary witness and victim participation, and impaired state court functioning).

When Congress enacted the INA in 1952, *Doe*, 490 F. Supp. 3d at 679, it did so against the backdrop of New York's longstanding common law privilege. And yet, nothing in the INA evinces any congressional content—let alone a clear and manifest one—to displace the State's settled

common law privilege or its exercise of police powers over the management of its courts. Neither of the INA's general provisions authorizing ICE civil arrests, *see* 8 U.S.C. §§ 1226, 1357, refers to state courthouses. But Congress did, in one of these same provisions, expressly empower ICE officials to conduct warrantless searches of vessels, vehicles, and *private* lands, exclusive of dwellings, within close proximity to "any external boundary of the United States." *Id.* § 1357(a)(3). Congress's use of explicit language authorizing ICE activity on otherwise protected private property in certain locations shows that it knows how to speak clearly when it intends to displace conflicting protections. *See Velazquez-Hernandez v. U.S. Immigration & Customs Enforcement*, 500 F. Supp. 3d 1132, 1143-44 (S.D. Cal. 2020) (noting that Congress granted permission to immigration officers "to enter private lands" close to the border but did not expressly authorize arrests in courthouses). Congress's silence on the location of civil immigration arrests via-a-vis state courthouses thus plainly cannot suffice as a "clear statement" of Congress's intent to displace the State's established police powers in these areas. *See Gregory*, 501 U.S. at 461; *United States Forest Serv. v. Cowpasture River Pres. Ass'n.*, 590 U.S. 604, 621-22 (2020) ("Our precedents require Congress to enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power").

This congressional silence has also led several courts to conclude that the INA did not preempt, but rather incorporated, longstanding state common law protections against civil courthouse arrests. *E.g.*, *State of New York I*, 431 F. Supp. 3d at 392; *Doe*, 490 F. Supp. 3d at 492 ("Because the INA provides *no* indication that Congress intended to abrogate the common law privilege against civil courthouse arrests—let alone an 'unmistakably clear' one—the Court concludes that 'the statute incorporates the privilege.'") (emphasis in original); *Velazquez-Hernandez*, 500 F. Supp. 3d at 1143-44 (Congress intended to retain common law rules against

civil courthouse arrests in the INA); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 879 n.21 (W.D. Wash. 2020) ("Defendants have not identified any provision of the INA indicating a Congressional intent to displace the state common-law privilege"); *see also Texas*, 507 U.S. at 535 (congressional silence on subject of common law "falls far short of an expression of legislative intent to supplant the existing common law in that area"). Indeed, based on the weight of the consistent authorities recognizing the privilege and the important policies underlying it, the two courts to have squarely considered the question both concluded that New York's common law civil arrest privilege applies to federal civil immigration arrests, and that these protections were not preempted by the INA. *State of New York I*, 431 F. Supp. 3d at 388-91; *Doe*, 490 F. Supp. 3d at 690. Both these cases pre-dated POCA's enactment. Here, since POCA codified the State's longstanding common law civil courthouse arrest privilege, it necessarily follows that the INA does not conflict with, and thus does not preempt, POCA's protections.

The only case suggesting the contrary, *Ryan v. U.S. Immigration & Customs Enforcement*, does not warrant a different result. 974 F.3d 9 (1st Cir. 2020). *Ryan* concerned a challenge brought by a group of local prosecutors in Massachusetts to the same ICE courthouse arrest policy at issue in *State of New York* and *Doe*. There, the First Circuit reversed the district court's grant of a preliminary injunction against enforcement of the ICE policy, based on its conclusion that the absence of any historical precedents showing that the common law privilege clearly applied to civil arrests conducted by the government meant that no such privilege likely existed. *Id.* at 24-26. But, the Second Circuit has been clear that the lack of historical evidence of disputes about the lawfulness of a particular prohibition does not compel the inference that the prohibition was improper. *See Antonyuk v. James*, 120 F. 4th 941, 971-72 (2d Cir. 2024), *cert. denied*, 145 S. Ct. 1900 (2025) (lack of similar historical regulations not dispositive in Second Amendment analysis).

Rather, an equally plausible inference from an absence of precedent is that the legality of the prohibition was sufficiently settled such that no one sought to dispute it. *Id.* at 972. Applied here, the Second Circuit's *Antonyuk* holding supports the conclusions reached by the district courts in *State of New York* and *Doe.*

Additionally, the *Ryan* court expressly declined to reach the dispositive question of whether the INA contains "a clear statement of Congress's intent to interfere with Massachusetts' sovereign decision to protect individuals attending court on official business from civil arrests," and remanded to the district court for factfinding because the record was undeveloped as to what Massachusetts' policy on courthouse arrests was. *Ryan*, 974 F.3d at 29-31. Here, in contrast, New York's policy in protecting individuals from civil courthouse arrests and civil arrests in state facilities is clear and unambiguous, as evinced by POCA and Executive Order 170.1. *Ryan* is thus of no assistance to plaintiffs in avoiding dismissal. *See Doe*, 490 F. Supp. 3d at 692 & n.3 (rejecting ICE's preemption claim notwithstanding *Ryan*, as *Ryan* did not reach preemption question).

Finally, plaintiff is not aided by its complaints (Compl. ¶ 49) about the breadth of POCA's restrictions and purported uncertainty about how the statute would apply in hypothetical situations.[1] These criticisms do not further plaintiff's preemption claim because they have no

---

[1] POCA's language prohibiting civil arrests of parties and potential witnesses, including family members who might be parties or witnesses, "while going to, remaining at, and returning from" a court proceeding merely mirrors common law protections. Civil Rights Law § 28(1); *Person*, 66 N.Y. at 125 (common law privilege from "arrests upon civil process while coming to and attending the court and while returning home"); *State of New York II*, 466 F. Supp. 3d at 447 (state common law protects against "civil immigration arrests for those present in New York state courthouses, or on courthouse grounds, or necessarily traveling to or from court proceedings"). Ample precedents exist expounding on the extent of the common law's protections to guide a future court's application of POCA's terms. *See, e.g.*, *Parker*, 136 N.Y. at 589 (party protected from arrest at his hotel when beginning his travel home after deposition); Lasch, *Common-Law Privilege*, 127 Yale L. J. Forum at 424-25 (collecting cases showing "the liberality with which" the traveling to and from part of the privilege was interpreted in the common law).

bearing on the relevant question of whether the INA contains the requisite clear statements of congressional intent to displace state law. *See* supra at 11-15. Questions about how POCA would apply in particular situations, and whether federal officials may be immune from liability in certain cases (Compl. ¶ 64), do not render the statute facially invalid. Rather, such questions are properly considered by courts on an as-applied basis in proceedings seeking to enforce POCA's protections, based on "actual conduct and not with respect to hypothetical situations at the periphery of the statute's scope." *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010); *cf. United States v. Salerno*, 481 U.S. 739, 745 (1987) (standards for facial invalidation of statute).

**B.    The State's Executive Orders Protecting Its Facilities and Directing State Officials to Refrain from Assisting with Federal Immigration Enforcement Do Not Pose Any Obstacle to Federal Law**

Settled federalism principles and the Tenth Amendment empower States to control the use of their own facilities, manage their internal affairs, and direct the conduct of their officials without federal interference. *See Adderley v. State of Fla.*, 385 U.S. 39, 47 (1966) (control over property); *New York v. United States*, 505 U.S. 144, 175-76 (1992) (Congress lacks power to compel States to take title to property); *City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999) ("the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies" is "surely" within a State's sovereign powers). Here, Executive Orders 170 and 170.1, which concern the use of state facilities and the activities of state employees, are likewise entitled to the presumption against preemption. *See supra* at 11.

Executive Order 170.1 was tailored to ensure the State's facilities, such as hospitals, schools, and government offices, can operate and be accessed by residents without undue disruption posed by civil arrests unrelated to state business. *See* 9 N.Y.C.R.R. § 8.170.1(B) & preamble (explaining order was intended to counter "chilling effect" caused by immigration

enforcement activities that prevents residents from accessing state benefits and services); *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 297-300 (E.D. Pa. 2018) (recounting "credible" testimony of city official that residents are less likely to use city services if they worry that they may be exposed to ICE enforcement action as a result). And Executive Order 170 directs the actions of state employees and officials in the performance of their state duties and generally instructs them to avoid participating in federal civil immigration enforcement unless required by law. *See* 9 N.Y.C.R.R. § 8.170(B). Specifically, Executive Order 170 instructs state officials not to inquire about immigration status unless that information is relevant to state business or to the enforcement of state laws, and directs state employees to refrain from sharing personal, non-immigration status information about residents obtained for state business reasons for civil immigration purposes. *Id.* § 8.170(B)(2)-(3). The order also prohibits state law enforcement officers from using state resources and personnel for enforcing federal civil immigration offenses. *Id.* § 8.170(B)(3)(b).

Plaintiff's preemption challenges to these state executive actions fail because neither executive order conflicts with federal law. Just as the general INA civil arrest provisions do not expressly authorize federal officials to undertake enforcement actions in state courthouses, the INA is similarly silent as to whether civil immigration arrests may take place in state facilities where a State has exercised its sovereign prerogative in restricting the use of its facilities for such activities. *See* supra at 12-14; *e.g.*, *United States v. State of Illinois*, No. 25-cv-1285, 2025 WL 2098688, at *21-23 (N.D. Ill. July 25, 2025) (state-law provisions restricting access of federal immigration officials to local law enforcement facilities for immigration enforcement activities not preempted). There is thus no basis for invalidating Executive Order 170.1's protections.

Executive Order 170 is likewise not preempted because no provision of the INA obligates

state officials to provide federal immigration authorities with personal information about residents. Courts have consistently upheld similar information-sharing restrictions against conflict preemption challenges. *See State of Illinois*, 2025 WL 2098688 at *21-23 (rejecting preemption claim asserted against state and local laws prohibiting disclosure of information about residents to federal officials); *County of Ocean v. Grewal*, 475 F. Supp. 355, 380-82 (D.N.J. 2020) (same, with regard to New Jersey's executive order prohibiting information sharing), *aff'd by Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-82 (3d Cir. 2021); *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019) ("finding no constitutional infirmity in" state law prohibiting provision of release date and non-public personal information); *see also City of Chicago*, 888 F.3d at 282 (local restrictions on notifying federal authorities about release dates and granting federal immigration officials access to local detention facilities do not constitute "any interference whatsoever with federal immigration authorities").

The statutes cited by plaintiff, 8 U.S.C. §§ 1373 and 1644 (Compl. ¶ 59),[2] which relate to information-sharing between state and federal officials, do not give rise to a conflict. The relevant provisions of §§ 1373 and 1644 prohibit state and local officials from restricting the sharing of "citizenship or immigration status" information about individuals. *See* 8 U.S.C. § 1373(a), (b). These statutes, however, reach only information about an individual's citizenship or immigration classification (e.g., lawful permanent resident, visa holder, asylum seeker), and not all personal information about an individual. *See, e.g., State of Illinois*, 2025 WL 2098688, at *10-13; *California*, 921 F.3d at 891-92 (§ 1373 does not cover address, employment status, or release date information). And in any event, Executive Order 170 adheres to §§ 1373 and 1644's terms, as it

---

[2] Courts have generally held that the relevant provisions in §§ 1373 and 1644 have no meaningful differences and have analyzed them together. *E.g.*, *County of Ocean*, 475 F. Supp. 3d at 371-72 & n.13 (collecting cases).

expressly incorporates the statutory language of those federal law provisions, stating that the order does not restrict the sharing of "information regarding the citizenship or immigration status . . . of any individual." 9 N.Y.C.R.R. § 8.170(B)(2).

Nor does 8 U.S.C. § 1357(g) (Compl. ¶ 59), provide a basis for preemption. That provision, which gives States and local governments the option to enter into agreements with federal immigration officials to assist with immigration enforcement, plainly does not conflict with the State's choice not to exercise that option. *See, e.g.*, *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."); *California*, 921 F.3d at 889 ("Federal law provides states and localities the *option*, not the *requirement*, of assisting federal immigration authorities.") (emphasis in original).

Fundamentally, plaintiff fails to identify any federal law mandating that state and local officials generally assist or cooperate with federal immigration enforcement efforts. Nor could it. No such federal laws exist because the Tenth Amendment prohibits Congress from conscripting state and local officials and resources to assist with federal regulatory schemes, like immigration enforcement. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (statute requiring local officials to conduct background checks for firearms purchases contravened Tenth Amendment). Indeed, in *Printz*, the Supreme Court invalidated a federal law on Tenth Amendment grounds where the law required state actors "to perform discrete, ministerial tasks," provide "information that belongs to the State and is available to them only in their official capacity," and "examin[e] databases and records that only state officials have access to." *Id.* at 930, 932 n.17.

It may be, as plaintiff contends, that Congress had "the expectation of collaboration" between federal, state, and local authorities when it enacted the federal immigration laws. *See* Compl. ¶ 59. But a hope, however fervent, that federal-state cooperation will occur does not

empower the federal government to conscript the States; were it otherwise, the anticommandeering doctrine would be a dead letter. As the Ninth Circuit explained, "when questions of federalism are involved, we must distinguish between expectations and requirements. In [the immigration] context, the federal government was free to *expect* as much as it wanted, but it could not *require* [a State's] cooperation without running afoul of the Tenth Amendment." *California*, 921 F.3d at 890-91 (emphasis in original); *accord McHenry Cnty. v. Raoul*, 44 F.4th 581, 591-92 (7th Cir. 2022) ("Congress may have hoped or expected that States would cooperate with" federal immigration enforcement, but "States are not bound by that hope or expectation" in light of the Tenth Amendment). Here, the State's permissible decision "not to assist federal immigration enforcement in its endeavors is not an 'obstacle' to that enforcement effort." *United States v. California*, 314 F. Supp. 3d 1077, 1104-05 (E.D. Cal. 2018), *aff'd on relevant grounds by California*, 921 F.3d at 890; *accord State of Illinois*, 2025 WL 2098688, at *23-25 (dismissing obstacle preemption claims against state and local laws which restrict immigration assistance).

## II.    THE SUBJECT STATE LAWS AND EXECUTIVE ORDERS DO NOT VIOLATE THE INTERGOVERNMENTAL IMMUNITY DOCTRINE

Because the States and the federal government are dual sovereigns, just as the Constitution prohibits Congress from regulating States, it similarly prohibits the States from regulating the federal government. Under the intergovernmental immunity doctrine—the flip side of the Tenth Amendment's anticommandeering prohibition—a state law is invalid "if it regulates the United States directly or discriminates against the Federal Government." *North Dakota v. United States*, 495 U.S. 423, 435 (1990). As the Supreme Court has instructed, in considering claims of governmental immunity, courts must adopt "a functional approach" that "accomodat[es] the full range of each sovereign's legislative authority." *Id.* at 435. Additionally, "the question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation.

21

Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory with regard to the [] burdens that result." *Id.*

In this action, plaintiff's intergovernmental claims are two-fold: it alleges that POCA and Executive Order 170.1 constitute improper regulation of federal activities, *see* Compl. ¶¶ 62-65 (Count II), and that Executive Orders 170 and 170.1 impermissibly discriminate against the federal government, *id.* ¶¶ 67-69 (Count III). Plaintiff fails to state a claim on both counts.

The civil-arrest protections of POCA and Executive Order 170.1 do not direct federal immigration officials in the performance of their duties by dictating who to investigate or arrest or remove. Rather, they regulate the permissible activities in or near state courthouses and in state facilities by prohibiting disruptive civil arrests that impair the functioning of the State's courts and hinder the conduct of the State's official business within state facilities. At most, the provisions of POCA and Executive Order 170.1 prohibiting certain civil arrests impose "a very narrow limitation on federal enforcement authority that is tailored to protect states' interests." *State of New York I*, 431 F. Supp. 3d at 393. Neither POCA nor Executive Order 170.1 restricts ICE agents from conducting their immigration enforcement activities across the State, in non-sensitive and non-protected places, consistent with the authority conferred to them by Congress. *Cf. CoreCivic, Inc. v. Governor of N.J.*, __ F.4th __, 2025 WL 2046488 (3d Cir. July 22, 2025) (state law that effectively barred ICE from having any detention facilities in the state invalid). The civil arrest restrictions imposed by POCA and Executive 170.1 thus do not violate the intergovernmental immunity doctrine because they are permissible laws that "protect [one] sovereign's governmental operations from undue interference by the other." *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 814 (1989); *see Texas v. U.S. Dep't of Homeland Security*, 123 F.4th 186, 206-07 (5th Cir. 2024) (rules aimed at preservation of state property may "incidentally impact[]" how federal actors

do their jobs connected to that property but do not constitute impermissible direct regulation).

Further, plaintiff's immunity claims also fail because none of the challenged state-law provisions impermissibly burden federal activities—a necessary element of an intergovernmental immunity claim. *California*, 921 F.3d at 880 (intergovernmental immunity violation requires showing of burden). The burden claimed by plaintiff is that POCA and the executive orders require ICE agents to "expend significant additional resources" to locate and apprehend noncitizens (i.e., to do their own jobs). *See* Compl. ¶ 47. It may be that the challenged state-law provisions make immigration enforcement "more burdensome than it would be if state and local [officials] provided immigration officers with their assistance," but where the State is permitted to decline to assist, any purported "burden" resulting therefrom is insufficient upon which to premise an intergovernmental immunity claim. *See id.* at 888 (quoting *California*, 314 F. Supp. 3d at 1104); *State of Illinois*, 2025 WL 2098688, at *21 ("because the INA merely offers States the opportunity to assist in civil immigration enforcement, [state and local non-assistance policies] don't make ICE's job more *difficult*; they just don't make it *easier*") (emphasis in original).

Executive Orders 170 and 170.1 also do not improperly discriminate against the federal government. As the Supreme Court has explained, for purposes of an intergovernmental immunity claim, "the State does not discriminate against the Federal Government . . . unless it treats someone else better than it treats them." *Washington v. United States*, 460 U.S. 536, 544-45 (1983); *Dawson v. Steager*, 586 U.S. 171, 177 (2019) (differential treatment of "similarly situated state and federal [actors]" violates intergovernmental immunity).

Neither of the challenged executive orders treats any similarly situated actors better than they treat federal actors. Instead, the orders are focused on limiting state assistance for a particular activity—that is, enforcement of the federal immigration laws. As the Seventh Circuit explained,

that a state regulation "affects an exclusively federal domain" is insufficient to state an intergovernmental immunity claim, absent a showing of disparate treatment of "similarly situated" actors. *See McHenry County*, 44 F.4th at 594. That is, "[f]or a state law to unconstitutionally discriminate against the federal government, it must treat comparable classes of federal and *non-federal* employees differently." *State of Illinois*, 2025 WL 2098688, at *26 (emphasis in original).

Although Executive Orders 170 and 170.1 are directed towards civil immigration enforcement activities, they make no exemptions for non-federal actors engaged in the same conduct. *But see* 8 U.S.C. § 1357(g) (authorizing local officials to perform federal immigration enforcement functions upon written agreement); *cf. United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) (local ordinance that barred military recruiting by federal employees but exempted same activity by other actors invalid). Here, plaintiff's "failure to identify a comparator ends the inquiry." *State of Illinois*, 2025 WL 2098688, at *25-26 (dismissing intergovernmental immunity claim). In any event, invalidating the challenged executive orders in this case based on intergovernmental immunity principles "would imply that [New York] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891 (emphasis in original).

Make no mistake, commandeering is the whole point and purpose of this suit. Plaintiff's own allegations make plain their desire to commandeer state resources to aid in federal immigration efforts. For example, plaintiff states its preference for effectuating civil arrests "in the safe and controlled environments of [state] government facilities," and claims that having information about noncitizens' "scheduled appearances" in state court proceedings make it easier for federal officials to locate and apprehend noncitizens. *See* Compl. ¶ 47. But state government

24

facilities are "safe and controlled" only because *state officials* have "screened [entrants] for weapons or other contraband," Compl. ¶ 3, and information about "scheduled appearances," *id.* ¶ 47, is available only because *state officials* have assembled and published court calendars—all in service of the safe and orderly operations of the *State's* judicial system. Notably, ICE's own policies expressly provide that enforcement activities "in or near courthouses should . . . take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." Lyons Memo at 2 (Procedures), *supra*. But adherence to such protocols would plainly conscript state court officers to expend state time and resources, for instance, to grant ICE agents access to "non-public areas" and "non-public entrances," in order to help ICE enforce the federal civil immigration laws.

Compelling the State to allow federal immigration authorities to reap the benefits of the work of state employees is no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives. Such commandeering is not permitted by the Constitution. *See Printz*, 521 U.S. at 935. The Court should accordingly reject it. *See California*, 921 F.3d at 891 (rejecting similar intergovernmental immunity claim on anticommandeering grounds); *McHenry County*, 44 F.4th at 593-94 (same).

## CONCLUSION

The Court should dismiss the complaint in its entirety.

Dated:    New York, New York
          August 4, 2025

                              Respectfully submitted,

                              LETITIA JAMES
                               *New York State Attorney General*
                              Attorney for Defendants

          By:    /s/ Linda Fang
                 Linda Fang
                 Special Litigation Counsel
                 28 Liberty Street
                 New York, New York 10005
                 (212) 416-8580