# EXHIBIT A

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE UNITED STATES OF AMERICA, | Case No.<br>25-cv-00744-MAD-PJE |
| Plaintiffs, | |
| v. | |
| STATE OF NEW YORK; KATHLEEN HOCHUL, Governor of New York, in her Official Capacity; LETITIA A. JAMES, Attorney General of New York, in her Official Capacity, | |
| Defendants. | |

## PROPOSED BRIEF OF *AMICI CURIAE* THE LEGAL AID SOCIETY, IMMIGRANT DEFENSE PROJECT, SANCTUARY FOR FAMILIES, NEW YORK COUNTY DEFENDER SERVICES, LATINOJUSTICE PRLDEF, NEIGHBORHOOD DEFENDER SERVICE OF HARLEM, MAKE THE ROAD NEW YORK, AND BROOKLYN DEFENDER SERVICES IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

Date: August 11, 2025

Meghna Philip (Bar No. 706580)
Hasan Shafiqullah (Bar No. 706588)
Alexander Lesman (Bar No. 706631)
Evan Henley (Bar No. 706520)
THE LEGAL AID SOCIETY
49 Thomas Street, Floor 10
New York, NY 10013
(212) 577-3367
mphilip@legal-aid.org
*Additional counsel listed in signature block*

## <u>CORPORATE DISCLOSURE STATEMENTS</u>

1. The Legal Aid Society is a nonprofit corporation with no parent corporation. No publicly-held corporation owns ten percent or more of its stock.

2. The Immigrant Defense Project is a not-for-profit organization that has no parent corporation. No publicly-held corporation owns ten percent or more of its stock.

3. Sanctuary for Families has no corporate parent. No publicly-held corporation owns ten percent or more of its stock.

4. New York County Defender Services has no parent company. No publicly-held corporation owns ten percent or more of its stock.

5. LatinoJustice PRLDEF has no parent company. No publicly-held corporation owns ten percent or more of its stock.

6. Neighborhood Defender Service of Harlem is a nonprofit corporation with no parent corporation. No publicly-held corporation owns ten percent or more of its stock.

7. Make the Road New York is a nonprofit corporation with no parent corporation. No publicly-held corporation owns ten percent or more of its stock.

8. Brooklyn Defender Services has no parent company. No publicly-held corporation owns ten percent or more of its stock.

## **TABLE OF CONTENTS**

CORPORATE DISCLOSURE STATEMENTS .......................................................... i

TABLE OF AUTHORITIES ............................................................................. iii

PRELIMINARY STATEMENT ......................................................................... 1

STATEMENT OF INTEREST ........................................................................... 2

ARGUMENT .................................................................................................. 2

    I.    New York's Protect Our Courts Act supports the proper functioning of the justice system and protects the constitutional rights of people using the courts. ............................................. 2

    II.    The challenged Executive Orders make New Yorkers safer and healthier. ....................... 8

CONCLUSION ............................................................................................... 12

## **TABLE OF AUTHORITIES**

**Cases**

*Aliessa v. Novello*, 754 N.E.2d 1085 (N.Y. 2001) .......................................................... 9

*Barnes v. Glen Theatre*, 501 U.S. 560 (1991) ............................................................... 8

*California v. United States*, 921 F.3d 865 (9th Cir. 2019)............................................... 8

*Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523 (6th Cir. 2002)............... 12

*Graham v. Richardson*, 403 U.S. 365 (1971) ................................................................. 6

*Kwong Hai Chew v. Colding*, 344 U.S. 590 (1953)........................................................... 6

*Logan v. Zimmerman Brush Co.*, 455 U.S. 422 (1982) ..................................................... 6

*Parker v. Marco,* 32 N.E. 989 (N.Y. 1893) ................................................................... 3

*People ex rel. Wells v. DeMarco,* 88 N.Y.S.3d 518 (N.Y. App. Div. 2018) .............................. 8

*Person v. Grier*, 66 N.Y. 124 (1876) .......................................................................... 3

*State of New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019) ........ 3

*Tucker v. Toia,*  371 N.E.2d 449 (N.Y. 1977)................................................................. 9

*Turner v. Louisiana,*  379 U.S. 466 (1965).................................................................... 6

**Statutes**

42 U.S.C. § 2000d.................................................................................................. 11

8 U.S.C. § 1373.................................................................................................... 8

8 U.S.C. § 1621.................................................................................................... 9

N.Y. Civ. Rights Law § 23 ...................................................................................... 3

N.Y. Civ. Rights Law § 25 ...................................................................................... 3

N.Y. Civ. Rights Law § 28 ................................................................................... 1, 3

N.Y. Civ. Rights Law § 40 ...................................................................................... 12

N.Y. Exec. Law § 296............................................................................................ 12

N.Y. Soc. Serv. Law § 122 ..................................................................................... 9

**Constitutional Provisions**

N.Y. Const. art. I, § 11 ................................................................................................ 6, 11

N.Y. Const. art. I, § 6 ....................................................................................................... 6

N.Y. Const. art. XVII, § 1 ................................................................................................ 8

N.Y. Const. art. XVII, § 3 ................................................................................................ 8

U.S. Const. amend. I ........................................................................................................ 6

U.S. Const. amend. V ....................................................................................................... 6

U.S. Const. amend. VI ...................................................................................................... 6

U.S. Const. amend. XIV .............................................................................................. 6, 11

**Executive Orders**

N.Y. Comp. Code R. & Regs. tit. 9, § 8.170 ........................................................ 1, 8, 12

N.Y. Comp. Code R. & Regs. tit. 9, § 8.171 ............................................................. 1, 8

**Other Authorities**

Akash Pillai et al., *State Health Coverage for Immigrants and Implications for Health Coverage and Care*, KFF (May 1, 2024), https://www.kff.org/racial-equity-and-health-policy/issue-brief/state-health-coverage-for-immigrants-and-implications-for-health-coverage-and-care/ ... 9

Amy Finkelstein et al., *The Oregon Health Insurance Experiment: Evidence from The First Year*, 127 Q. J. Econ. 1057 (2012) ............................................................................................ 9

Angela Irvine et al., Ceres Pol'y Research, *The Chilling Effect of ICE Courthouse Arrests: How Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings* (Oct. 2019), *available at* https://shorturl.at/uS9b2 ........................................................................................ 4

Anita Kashu, Police Found., *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* (Apr. 2009), *available at* https://www.policinginstitute.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf ....................................................................................................... 10

Bill Jacket, N.Y. L. 2020, ch. 322 ............................................................................... 2, 3

Brief of Amici Curiae Immigrant Defense Project and 44 Legal Services Organizations, Public Defender Organizations, and Non-Profit Organizations in Support of Plaintiffs, *State of New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019) (19-cv-8876), ECF No. 82 ..................................................................................................................... 4

Edward Vargas & Maureen Pirog, *Mixed-Status Families and WIC Uptake: The Effects of Risk of Deportation on Program Use*, 97 Soc. Sci. Q. 555 (Sept. 2016) ......................................... 10

Felipe Gonçalvez et al., *Community Engagement and Public Safety: Evidence from Crime Enforcement Targeting Immigrants* (Feb. 2025), *available at* http://bit.ly/3TIFiGc ............... 10

Francisco Pedraza et al., *Cautious Citizenship: The Deterring Effect of Immigration Issue Salience on Health Care Use and Bureaucratic Interactions among Latino US Citizens*, 42 J. Health Politics, Pol'y & L. 925 (Oct. 2017) ............................................................................ 11

General Information Systems Message from Valerie Figueroa, Deputy Comm'r Emp't & Income Support Programs, N.Y. Off. of Temp. & Disability Assistance (May 12, 2023), *available at* https://otda.ny.gov/policy/gis/2023/23DC039.pdf...................................................... 9

Gwynne Hogan, *Migrants, Protesters and a Pastor Arrested Inside and Outside Manhattan Immigration Courthouses*, The City, May 28, 2025, https://www.thecity.nyc/2025/05/28/ice-arrests-migrants-26-federal-plaza-pastor/ .................................................................... 5

ICE Out of Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* (Jan. 2020), *available at* https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-ofOur-Courts-Final-Report.pdf .................................................................................... 5

Luis Ferré-Sadurní & Dana Rubinstein, *ICE, Shifting Tactics, Detains High School Student at N.Y.C. Courthouse*, N.Y. Times, May 27, 2025, https://www.nytimes.com/2025/05/27/nyregion/new-york-student-arrested-ice.html?smid=url-share ...................................................................................................................................... 5

Marcella Alsan & Crystal Yang, *Fear and the Safety Net: Evidence from Secure Communities*, 106 Rev. Econ. & Statistics 1427 (2024)......................................................................... 9, 10

N.Y. Dep't of Health, *WIC Program*, https://www.health.ny.gov/prevention/nutrition/wic/ ...... 11

N.Y. Off. of Temp. & Disability Assistance, *About OTDA*, https://otda.ny.gov/about/ .............. 11

SUNY, *SUNY Hospitals and a Healthier New York*, https://www.suny.edu/hospitals/ ............... 11

Tara Watson, *Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation*, 6 Am. Econ. J.: Econ. Pol'y 313 (2014).............................................. 9

Tom Wong et al., U.S. Immigr. Pol'y Ctr., *How Interior Immigration Enforcement Affects Trust in Law Enforcement* (Apr. 3, 2019), *available at* https://usipc.ucsd.edu/publications/usipc-working-paper-2.pdf ................................................................................................... 11

U.S. Citizenship & Immigr. Servs., *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-criminal-activity-u-nonimmigrant-status ....... 7

U.S. Citizenship & Immigr. Servs., *Victims of Human Trafficking: T Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status...... 7

U.S. Dep't of Health & Hum. Servs., *Civil Rights Requirements- A. Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ("Title VI")*, https://www.hhs.gov/civil-rights/for-individuals/special-topics/needy-families/civil-rights-requirements/index.html..................... 12

## PRELIMINARY STATEMENT

Four and a half million immigrants live in New York. Immigrants are twenty-three percent of New York's population. Immigrants are workers and business owners. Immigrants are tenants and homeowners. Immigrants come with their families and build families here. Immigrants are crime victims and survivors of domestic violence. Immigrants struggle and thrive. Put simply, immigrants are New Yorkers. Immigrants make up an important part of New York's social fabric, and laws that ensure that they have full access to state services and functions advance public policy goals unrelated to immigration and benefit the entire state.

New York has codified the longstanding privilege against civil arrest while attending or traveling to or from court in the Protect Our Courts Act ("POCA"). It has also issued Executive Orders that generally restrict state employees from inquiring about an individual's immigration status or sharing information with federal immigration authorities (Executive Order 170), and require judicial warrants for civil immigration arrests in state facilities (Executive Order 170.1). As explained by Defendants, these legislative and executive enactments fall within New York's core Tenth Amendment powers to manage the conduct of its employees and the operation of its buildings.

This brief draws on *amici* and their immigrant clients and members' experiences to underline the importance of POCA and the Executive Orders to them and their communities. POCA and the Executive Orders not only help keep New Yorkers healthy and safe, but they also help New York fulfill its constitutional obligations. Because federal law does not displace New York's power to enact these beneficial laws, and the federal government cannot force New York to act as its instrument, the Court should grant Defendants' motion to dismiss.

## STATEMENT OF INTEREST

The *amici* submitting this brief include legal services providers, advocacy organizations, and a member-based organization.[1] Together, we represent New Yorkers who benefit from POCA and the Executive Orders. We collectively share an interest in ensuring that New Yorkers may freely and safely access the courts and the state services and buildings that they need to exercise their constitutional rights and to live safe, healthy, and productive lives.

## ARGUMENT

I.    **New York's Protect Our Courts Act supports the proper functioning of the justice system and protects the constitutional rights of people using the courts.**

New York enacted the Protect Our Courts Act ("POCA") to address an intolerable situation: federal immigration agents' disruption of court business and intimidation of people using the courts in a range of civil and criminal proceedings. As Senate sponsor Brad Hoylman-Sigal wrote to the governor after passage, POCA was "necessary to counteract the deliberate federal policy that has led U.S. Immigration and Customs Enforcement (ICE) officers to make arrests in and around New York Courthouses." Bill Jacket, N.Y. L. 2020, ch. 322 at 5  [hereinafter Legislative Bill Jacket].[2] Such arrests, Sen. Hoylman-Sigal wrote, "impede access to justice for crime victims, criminal defendants, and litigants, and discourages non-citizens—even those not subject to immigration arrests—from participating in court proceedings." *Id.* These arrests also violate the well-established privilege against civil arrest in or while traveling to courthouses. *See*

---

[1] A description of each amicus appears in Exhibit A to this brief, which lists the identity and interest of each amicus. Pursuant to Local Rule 7.2(d), no party's counsel authored the brief in whole or in part; no party or a party's counsel contributed money that was intended to fund preparing or submitting the brief; and no person—other than *amici*, their members, or their counsel—contributed money that was intended to fund preparing or submitting the brief.

[2] *Available at* https://digitalcollections.archives.nysed.gov/index.php/Detail/objects/88569 (last accessed Aug. 7, 2025).

*State of New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377, 391-394 (S.D.N.Y. 2019); *Parker v. Marco,* 32 N.E. 989, 989-990 (N.Y. 1893); *Person v. Grier*, 66 N.Y. 124, 125-126 (1876).

Under POCA (codified as Civil Rights Law § 28), people are protected from civil arrests in and around New York State courts and when traveling to and from state courthouses, absent a judicial warrant or court order. Even before POCA's enactment, New York had enacted provisions to protect people from certain courthouse arrests. *See, e.g.*, N.Y. Civ. Rights Law § 23 ("No person to be arrested in civil proceedings without a statutory provision"); *id.* § 25 ("Witness exempt from arrest"). In 2020, amid the federal government's aggressive move into state courts for immigration enforcement, the New York Legislature decided that codification of the long-standing privilege against civil arrests in courthouses was warranted. Under the "Justification" section of the bill, the Legislature made clear that the increase in arrests by ICE agents at courthouses in New York State had left "many immigrants, documented and undocumented, afraid to access the justice system or respond to court summonses for fear of potentially life-changing immigration-related repercussions." Legislative Bill Jacket at 8. It also recognized that this trend had a "damaging impact on all New Yorkers, not just immigrant communities, as the operation of our judicial system and public safety are undermined." *Id.* (detailing the consequences for domestic violence victims, families in tenant-landlord disputes, rights to fair and just legal outcomes, and public safety).

The broader legal community strongly supported POCA, recognizing that civil arrests in or near courthouses undermine the integrity of New York's justice system. For example, the District Attorney of Ulster County wrote that "the presence of ICE in our courthouses . . . inhibits the ability of our office to protect our community and hold accountable those who prey on society's most vulnerable." *Id.* at 16. These concerns grew from four years of experience with federal agents'

disruptive and intimidating actions in and around courthouses across New York State. As a group of legal services organizations reported in an *amicus curiae* brief supporting New York's 2019 lawsuit challenging ICE's actions, ICE made arrests in the immediate vicinity of courthouses and focused on surveillance inside and around courts; mounted frightening shows of force at courthouses; refused to provide basic information or documentation, in contravention of its own regulations; and arrested survivors of gender-based violence, a pregnant mother, and people with disabilities.[3]

A nationwide survey documented the chilling effect of ICE's actions. The survey found that sixty percent of respondents avoided attending court as witnesses when they had been a victim of a crime, and forty-eight percent of court-involved respondents believed that judges helped ICE conduct arrests.[4] New Yorkers felt this chilling effect. An organization that advocates for victims of domestic violence in New York reported that increased ICE presence led several of its clients to withdraw requests for orders of protection. The organization's advocates resorted to meeting other clients in the community and walking them into Family Court, rather than meeting at the courthouse. Immigrant Defense Project Amicus Brief at 9. State law enforcement officials also recognized the problem. District Attorneys in Manhattan, Bronx, and Brooklyn reported

---

[3] Brief of Amici Curiae Immigrant Defense Project and 44 Legal Services Organizations, Public Defender Organizations, and Non-Profit Organizations in Support of Plaintiffs at 3, *State of New York v. U.S. Immigr. & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019) (19-cv-8876), ECF No. 82 [hereinafter Immigrant Defense Project Amicus Brief].

[4] Angela Irvine et al., Ceres Pol'y Research, *The Chilling Effect of ICE Courthouse Arrests: How Immigration and Customs Enforcement (ICE) Raids Deter Immigrants from Attending Child Welfare, Domestic Violence, Adult Criminal, and Youth Court Hearings* 8-9 (Oct. 2019), *available at* https://shorturl.at/uS9b2.

heightened fear among immigrant victims and witnesses of testifying in criminal court since 2017, making cases harder to prosecute.[5]

ICE's actions affected not only litigants and witnesses. Its arrests and surveillance in and around courthouses obstructed court personnel and distracted public defenders, who were invariably required to respond to ICE's presence to advocate for their clients. In at least one instance, an arrest caused property damage: in July 2019, an ICE agent broke the glass of a Yonkers City Court door when a person of interest tried to enter the courthouse. "During the arrest, court officers were forced to restrict access to the court, file a police report, and contact building maintenance." Immigrant Defense Project Amicus Brief at 6. POCA's codification of the common law privilege against civil courthouse arrests thus responded to practices that fundamentally undermined New York's system of justice.

Since January 2025, ICE has returned to aggressive enforcement operations in and around courts.[6] Noncitizen New Yorkers' fear has also returned. For example, The Legal Aid Society has a noncitizen client who is a domestic violence survivor and recently separated from her abuser. A

---

[5] ICE Out of Courts Coalition, *Safeguarding the Integrity of Our Courts: The Impact of ICE Courthouse Operations in New York State* 10-13 (Jan. 2020), *available at* https://www.immigrantdefenseproject.org/wp-content/uploads/Safeguarding-the-Integrity-of-Our-Courts-Final-Report.pdf.

[6] Records obtained by the Immigrant Defense Project from New York's Office of Court Administration through a Freedom of Information Law request demonstrate that DHS or ICE officers have entered state courthouses at least thirty times in 2025. The officers have monitored court proceedings, obtained court records, and made at least four arrests pursuant to judicial warrants. For examples of increased ICE enforcement around immigration courts, see Luis Ferré-Sadurní & Dana Rubinstein, *ICE, Shifting Tactics, Detains High School Student at N.Y.C. Courthouse*, N.Y. Times, May 27, 2025, https://www.nytimes.com/2025/05/27/nyregion/new-york-student-arrested-ice.html?smid=url-share; Gwynne Hogan, *Migrants, Protesters and a Pastor Arrested Inside and Outside Manhattan Immigration Courthouses*, The City, May 28, 2025, https://www.thecity.nyc/2025/05/28/ice-arrests-migrants-26-federal-plaza-pastor/.

case manager at the client's shelter recommended that she go to Family Court for an order of protection. But she told her lawyer that she is too scared to go to court because of the current administration's policies toward undocumented immigrants. Another Legal Aid client involved in a nonpayment-of-rent eviction proceeding was intimidated by her landlord's repeated threats to call "immigration." The client had made significant cash payments to her landlord, a fact which her testimony in housing court was required to prove. But because of the threats, she decided to settle with her landlord rather than appear in court, forgoing a meritorious defense and committing to paying out even more money.

The disruption and intimidation caused by ICE courthouse arrests also impair New Yorkers' constitutional rights. The First Amendment to the United States Constitution protects the right "to petition the Government for a redress of grievances" and guarantees anyone, regardless of their immigration status, the right to complain to, or seek the assistance of, the government without fear of punishment or reprisal. *See Kwong Hai Chew v. Colding*, 344 U.S. 590, 596 n.5 (1953). The Fifth and Fourteenth Amendments to the United States Constitution and Article I, Section Six of the New York Constitution guarantee due process of law, including the right to sue and to defend oneself in court, which requires a meaningful opportunity to be heard. *See, e.g.*, *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428-430, 430 n.5 (1982).[7] The Sixth Amendment to the U.S. Constitution and Article I, Section Six of the New York Constitution guarantee any person charged with a crime the right to a fair and public trial and to confront the witnesses against them. *See, e.g.*, *Turner v. Louisiana*,  379 U.S. 466, 472-473 (1965). Notably, New York's guarantee of equal protection of the laws, found in Article I, Section Eleven, expressly protects

---

[7] The Fifth and Fourteenth Amendment guarantees of due process apply equally to noncitizens. *See, e.g.*, *Kwong Hai Chew*, 344 U.S. at 596 n.5; *Graham v. Richardson*, 403 U.S. 365, 371 (1971).

immigrants by including national origin among the characteristics that may not be the basis of discrimination. All of these constitutional rights are impaired when people subject to immigration enforcement—whether defendants, complainants, or witnesses—are afraid to use New York's courts.

Perversely, immigration arrests that disrupt state court proceedings can foreclose relief under federal immigration law. Victims and survivors of violence, including victims of domestic violence and trafficking, are eligible for T and U nonimmigrant status. T nonimmigrant status is available to noncitizen trafficking victims, and U nonimmigrant status is available to noncitizen victims of certain crimes who assist law enforcement agencies in investigating or prosecuting those crimes.[8] Even when these victims are themselves charged with crimes, they may succeed in having their criminal charges dismissed or convictions overturned because of their histories of trauma or the fact that they were trafficked and coerced, and they may then go on to obtain T and U nonimmigrant status. But if ICE arrests and deports victims of violence before state court proceedings are concluded, they are unable to obtain T nonimmigrant status, which requires their presence in the United States. U visas are more difficult to obtain from abroad, since they require the petitioner to have the ability to cooperate with local law enforcement agencies.

POCA is the product of New Yorkers' hard experience from 2017 to 2020, when aggressive ICE operations disrupted court business and intimidated litigants and witnesses, to the detriment of the state's entire justice system. Particularly in the present context of aggressive ICE operations

---

[8] *See* U.S. Citizenship & Immigr. Servs., *Victims of Human Trafficking: T Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-human-trafficking-t-nonimmigrant-status (last accessed July 17, 2025); U.S. Citizenship & Immigr. Servs., *Victims of Criminal Activity: U Nonimmigrant Status*, https://www.uscis.gov/humanitarian/victims-of-criminal-activity-u-nonimmigrant-status (last accessed Aug. 7, 2025).

in New York and across the country, POCA's protections must remain in place to ensure the safe and orderly operation of state courthouses, and access to justice for all New Yorkers.

## II. The challenged Executive Orders make New Yorkers safer and healthier.

The challenged Executive Orders 1) prevent state officers or employees from asking about an individual's immigration status or sharing information with federal immigration officials (except where required by law or in connection with a criminal investigation into that individual), N.Y. Comp. Code R. & Regs. tit. 9, § 8.170,[9] and 2) ensure that New Yorkers may visit state buildings without facing warrantless civil arrests, *id.* § 8.171; *see also People ex rel. Wells v. DeMarco,* 88 N.Y.S.3d 518, 528-529 (N.Y. App. Div. 2018) (explaining that New York law does not authorize warrantless civil arrests). The Executive Orders directly relate to New York's "traditional police power" to "provide for the public health, safety, and morals." *Barnes v. Glen Theatre*, 501 U.S. 560, 569 (1991); *see also* N.Y. Const. art. XVII, § 3 ("The protection and promotion of the health of the inhabitants of the state are matters of public concern . . . ."). They seek to combat well-documented chilling effects that impede eligible residents' access to services and impair New Yorkers' health and safety. They also respect New York's constitutional and statutory obligations. If immigrants fear interactions with state employees, then New York is less healthy and less safe. New York has the right to pursue these policy priorities and to decline to aid immigration enforcement efforts. *See, e.g.*, *California v. United States*, 921 F.3d 865, 890-891 (9th Cir. 2019).

New York has a constitutional obligation to support New Yorkers in need. N.Y. Const. art. XVII, § 1. In New York, "care for the needy is not a matter of 'legislative grace'; it is a

---

[9] Executive Order 170 explicitly does not prohibit or restrict state employees from sharing information regarding an individual's citizenship or immigration status with federal immigration authorities as required by law. *See* 8 U.S.C. § 1373(a).

constitutional mandate," *Aliessa v. Novello*, 754 N.E.2d 1085, 1092 (N.Y. 2001), and aid to the needy is "a fundamental part of the social contract," *Tucker v. Toia*, 371 N.E.2d 449, 451 (N.Y. 1977). Among its obligations, New York must provide state-funded public benefits to immigrants classified as "Persons Residing Under Color of Law ('PRUCOL')."[10] *Aliessa*, 754 N.E.2d at 1093.

Ensuring that all eligible New Yorkers may freely access public benefits is not just the state's constitutional obligation—it is an essential public health measure. *See, e.g.*, Tara Watson, *Inside the Refrigerator: Immigration Enforcement and Chilling Effects in Medicaid Participation*, 6 Am. Econ. J.: Econ. Pol'y 313, 330 (2014) (stating that "increases in Medicaid participation reduce hospitalizations for conditions that benefit from preventative care"); Amy Finkelstein et al., *The Oregon Health Insurance Experiment: Evidence from The First Year*, 127 Q. J. Econ. 1057, 1082-1099 (2012) (describing positive effects reported by adults who received Medicaid coverage via lottery). However, the fear of immigration enforcement significantly reduces the uptake of public benefits by eligible immigrants due to a chilling effect. *See, e.g.*, Marcella Alsan & Crystal Yang, *Fear and the Safety Net: Evidence from Secure Communities*, 106 Rev. Econ. & Statistics 1427, 1428 (2024) (finding that the fear of deportation tied to increased immigration enforcement reduced participation by immigrant citizens in two federal benefits programs); Edward Vargas & Maureen Pirog, *Mixed-Status Families and WIC Uptake: The Effects of Risk of*

---

[10] *See, e.g.*, N.Y. Soc. Serv. Law § 122; General Information Systems Message from Valerie Figueroa, Deputy Comm'r Emp't & Income Support Programs, N.Y. Off. of Temp. & Disability Assistance (May 12, 2023), *available at* https://otda.ny.gov/policy/gis/2023/23DC039.pdf (describing PRUCOL categories). Some non-PRUCOL immigrants are also entitled to certain public benefits; for example, children and pregnant people may obtain state-funded medical coverage. Akash Pillai et al., *State Health Coverage for Immigrants and Implications for Health Coverage and Care*, KFF (May 1, 2024), https://www.kff.org/racial-equity-and-health-policy/issue-brief/state-health-coverage-for-immigrants-and-implications-for-health-coverage-and-care/ (last accessed Aug. 7, 2025). Federal law even authorizes states to extend public benefits to undocumented or otherwise non-qualified immigrants. *See, e.g.*, 8 U.S.C. § 1621(d).

*Deportation on Program Use*, 97 Soc. Sci. Q. 555, 569 (Sept. 2016) (finding that risk of deportation has a chilling effect on citizen children's receipt of WIC supplemental nutrition program benefits). Conversely, immigrants living in areas where local authorities did not enforce federal immigration detainers maintained their use of the public benefits. *Fear and the Safety Net*, 106 Rev. Econ. & Statistics at 1438.

A similar chilling effect threatens public safety. A law enforcement agency's involvement in immigration enforcement leads to decreased reporting of crimes. *See* Felipe Gonçalvez et al., *Community Engagement and Public Safety: Evidence from Crime Enforcement Targeting Immigrants* 3, 17 (Feb. 2025) [hereinafter *Community Engagement and Public Safety*];[11] Anita Kashu, Police Found., *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties* 23 (Apr. 2009).[12] This underreporting of crimes in turn makes the community less safe, particularly the populations made most vulnerable by immigration enforcement. *Community Engagement and Public Safety* at 17.

These chilling effects have likewise impacted *amici*'s clients. For example, a Sanctuary for Families noncitizen client's abuser stabbed her. The client was too afraid of potential immigration enforcement to report the attack to the police or even go to the hospital. At least two other Sanctuary for Families clients who are victims of domestic violence did not call the police on their abusers or seek orders of protection against them because their abusers threatened to report them to ICE.

---

[11] *Available at* http://bit.ly/3TIFiGc.

[12] *Available at* https://www.policinginstitute.org/wp-content/uploads/2015/06/The-Role-of-Local-Police-Narrative.pdf.

As the sources cited above illustrate, chilling effects impact all immigrants, including people who have attained lawful permanent resident status and United States citizenship—up to twenty-three percent of New Yorkers. A state can best combat chilling effects by 1) adopting and publicizing policies that assure the security of residents' personal information, *see, e.g.*, Francisco Pedraza et al., *Cautious Citizenship: The Deterring Effect of Immigration Issue Salience on Health Care Use and Bureaucratic Interactions among Latino US Citizens*, 42 J. Health Politics, Pol'y & L. 925, 953 (Oct. 2017), and 2) building trust with immigrant communities by adopting and publicizing a policy not to participate in federal immigration enforcement efforts, *see, e.g.*, Tom Wong et al., U.S. Immigr. Pol'y Ctr., *How Interior Immigration Enforcement Affects Trust in Law Enforcement* 8-14 (Apr. 3, 2019).[13] The Executive Orders serve this trust-building function. They inform all New York residents that they may apply for public benefits[14] and visit the state buildings needed to access them and seek assistance from state law enforcement officers without an intrusive inquiry into their immigration status or the fear of arrest. New York is healthier and safer as a result.

Moreover, the prohibition on immigration status inquiries respects New York's obligations under the federal and state Equal Protection Clauses and Title VI. *See* U.S. Const. amend. XIV; N.Y. Const. art. I, § 11(a); 42 U.S.C. § 2000d. If a state officer or employee asks only some people about their immigration status, this may constitute unlawful national origin or racial

---

[13] *Available at* https://usipc.ucsd.edu/publications/usipc-working-paper-2.pdf.

[14] State agencies (the Office of Temporary and Disability Assistance and Department of Health) administer most public benefits in New York. *See* N.Y. Off. of Temp. & Disability Assistance, *About OTDA*, https://otda.ny.gov/about/ (last accessed Aug. 7, 2025); N.Y. Dep't of Health, *WIC Program*, https://www.health.ny.gov/prevention/nutrition/wic/(last accessed July 16, 2025). New York also delivers health care and safety net services through SUNY Hospitals. SUNY, *SUNY Hospitals and a Healthier New York*, https://www.suny.edu/hospitals/ (last accessed Aug. 7, 2025).

discrimination. *See Farm Lab. Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 535 (6th Cir. 2002) (stating that a law enforcement agency's disproportionate inquiries about immigration status of Hispanic motorists was circumstantial evidence of unlawful discrimination); U.S. Dep't of Health & Hum. Servs., *Civil Rights Requirements- A. Title VI of the Civil Rights Act of 1964, 42 U.S.C. 2000d et seq. ("Title VI")*[15] (providing, as an example of conduct that may violate Title VI: "A local welfare office makes assumptions . . . and asks only those persons who look or sound foreign about their citizenship and immigration status."). A state employee's questions about immigration status may also violate New York State laws, some of which prohibit discrimination based on citizenship or immigration status in addition to national origin. *See, e.g.*, N.Y. Civ. Rights Law § 40; N.Y. Exec. Law § 296(2), (4). Executive Order 170 requires state employees to follow a more prudent course of action and not ask about immigration status unless it is necessary or directly relevant to the services being sought.

## CONCLUSION

For the above reasons, and the reasons given in Defendants' motion to dismiss, the Court should dismiss Plaintiff's complaint in its entirety.

---

[15]*Available at* https://www.hhs.gov/civil-rights/for-individuals/special-topics/needy-families/civil-rights-requirements/index.html (last accessed Aug. 7, 2025).

Respectfully submitted,

/s/ Evan Henley

Meghna Philip (Bar No. 706580)
Hasan Shafiqullah (Bar No. 706588)
Alexander Lesman (Bar No. 706631)
Evan Henley (Bar No. 706520)
THE LEGAL AID SOCIETY
49 Thomas Street, Floor 10
New York, NY 10013
Phone: (212) 577-3367
Facsimile: (646) 616-4198
mphilip@legal-aid.org

Yasmine Farhang
Nabilah Siddiquee
IMMIGRANT DEFENSE PROJECT
P.O. Box 1765
New York, NY 10027
(646) 760-0591
yasmine@immdefense.org
nabilah@immdefense.org

Pooja Asnani
Program Director, Immigration Intervention
Project
SANCTUARY FOR FAMILIES
P.O. Box 1406
Wall Street Station
New York, NY 10268
(212) 349–6009
pasnani@sffny.org

Sergio De La Pava
Legal Director
NEW YORK COUNTY DEFENDER SERVICES
100 William Street, 20th Floor
New York, NY 10038
sdelapava@nycds.org

13

Jose Perez
Rex Chen
LATINOJUSTICE PRLDEF
475 Riverside Drive, Suite 1901
New York, NY 10115
jperez@latinojustice.org
rchen@latinojustice.org

Piyali Basak
Managing Director
NEIGHBORHOOD DEFENDER SERVICE OF
HARLEM
317 Malcolm X Blvd., 10th floor
New York, NY 10027
(646) 483-3123
pbasak@ndsny.org

Paige Austin
MAKE THE ROAD NEW YORK
301 Grove St.
Brooklyn, New York 11237
Office: (718) 565-8500 ext. 4139
paige.austin@maketheroadny.org

Lucas Marquez
BROOKLYN DEFENDER SERVICES
177 Livingston Street, 7th Floor
Brooklyn, NY 11201
(718) 254-0700
lmarquez@bds.org

14

# EXHIBIT A

<u>**STATEMENTS OF INTEREST**</u>

1. <u>**The Legal Aid Society "Legal Aid")**</u> has provided free legal services to low-income people in New York City since 1876. As the primary provider of indigent criminal defense services in New York City, Legal Aid's Criminal Defense Practice defends the rights of thousands of New Yorkers accused of crimes. Legal Aid's Immigration Law Unit is a leader in the provision of legal services in a wide variety of immigration matters. Legal Aid's Civil Practice represents tenants, survivors of domestic violence, public benefits applicants and recipients, and workers, among others, in a wide variety of cases. Legal Aid's Law Reform Units engage in policy advocacy and affirmative litigation to respond to emergent issues and protect and expand the rights of our clients. Legal Aid was plaintiffs' counsel in *Doe v. U.S. Immigration & Customs Enforcement*, 19-cv-8892 (S.D.N.Y.), a case about ICE's courthouse arrests policy, and was part of the coalition advocating for the enactment of the Protect Our Courts Act ("POCA"). Legal Aid's staff has deep interdisciplinary expertise on laws protecting the rights of New Yorkers, including immigrants, and on ICE's operations.

2. <u>**The Immigrant Defense Project ("IDP")**</u> is a New York-based nonprofit legal resource, training and advocacy organization dedicated to promoting fundamental fairness for immigrants accused or convicted of crimes. IDP is a New York State Office of Indigent Legal Services Regional Immigration Assistance Center ("ILS-RIAC") and provides training, technical assistance, and resources to the five ILS-RIAC offices. Since 1997, IDP has published the premier legal resource and treatise on criminal-immigration law for defense counsel in New York State, which is updated annually. As an organization devoted to fair treatment for immigrants involved in the criminal legal system, IDP played a central

1

role in advocating for the protections of POCA and is deeply committed to defending the historic law, which safeguards the functioning of our courts and helps ensure that our state resources allow all New Yorkers to thrive.

3. **Sanctuary for Families ("Sanctuary")** is New York State's largest dedicated service provider and advocate for survivors of domestic violence, human trafficking, and related forms of gender violence. Each year, Sanctuary provides legal, clinical, shelter, and economic empowerment services to approximately 15,000 survivors. Sanctuary's Immigration Intervention Project provides free legal assistance and direct representation to thousands of immigrant survivors every year in a broad range of humanitarian immigration matters, including asylum, special rule cancellation of removal, SIJS, Violence Against Women Act self-petitions, and petitions for U and T nonimmigrant status. In addition, Sanctuary provides training on domestic violence and trafficking to community advocates, pro bono attorneys, law students, service providers, and the judiciary, and plays a leading role in advocating for legislative and public policy changes that further the rights and protections afforded to survivors and their children.

4. **New York County Defender Services ("NYCDS")** is a public defender office serving indigent clients in the borough of Manhattan since 1997. Like other *amici*, NYCDS provides comprehensive legal advocacy for its clients facing all manner of criminal charges and the related collateral impacts of criminal prosecution. NYCDS's Immigration Unit is specifically tasked with aiding and advising each and every NYCDS client with immigration concerns or otherwise facing immigration consequences as a result of their criminal case. In collaboration with Immigration and other units, NYCDS's Policy Team engages in advocacy and affirmative litigation to respond to emergent issues and advocate

2

for systemic reforms that impact all clients, regardless of citizenship. NYCDS bears witness every day to the disproportionate impacts of the justice system borne by our non-citizen clients, in and out of the courtroom. NYSCDS was also part of the original coalition advocating for the enactment of POCA.

5. **LatinoJustice PRLDEF ("LatinoJustice")**. Founded in 1972, LatinoJustice PRLDEF's mission is to use and challenge laws to create a more just and equitable society, transform harmful systems, empower Latino communities, fight for racial justice, and grow the next generation of leaders. For over fifty years, LatinoJustice has litigated landmark civil rights cases and advanced policy reforms in our primary pillars of practice including immigrants' rights. LatinoJustice has filed, joined and supported numerous amicus briefs supporting and defending immigrants' rights, including IDP's 2019 amicus brief supporting the plaintiff in *State of New York v. U.S. ICE*, 2019-cv-8876 (JSR) (S.D.N.Y.) (challenging the ICE policy change on courthouse arrests); and was an active member of the IDP-led ICE Out of Courts NYS campaign in 2018-20, leading to the enactment of POCA.

6. **Neighborhood Defender Service of Harlem ("NDS")** is a community-based public defense office serving the residents of Northern Manhattan. NDS's unique holistic defense model provides clients with zealous, client-centered advocacy in addressing a wide array of legal issues. NDS advocates for clients in courthouses across New York City including criminal court, family court, housing court, and civil court, as well as in immigration and custody proceedings. NDS's Immigration Defense Team advises every noncitizen client that the organization represents in criminal proceedings and has an interest in ensuring that immigrant defendants' rights are protected.

7. **<u>Make the Road New York ("MRNY")</u>** is a nonprofit, membership-based community organization that integrates community organizing, adult and youth education, legal and survival services, and policy advocacy, in a holistic approach to help low-income New Yorkers improve their lives and neighborhoods. MRNY has over 180 staff, over 28,000 members, and five offices spread throughout New York City, Long Island, and Westchester. MRNY is at the forefront of numerous initiatives to analyze, develop, and improve civil and human rights for immigrant communities, including issues related to detention and deportation of immigrant community members. MRNY was deeply involved in the efforts to pass the Protect Our Courts Act in New York. Its attorneys and accredited representatives regularly represent both detained and nondetained clients in the greater New York City area in immigration matters, as well as represent clients in their legal matters in various state courts, including housing and family courts.

8. **<u>Brooklyn Defender Services ("BDS")</u>** is one of the largest public defense offices in New York State, representing low-income people in criminal, family, civil, and immigration proceedings each year. Our criminal defense practice represents people charged with crimes in Brooklyn and Queens. Since 2009, BDS has counseled thousands of clients in immigration matters, including deportation defense, affirmative applications, advisals, and immigration consequence consultations in the criminal court system. For over twenty-five years, BDS has worked, in and out of court, to protect and uphold civil rights and change laws and systems that perpetuate injustice and inequality.