## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK

THE UNITED STATES OF AMERICA,

                              *Plaintiff*,

v.

STATE OF NEW YORK, KATHLEEN HOCHUL,
Governor of New York, in her official capacity, and
LETITIA A. JAMES, Attorney General of New York,
in her official capacity,

                              *Defendants*.

No. 1:25 Civ. 00744 (MAD/PJE)

## BRIEF OF LAW AND HISTORY PROFESSORS
## AS *AMICI CURIAE* IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS

## TABLE OF CONTENTS

*Page*

TABLE OF AUTHORITIES ........................................................................................................ ii

INTEREST OF *AMICI CURIAE* ............................................................................................1

INTRODUCTION ......................................................................................................................1

ARGUMENT ...............................................................................................................................2

I.  THE FEDERAL GOVERNMENT'S LAW ENFORCEMENT ROLE—BOTH CIVIL
AND CRIMINAL—WAS MINIMAL UNTIL WELL INTO THE TWENTIETH
CENTURY ......................................................................................................................... 2

II.  THE COURTHOUSE ARREST PRIVILEGE'S ROLE IN PROTECTING LAW
ENFORCEMENT AND AUTHORITY ...................................................................... 5

III. FEDERAL-STATE INTERACTIONS ARE GOVERNED BY STATUTES AND
RULES THAT DO NOT AUTHORIZE PHYSICAL INTRUSION INTO STATE
COURTHOUSES ............................................................................................................ 8

IV. THE ATTEMPT TO INTRUDE ON STATE COURTHOUSES HAS PARALLELS IN
THE RENDITION EFFORTS CARRIED OUT BY THE FEDERAL
GOVERNMENT TO ENFORCE THE FUGITIVE SLAVE ACT ........................... 10

CONCLUSION ..........................................................................................................................12

# TABLE OF AUTHORITIES

*Page(s)*

## CASES

*Ableman v. Booth*,
  62 U.S. 506 (1858) ........................................................................................... 11

*Alabama Pub. Serv. Comm'n v. S. Ry. Co.*,
  341 U.S. 341 (1951) ........................................................................................... 9

*Alabama v. Bozeman*,
  533 U.S. 146 (2001) ........................................................................................... 9

*Alden v. Maine*,
  527 U.S. 706 (1999) ........................................................................................... 7

*In re Booth*,
  3 Wis. 144 (1854) ........................................................................................... 11

*Claflin v. Houseman*,
  93 U.S. 130 (1876) ........................................................................................... 9

*Commonwealth v. Vrooman*,
  164 Pa. 306 (1894) ........................................................................................... 6

*Fed. Mar. Comm'n v. S.C. State Ports Auth.*,
  535 U.S. 743 (2002) ........................................................................................... 7

*Halsey v. Stewart*,
  4 N.J.L. 366 (N.J. 1817) ........................................................................................... 6

*Haywood v. Drown*,
  556 U.S. 729 (2009) ........................................................................................... 9

*Idaho v. Coeur d'Alene Tribe*,
  521 U.S. 261 (1997) ........................................................................................... 7

*Levin v. Com. Energy, Inc.*,
  560 U.S. 413 (2010) ........................................................................................... 10

*Mitchum v. Foster*,
  407 U.S. 225 (1972) ........................................................................................... 9

*Murphy Bros. v. Michetti Pipe Stringing, Inc.*,
  526 U.S. 344 (1999) ........................................................................................... 3

*New York v. Miln*,
    36 U.S. 102 (1837) ................................................................. 5, 6

*Orchard's Case* (1828),
    38 Eng. Rep. 987 ..................................................................... 6

*Parker v. Marco*,
    136 N.Y. 585 (1893) ................................................................ 7

*Person v. Grier*,
    66 N.Y. 124 (1876) ................................................................. 3

*R.R. Comm'n of Tex. v. Pullman Co.*,
    312 U.S. 496 (1941) ................................................................ 10

*Royal Canin U.S.A., Inc. v. Wullschleger*,
    604 U.S. 22 (2025) .................................................................. 9

*Seminole Tribe v. Florida*,
    517 U.S. 44 (1996) .................................................................. 7

*Sprint Commc'ns, Inc. v. Jacobs*,
    571 U.S. 69 (2013) .................................................................. 10

*Stewart v. Ramsay*,
    242 U.S. 128 (1916) ................................................................ 7

*Tafflin v. Levitt*,
    493 U.S. 455 (1990) ................................................................ 8, 9

*Testa v. Katt*,
    330 U.S. 386 (1947) ................................................................ 9

*Walpole v. Alexander* (1782),
    99 Eng. Rep. 530 .................................................................... 6

*Williams v. Reed*,
    145 S. Ct. 465 (2025) .............................................................. 9

*Younger v. Harris*,
    401 U.S. 37 (1971) .................................................................. 10

## CONSTITUTIONAL PROVISIONS

U.S. CONST. amend. XIV ............................................................................................ 12

ALA. CONST. of 1819, Article I, § 14 ............................................................................ 7

CONN. CONST. of 1818, Article I, § 12 .......................................................................... 7

GA. CONST. of 1777, Art. LV ........................................................................................ 7

MO. CONST. of 1820, Article XIII ................................................................................. 7

## STATUTES

8 U.S.C. § 1101 ............................................................................................................. 1

8 U.S.C. § 1126 ........................................................................................................... 12

8 U.S.C. § 1357 ........................................................................................................... 12

26 U.S.C. § 7421 ........................................................................................................... 9

28 U.S.C. § 1342 ........................................................................................................... 9

28 U.S.C. § 1441 ........................................................................................................... 9

28 U.S.C. § 1446(d) ...................................................................................................... 9

28 U.S.C. § 1447(c) ...................................................................................................... 9

28 U.S.C. § 2254 ........................................................................................................... 9

28 U.S.C. § 2283 ........................................................................................................... 9

1 Stat. 302 (1793) ....................................................................................................... 10

9 Stat. 462 (1850) ....................................................................................................... 10

Act of Oct. 19, 1888, ch. 1210, 25 Stat. 565 ............................................................... 5

Act of Sept. 13, 1888, ch. 1015, § 13, 25 Stat. 476 ..................................................... 5

Chinese Exclusion Act, ch. 126, §§ 1, 12, 22 Stat. 58 (1882) ..................................... 5

Interstate Agreement on Detainers, Pub. L. No. 91-538, 84 Stat. 1397 (1970) ............ 9

## OTHER AUTHORITIES

*23-1023 Judges, Magistrate Judges, and Magistrates*, U.S. Bureau of Lab. Stats. (May 2023),
https://www.bls.gov/oes/2023/may/oes231023.htm ................................................................... 8

Allen Steinberg, *The Transformation of Criminal Justice: Philadelphia 1800-1880* (1989) ......... 3

Andrea M. Gardner & Kevin M. Scott, BUREAU OF JUST. STAT., U.S. DEPT. OF JUST.,
NCJ 302187, *Census of State and Local Law Enforcement Agencies, 2018 – Statistical Tables*
(October 2018) ................................................................................................................ 4

Beverly Gage, *G-Man: J. Edgar Hoover and the Making of the American Century* (2022).......... 4

Brian A. Reeves, BUREAU OF JUST. STAT., U.S. DEPT. OF JUST., No. 142972,
*Census of State and Local Law Enforcement Agencies, 1992* ..................................................... 4

Connor Brooks, BUREAU OF JUST. STAT., U.S. DEPT. OF JUST., NCJ 304752,
*Federal Law Enforcement Officers 2020–Statistical Tables* (September 2022) ....................... 4

Cooper Wingert, *Fugitive Slave Renditions and the Proslavery Crisis of Confidence in
Federalism, 1850–1860*, 110 J. AM. HIST. 40 (2023) ............................................................... 10

Daniel C. Richman & Sarah Seo, *How Federalism Built the FBI, Sustained Local Police, and
Left Out the States*, 17 STAN. J. C. R. & C. L. 421 (2022)................................................... 2, 3, 4

David A. Sklansky, *The Private Police*, 46 UCLA L. REV. 1165 (1999)...................................... 3

Emma Kaufman, *The Past and Persistence of Private Prosecution*,
173 U. PA. L. REV. 89 (2024)..................................................................................................... 3

Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1885)*,
93 COLUM. L. REV. 1833 (1993)................................................................................................ 5

H. Robert Baker, THE RESCUE OF JOSHUA GLOVER (2006) ................................................... 10, 11

Harvey Cortlandt Voorhees, *The Law of Arrest in Civil and Criminal Actions*,
The Boston Book Company (1904) ........................................................................................... 3

Jeffery M. Schmitt, *The Antislavery Judge Reconsidered*,
UNIV. DAYTON SCH. L. FAC. PUBL. (2011) .............................................................................. 11

Jonathan Barth, *Criminal Prosecution in American History: Private or Public?*,
67 S.D. L. REV. 119 (2022).......................................................................................................... 3

Jonathan Obert, *A Fragmented Force: The Evolution of Federal Law Enforcement in the United
States 1870-1900*, 29 J. POL'Y HIST. 640 (2017) ........................................................................ 3

Judith Resnik & Dennis Curtis, REPRESENTING JUSTICE: INVENTION, CONTROVERSY, AND RIGHTS IN CITY-STATES AND DEMOCRATIC COURTROOMS (2011) ....................................................... 7, 8

Judith Resnik, *Building the Federal Judiciary (Literal and Legally): The Monuments of Chief Justices Taft, Warren, and Rehnquist*, 87 IND. L. J. 823 (2012) .................................................. 7

Judith Resnik, *The Capital of and the Investments in Courts, State and Federal*, 99 N.Y.U. L. REV. 1958 (2024) ............................................................................................... 8

Karl Shoemaker, *Sanctuary and Crime in the Middle Ages, 400-1500* (Fordham University Press, 2011) .................................................................................... 6

Kellen Funk, *Equity's Federalism*, 97 NOTRE DAME L. REV. 2057 (2022) ................................... 9

Lawrence M. Friedman, *Crime and Punishment in American History* (1993) .............................. 3

Letter from Charles Sumner to Robert C. Winthrop (Feb. 9, 1843), in *Robert Winthrop Papers* (Massachusetts Historical Society) ................................................................... 5

Lindsay Nash, *Deportation Arrest Warrants*, 73 STAN. L. REV. 433 (2021) .............................. 12

Lindsay Nash, *Inventing Deportation Arrests*, 121 MICH. L. REV. 1301 (2023) ........................... 5

M. Rhead Enion, *Constitutional Limits on Private Policing and the State's Allocation of Force*, 59 DUKE L.J. 519 (2009) .................................................................................................. 6

Maeve Glass, *Citizens of the State*, 85 U. CHI. L. REV. 865 (2018) ........................................ 5, 11

Matthew Bacon, *A New Abridgment of the Law* (London, A. Strahan, 7th ed. 1832) .................. 6

National Center for State Courts, *Trial Court Caseload Overview Data Table* (Aug. 2025), https://perma.cc/59SP-BQ3K .......................................................................................... 8

Nicholas Parillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780-1940* (2013) ........................................................................................................... 4

Paul Finkelman, *Legal Ethics and Fugitive Slaves: The Anthony Burns Case, Judge Loring, and Abolitionist Attorneys*, 17 CARDOZO L. REV. 1793 (1996) ...................................................... 11

Robert M. Cover, JUSTICE ACCUSED (1975) .............................................................................. 11

*The Future of Federal Courthouse Construction Program: Results of a Government Accountability Office Study on the Judiciary's Rental Obligations: Hearing Before the Subcomm. on Econ. Dev., Pub. Bldgs. & Emergency Mgmt. of the H. Comm. on Transp. & Infrastructure*, 109th Cong. 269 (2006) ..................................................................................... 8

U.S. Dep't of Justice, ANNUAL REPORT OF THE ATTORNEY GENERAL OF THE UNITED STATES 114-21 (1905)..........................................................................................................4

U.S. Gov't Accountability Off., GAO- 22-104034, *Federal Courthouse Construction: Judiciary Should Refine Its Methods for Determining Which Projects Are Most Urgent* (2022)...................................................................................................................................8

United States Courts, *Status of Article III Judgeships — Judicial Business 2023* (Sept. 2023), https://perma.cc/J6Y2-7L9K ................................................................................................8

United States Courts, *Status of Article III Judgeships—Judicial Business 2022* (Sept. 2022), https://perma.cc/7VZ4-897N ................................................................................................8

Vroman Mason, THE FUGITIVE SLAVE LAW IN WISCONSIN, WITH REFERENCE TO NULLIFICATION SENTIMENT (1895) ..................................................................................................................11

William Blackstone, *Commentaries on the Laws of England* (1765)...........................................6

William Lauriston Melville Lee, *A History of Police in England* (1901) ......................................5

## INTEREST OF *AMICI CURIAE*

*Amici*, who are listed in the Appendix, are scholars of legal history, federalism, the courts, citizenship, slavery, constitutional rights, and American law. Among these scholars are individuals with expertise in the history of English common law, the relationships of states to citizens and non-citizens, federal immigration law, and the law of federal and state courts. Their research informs their view that state courthouses are central icons of state sovereignty and that the historic purpose of the common law privilege against civil arrests in and around courthouses (the "courthouse arrest privilege") was to respect the dignity of the courts and ensure that courts could discharge their obligations to enforce the law free from physical intrusions—a purpose that applies equally to civil immigration arrests in state courthouses. No counsel for a party authored this brief in whole or in part, and no person or entity, other than *amici curiae* and their counsel, has contributed money that was intended to fund preparing or submitting the brief.

## INTRODUCTION

New York's Protect Our Courts Act, Ch. 332, Laws of 2020 ("POCA"),  is a codification of the common law privilege against civil arrests in and around courthouses—a privilege whose history long predates the 1952 Immigration and Nationality Act, 8 U.S.C. § 1101 ("INA"). Before the United States came into being, English common law recognized that everyone was protected from civil arrest while attending to court business or while traveling to and from court. The purpose of this courthouse arrest privilege, which became part of U.S. common law, was to respect states' sovereignty and ensure that their courts could conduct their business free from physical interference. Indeed, state courthouses were iconic embodiments of law around the country.

As detailed below, until the twentieth century, federal law enforcement was extremely limited. States and localities were the locus of law enforcement powers for much of the first century, as municipalities developed their law enforcement capacities. Immigration enforcement,

to the extent it existed, was primarily handled by the states, protecting their populations through general police and welfare powers. Federal law enforcement grew after the Civil War, as Congress enacted general federal question jurisdiction and created the U.S. Department of Justice; further expansion came during the twentieth century, with a growing federal administrative state.

Of course, the Constitution made federal law supreme, when it applied, and hence state and federal courts have a myriad of interactions. Congress has regulated those relationships through a variety of statutes, such as the Anti-Injunction Act, the removal statutes, and habeas corpus jurisdiction. The Supreme Court has interpreted those doctrines, the Constitution, and the common law to require deference, abstention, and comity. These layers of law establish orderly interactions between state and federal courts and their law.

Given the limited role for federal law enforcement and of immigration activity before the INA, federal judges were not asked to decide issues related to the courthouse arrest privilege in the context of immigration. In contrast, many decisions addressed state-federal relations and the way that lawyers, judges, and litigants interact. That expansive jurisprudence does not sanction brute physical force to interrupt state courthouse proceedings. The closest historical analogue to the federal government's 2025 actions may well be its efforts to enforce the Fugitive Slave Act through seizures and renditions. The Civil War and the Fourteenth Amendment put those practices to an end; they should not be resurrected, nor should they be sanctioned by law.

## ARGUMENT

## I.     THE FEDERAL GOVERNMENT'S LAW ENFORCEMENT ROLE—BOTH CIVIL AND CRIMINAL—WAS MINIMAL UNTIL WELL INTO THE TWENTIETH CENTURY

From the colonial era to the mid-1800s, "crime control in the United States was a local matter and often prosecuted privately." Daniel C. Richman & Sarah Seo, *How Federalism Built the FBI, Sustained Local Police, and Left Out the States*, 17 STAN. J. C. R. & C. L. 421, 424 (2022);

*see also* Allen Steinberg, *The Transformation of Criminal Justice: Philadelphia 1800-1880* (1989). Indeed, the government's "monopoly on prosecution" did not begin until the late nineteenth century with the appointment of public prosecutors. Emma Kaufman, *The Past and Persistence of Private Prosecution*, 173 U. Pa. L. Rev. 89, 107-08 (2024). Local police forces, which became more common during the second half of the nineteenth century, addressed issues of general urban disorder. *See* Lawrence M. Friedman, *Crime and Punishment in American History* 68-69 (1993); David A. Sklansky, *The Private Police*, 46 UCLA L. Rev. 1165, 1208 (1999).

At the state and local level, the closest analogy to civil arrests by governments were arrests by the sheriff to compel an appearance in court by the defendant. *See Murphy Bros. v. Michetti Pipe Stringing, Inc.*, 526 U.S. 344, 350 (1999). As to that kind of arrest, the courthouse arrest privilege applied. *See* Harvey Cortlandt Voorhees, *The Law of Arrest in Civil and Criminal Actions*, The Boston Book Company (1904). The privilege was later extended to protect against personal service of a summons, *see Person v. Grier*, 66 N.Y. 124, 125 (1876), the "contemporary counterpart" to the *writ of capias ad respondendum*, *Murphy Bros.*, 526 U.S. at 350.

In contrast to the expanding role for states in civil and criminal law enforcement, federal civil and criminal law enforcement remained "miniscule" until well into the twentieth century. Jonathan Obert, *A Fragmented Force: The Evolution of Federal Law Enforcement in the United States 1870-1900*, 29 J. Pol'y Hist. 640, 645 (2017); *accord* Jonathan Barth, *Criminal Prosecution in American History: Private or Public?*, 67 S.D. L. Rev. 119, 149 (2022). The federal government had no general police force or "a general investigative force" for much of the nineteenth century. Richman & Seo at 430. Its limited law enforcement activities were largely undertaken by the U.S. Marshals—a small, decentralized agency focused on courts and legal process. *See* Obert at 647.

3

The federal prosecutors during that era were primarily focused on crimes related to excise tax evasion and other internal fiscal violations. *See* Nicholas Parillo, *Against the Profit Motive: The Salary Revolution in American Government, 1780-1940*, at 257-58, 263-64, 273-74. Likewise, after the creation of the Department of Justice in 1870, its concerns were a narrow range of cases related to the Treasury Department and Post Office. Richman & Seo at 430; U.S. Dep't of Justice, ANNUAL REPORT OF THE ATTORNEY GENERAL OF THE UNITED STATES 114-21 (1905). Expansion of federal law enforcement powers and roles, including the development of the FBI, occurred later in the twentieth century. *See generally* Beverly Gage, *G-Man: J. Edgar Hoover and the Making of the American Century* (2022).

Long after the expansion of the federal government's law enforcement's apparatus, state and local law enforcement have remained central. For example, "[i]n 1992, state and local governments funded 17,360 police and sheriffs' departments, including 12,504 general purpose local police departments, 3,087 sheriffs' departments, 49 primary State police departments, and 1,720 special police agencies." Brian A. Reeves, BUREAU OF JUST. STAT., U.S. DEPT. OF JUST., No. 142972, *Census of State and Local Law Enforcement Agencies, 1992*, at 1. These agencies "employed approximately 603,000 full-time sworn officers with general arrest powers and 237,000 nonsworn civilian personnel." *Id.* In 2018, the predominance of local police departments remained. *See* Andrea M. Gardner & Kevin M. Scott, BUREAU OF JUST. STAT., U.S. DEPT. OF JUST., NCJ 302187, *Census of State and Local Law Enforcement Agencies, 2018 – Statistical Tables*, at 1 (October 2018). In 2020, some 137,000 individuals were federal law enforcement personnel, 49% of whom were employed by the Department of Homeland Security. Connor Brooks, BUREAU OF JUST. STAT., U.S. DEPT. OF JUST., NCJ 304752, *Federal Law Enforcement Officers 2020– Statistical Tables*, at 1 (September 2022).

As to immigration, the states were in control through most of the nineteenth century, *see* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1885)*, 93 COLUM. L. REV. 1833, 1839-84 (1993); immigration regulation fell within police powers that "rightfully belonged to the state," *New York v. Miln*, 36 U.S. 102, 132 (1837). As is familiar, in the 1880s, Congress enacted the Chinese Exclusion Act, ch. 126, §§ 1, 12, 22 Stat. 58, 59-61 (1882), and in subsequent legislation, *see, e.g.*, Act of Sept. 13, 1888, ch. 1015, § 13, 25 Stat. 476, 479; Act of Oct. 19, 1888, ch. 1210, 25 Stat. 565, 566-67, Congress created a civil deportation regime. In practice, before 1920, "few people were actually excluded or deported." Lindsay Nash, *Inventing Deportation Arrests*, 121 MICH. L. REV. 1301, 1333 (2023). During and after World War II, the federal government began to expand its use of civil deportation. *See id.* at 1341-52.

## II.    THE COURTHOUSE ARREST PRIVILEGE'S ROLE IN PROTECTING LAW ENFORCEMENT AND AUTHORITY

While federal law enforcement emerged in more recent decades, the courthouse arrest privilege has existed for centuries. It stems from the concept of the "King's Peace," which in medieval England was a guarantee that the King would provide "a state of peace and security in return for the allegiance" of his subjects. William Lauriston Melville Lee, *A History of Police in England*, at 1 (1901). The idea that a sovereign was duty-bound to protect its people was a rule that "finds its support in the principles of natural justice" and became part of the fabric of U.S. law. Letter from Charles Sumner to Robert C. Winthrop (Feb. 9, 1843), in *Robert Winthrop Papers* (Massachusetts Historical Society). "Ancient in its origins, the rule … migrat[ed] to the feudal manors of Britain and the kingdoms of renaissance Europe, where it echoed in the treatises of the early modern world." Maeve Glass, *Citizens of the State*, 85 U. CHI. L. REV. 865, 892 (2018). Moreover, "a sovereign that failed to protect its citizens from violence effectively abdicated its right to rule." *Id.*

The concept of the King's Peace generated the image of the King's presence in common law courts which required that courts be respectful, peaceful places. *See* William Blackstone, *Commentaries on the Laws of England*, at 1, C.7.  The U.S. Constitution continued that idea through its commitment to states' inherent police powers. *See* M. Rhead Enion, *Constitutional Limits on Private Policing and the State's Allocation of Force*, 59 DUKE L.J. 519, 536 (2009). The states "remained responsible—much like the English sovereigns before them—for the maintenance of order and security in society." *Id.* at 534.

The courthouse arrest privilege serves two distinct purposes: to encourage parties and witnesses to come forward voluntarily, *see Walpole v. Alexander* (1782), 99 Eng. Rep. 530, 530-31, and to enable courts to administer justice free of interference, *Orchard's Case* (1828), 38 Eng. Rep. 987, 987. This common law privilege applied broadly. "To permit arrest to be made in the Court would give occasion to perpetual tumults, and [is] altogether inconsistent with the decorum which ought to prevail in a high tribunal." *Id.* Thus, "all persons whatsoever, are free from arrests…." Matthew Bacon, *A New Abridgment of the Law*, at 530 (London, A. Strahan, 7th ed. 1832). While analogous privileges—like the church sanctuary privilege—were later abrogated by Parliament in the seventeenth century, *see* Karl Shoemaker, *Sanctuary and Crime in the Middle Ages, 400-1500* (Fordham University Press, 2011), at 170, the courthouse arrest privilege remained and became part of the common law in the United States. *See, e.g.*, *Miln*, 36 U.S. at 103; *Commonwealth v. Vrooman*, 164 Pa. 306, 316 (1894). The privilege was extended to service of process, which had become the more common method, in place of civil arrest, for obtaining personal jurisdiction over a defendant in civil litigation. *See Halsey v. Stewart*, 4 N.J.L. 366, 368 (N.J. 1817). As the New York Court of Appeals put it, the privilege "is not simply a personal privilege, but it is also the privilege of the court, and is deemed necessary for the maintenance of

its authority and dignity and in order to promote the due and efficient administration of justice."

*Parker v. Marco*, 136 N.Y. 585, 589 (1893). Likewise, the U.S. Supreme Court explained that the

privilege was a "true rule, well founded in reason and sustained by the greater weight of authority"

that "suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the

service of civil process while in attendance upon court, and during a reasonable time in coming

and going." *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916).

That privilege fits a core principle of federalism, which is that state sovereign interests

must be respected. A series of U.S. Supreme Court decisions on the immunity of states from

lawsuits rests on the importance of state sovereignty. *See, e.g.*, *Fed. Mar. Comm'n v. S.C. State

Ports Auth.*, 535 U.S. 743, 760 (2002); *Alden v. Maine*, 527 U.S. 706, 715 (1999); *Idaho v. Coeur

d'Alene Tribe*, 521 U.S. 261, 268-69 (1997); *Seminole Tribe v. Florida*, 517 U.S. 44, 72-73 (1996).

State courthouses are a material embodiment of that authority. Many state constitutions make

commitments to open courts and to rights to remedies. *See, e.g.*, CONN. CONST. of 1818, Article

I, § 12; ALA. CONST. of 1819, Article I, § 14; MO. CONST. of 1820, Article XIII, ¶ 7. Georgia's

specified the need to build courthouses. GA. CONST. of 1777, Art. LV. From the country's

founding, local and state courthouses were markers of civic pride and community centers. *See

Judith Resnik & Dennis Curtis, REPRESENTING JUSTICE: INVENTION, CONTROVERSY, AND RIGHTS

IN CITY-STATES AND DEMOCRATIC COURTROOMS*, at 137. By contrast, before the Civil War, no

federal building was a courthouse; customs houses at times had a courtroom tucked inside. Judith

Resnik, *Building the Federal Judiciary (Literal and Legally): The Monuments of Chief Justices

Taft, Warren, and Rehnquist*, 87 IND. L. J. 823, 838-41 (2012). After the Civil War and accelerating

in the twentieth century, Congress authorized more building, often combining courts and post

offices, to generate a "federal presence" and bring resources to communities. *Id.* at 841-60. During

the later part of the twentieth century, Congress expanded the footprint of the federal judiciary further. *See The Future of Federal Courthouse Construction Program: Results of a Government Accountability Office Study on the Judiciary's Rental Obligations: Hearing Before the Subcomm. on Econ. Dev., Pub. Bldgs. & Emergency Mgmt. of the H. Comm. on Transp. & Infrastructure*, 109th Cong. 269, 268-80 (2006).

Nonetheless, in terms of courthouses, judges, and cases, state services dominate. As of 2022, some 420 federal courthouses were in operation, and Congress has provided for fewer than 1,500 federal life-tenured judgeships. U.S. Gov't Accountability Off., GAO- 22-104034, *Federal Courthouse Construction: Judiciary Should Refine Its Methods for Determining Which Projects Are Most Urgent* 2 nn.3 & 5 (2022); United States Courts, *Status of Article III Judgeships— Judicial Business 2022* (Sept. 2022), https://perma.cc/7VZ4-897N. In contrast, in 2023 some 24,000 state and local judges were at work, and California alone had 450 buildings with trial facilities in its fifty-eight counties. *See 23-1023 Judges, Magistrate Judges, and Magistrates*, U.S. Bureau of Lab. Stats. (May 2023), https://www.bls.gov/oes/2023/may/oes231023.htm; United States Courts, *Status of Article III Judgeships — Judicial Business 2023* (Sept. 2023), https://perma.cc/J6Y2-7L9K; Resnik & Curtis, at 137. More than 60 million cases were filed in state courts around the country.  National Center for State Courts, *Trial Court Caseload Overview Data Table* (Aug. 2025), https://perma.cc/59SP-BQ3K; *see also* Judith Resnik, *The Capital of and the Investments in Courts, State and Federal*, 99 N.Y.U. L. REV. 1958, 1991-99 (2024).

## III.    FEDERAL-STATE INTERACTIONS ARE GOVERNED BY STATUTES AND RULES THAT DO NOT AUTHORIZE PHYSICAL INTRUSION INTO STATE COURTHOUSES

As Justice Scalia explained in *Tafflin v. Levitt*, by virtue of the Supremacy Clause, federal law is state law. 493 U.S. 455, 469-70 (1990). State law and federal law "together form one system of jurisprudence, which constitutes the law of the land for the State; and the courts of the two

jurisdictions are not foreign to each other." *Id.* at 470 (quoting *Claflin v. Houseman*, 93 U.S. 130, 136-37 (1876)). State judges are bound to enforce federal law and cannot take actions that would nullify a federal right or cause of action. *See Williams v. Reed*, 145 S. Ct. 465, 470 (2025); *Haywood v. Drown*, 556 U.S. 729, 736-37 (2009); *Testa v. Katt*, 330 U.S. 386, 389-90 (1947).

The relationship between the federal and state governments is a cooperative one, and the interactions between their courts are regulated through statutes and legal doctrine. For example, through removal statutes, Congress has created a process by which state court action can be transferred to federal courts, *see* 28 U.S.C. §§ 1441, 1446(d), as well as remanded, 28 U.S.C. § 1447(c); *see also Royal Canin U.S.A., Inc. v. Wullschleger*, 604 U.S. 22, 25 (2025). Similarly, the Interstate Agreement on Detainers, Pub. L. No. 91-538, 84 Stat. 1397 (1970) "creates uniform procedures for lodging and executing a detainer," such that individuals imprisoned by one state or the federal government may be transferred to another jurisdiction. *Alabama v. Bozeman*, 533 U.S. 146, 148 (2001). Likewise, the federal judiciary's oversight of state criminal convictions via habeas corpus is regulated and limited. *See* 28 U.S.C. § 2254.

Other examples abound. The Anti-Injunction Act, with limited exceptions, requires that federal judges not intrude in pending state cases. 28 U.S.C. § 2283; *see also Mitchum v. Foster*, 407 U.S. 225, 229 (1972). Congress's aim was to "restrain federal equity from interfering with *legal* process." Kellen Funk, *Equity's Federalism*, 97 NOTRE DAME L. REV. 2057, 2065 (2022) (emphasis in original). Similarly, the Tax Injunction Act prohibits lawsuits to restrain the assessment or collection of any state tax. 26 U.S.C. § 7421 The Johnson Act, 28 U.S.C. § 1342, likewise "deprive[s] federal district courts of jurisdiction to enjoin enforcement of certain state administrative orders affecting public utility rates" where a remedy is available in the state courts. *Alabama Pub. Serv. Comm'n v. S. Ry. Co.*, 341 U.S. 341, 350 (1951).

The Supreme Court has also developed doctrines of comity ensuring "a proper respect for state functions." *Levin v. Com. Energy, Inc.*, 560 U.S. 413, 421 (2010). A central example is *Younger* abstention, which recognizes that "[r]estraining equity jurisdiction within narrow limits," "avoid[s] a duplication of legal proceedings and legal sanctions," and ensures "proper respect for state functions." *Sprint Commc'ns, Inc. v. Jacobs*, 571 U.S. 69, 77 (2013) (quoting *Younger v. Harris*, 401 U.S. 37, 44 (1971)); *R.R. Comm'n of Tex. v. Pullman Co.*, 312 U.S. 496, 500 (1941).

## IV. THE ATTEMPT TO INTRUDE ON STATE COURTHOUSES HAS PARALLELS IN THE RENDITION EFFORTS CARRIED OUT BY THE FEDERAL GOVERNMENT TO ENFORCE THE FUGITIVE SLAVE ACT

In searching history for analogues to the federal government's immigration activity in 2025, one disheartening example exists: the federal government's role in seizing former slaves and returning them to their owners through the fugitive slave laws of 1793 and 1850. *See* 1 Stat. 302, 302-05 (1793); 9 Stat. 462 (1850). The 1793 Act codified a private right to recover a fugitive slave by establishing formal legal process for a rendition. *See* H. Robert Baker, THE RESCUE OF JOSHUA GLOVER, at 31.

The 1850 Act federalized slave renditions. Cooper Wingert, *Fugitive Slave Renditions and the Proslavery Crisis of Confidence in Federalism*, *1850–1860*, 110 J. AM. HIST. 40, 45 (2023). The law created a quasi-civil summary procedure that bears some of the hallmarks of federal immigration enforcement, "authoriz[ing] U.S. district courts to appoint U.S. commissioners and g[iving] them concurrent jurisdiction to issue certificates of removal for alleged fugitives in a summary hearing. … To obtain the certificate of removal, the slaveholder had to produce an affidavit or a deposition certified by a magistrate in the slaveholder's home state that proved the identity of the fugitive slave." Baker at 51-52. That brief affidavit—one-sided "proof" of ownership, escape, and identity—was all that was required to compel a federal court to return a fugitive slave. *Id.* at 52. "The result was a summary procedure that forbade the testimony of the

10

alleged fugitive or the introduction of any evidence on his behalf.  It also prevented all molestation … by any process issued by any court, judge, magistrate, or other person whomsoever." *Id.*

In short, "Congress had passed a law that deprived" the states of their "right to define and protect the rights of [their] citizens." Baker at 108. The Act "dramatically altered accepted practices and led to resistance far more ferocious than any that the 1793 law had ever occasioned." *Id.* at 286. Indeed, the northern states recognized the 1850 Fugitive Slave Act for what it was: an affront to their sovereignty and the dignity of their citizens. Many states responded by passing personal liberty laws, which they justified by invoking "the ancient duties of protection to [their] citizens." Glass, *Citizens of the State*, at 915-16; *see also* Jeffery M. Schmitt, *The Antislavery Judge Reconsidered*, UNIV. DAYTON SCH. L. FAC. PUBL., at 5 (2011).

The federal government's efforts to enforce the 1850 Fugitive Slave Act led to public resistance, social unrest, and conflict in and around courthouses. *See* Paul Finkelman, *Legal Ethics and Fugitive Slaves: The Anthony Burns Case, Judge Loring, and Abolitionist Attorneys*, 17 CARDOZO L. REV. 1793, 1799 (1996); *see also* Robert M. Cover, JUSTICE ACCUSED 175-91. For example, an effort to enforce the Act in Wisconsin led a group of thousands, including newspaper editor Sherman Booth, to travel to the Milwaukee courthouse to rescue a man who had been arrested and accused of being a fugitive slave.  *See* Vroman Mason, THE FUGITIVE SLAVE LAW IN WISCONSIN, WITH REFERENCE TO NULLIFICATION SENTIMENT 124-25 (1895). When Booth was later charged with aiding and abetting the man's escape, he argued that the Fugitive Slave Act was unconstitutional, and the Wisconsin Supreme Court agreed. *In re Booth*, 3 Wis. 144, 158 (1854). The U.S. Supreme Court reversed and held that the Act was constitutional. *Ableman v. Booth*, 62 U.S. 506, 507-11 (1858). Thereafter, the Civil War and the adoption of the Thirteenth and Fourteenth Amendments repudiated the Fugitive Slave Act. The Fourteenth Amendment made

citizens of "[a]ll persons born or naturalized in the United States," and today prohibits laws that deprive any person of due process or the equal protection of the laws. U.S. CONST. amend. XIV.

Turning to the contemporary civil immigration enforcement efforts, they too lack procedural constraints. Like the 1850 Fugitive Slave Act, the INA grants the federal government broad authority to issue arrest warrants for civil immigration violations with minimal judicial oversight. 8 U.S.C. §§ 1126, 1357; *see also* Lindsay Nash, *Deportation Arrest Warrants*, 73 STAN. L. REV. 433 455-58 (2021). ICE lacks the constraints and limits that marked prosecutions (civil, public, and private) and arrests in the eighteenth and nineteenth centuries. *Id.* One core part of what constrained "civil" arrests during that time was the risk of personal liability by officers. The "civil arrests" that ICE conducts are very different. Immigration officers are immunized in their actions and are not at legal risk for wrongful behavior, as nearly all "officers" were in earlier days. That fact heightens the need for protection at state courthouses. The warrantless—or inadequately warranted—behavior of immigration officers is another reason why people who use state courthouses for legal business need to be protected from such putatively civil arrests.

## CONCLUSION

New York's Protect Our Courts Act reflects the state's commitment to protect its communities through ensuring that state courts can do the "people's business" and that litigants, lawyers, judges, and witnesses can participate in judicial proceedings free of outside interference. It is a statute founded on a long and valuable history of recognizing the significance of courthouses as sites where the crucial business of republican government goes on and where citizens and non-citizens alike know they will be protected and safe while engaged in the civic affairs and duties that courthouses are meant for. *Amici curiae* respectfully submit that this Court should grant the defendants' motion to dismiss and hold that the privilege against civil arrests in and around courthouses extends to civil immigration arrests by federal officials.

Dated: August 11, 2025                          Respectfully submitted,
       New York, New York


                                                */s/ Roberta A. Kaplan*
                                                Roberta A. Kaplan
                                                Ellen V. Holloman
                                                D. Brandon Trice
                                                Philip W. Young
                                                Kaplan Martin LLP
                                                1133 Avenue of the Americas | Suite 1500
                                                New York, NY 10036
                                                Tel: (212) 316-9500
                                                rkaplan@kaplanmartin.com
                                                eholloman@kaplanmartin.com
                                                btrice@kaplanmartin.com
                                                pyoung@kaplanmartin.com

                                                *Attorneys for Amici Curiae*

# APPENDIX

## List of *Amici Curiae*

(Institutional affiliations provided for identification purposes only)

Judith Resnik
Arthur Liman Professor of Law
Yale Law School

Hendrik Hartog
Class of 1921 Bicentennial Professor in the History of American Law and Liberty, Emeritus
Princeton University

Karl Shoemaker
Robert F. and Sylvia T. Wagner Professor of History and Law
University of Wisconsin-Madison

Michelle McKinley
Bernard B. Kliks Professor of Law
University of Oregon School of Law

Richard C. Schragger
Walter L. Brown Professor of Law
University of Virginia School of Law

William Jordan
Dayton-Stockton Professor of History, Emeritus
Princeton University

Paul Halliday
Julian Bishko Professor of History; Professor of Law
University of Virginia

Sarah A. Seo
Professor of Law
New York University Law School

Julie Suk
Hon. Deborah A. Batts Distinguished Research Scholar, Professor of Law
Fordham University School of Law

Barbara Welke
Professor of History and Law
University of Minnesota Law School

Farah Peterson
Professor of Law
University of Chicago Law School

Maeve Glass
Professor of Law
Columbia Law School