# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF NEW YORK
### (Albany Division)

THE UNITED STATES OF AMERICA,

        Plaintiff,

  v.

STATE OF NEW YORK *et al.*,

        Defendants.

No. 1:25-cv-744-MAD-PJE

# MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ..................................................................................................................1

BACKGROUND ...................................................................................................................2

    I.     Constitutional and Statutory Principles ............................................................2

    II.    Agency Guidance on Civil Immigration Arrests ...........................................4

    III.   Challenged Sanctuary Policies .......................................................................6

         A.   Protect Our Courts Act ......................................................................6

         B.   Executive Orders 170 & 170.1 ..........................................................7

    IV.   Procedural History ..........................................................................................8

LEGAL STANDARD .........................................................................................................8

ARGUMENT .......................................................................................................................8

    I.     The Complaint States a Claim of Conflict Preemption .................................9

         A.   The Complaint Sufficiently Alleges Interference with Federal Immigration Enforcement ...................................................................9

         B.   The POCA Is Not Entitled to A Presumption Against Preemption ..................12

         C.   The Executive Orders Are Not Justified Under the Tenth Amendment ..........17

    II.    The Complaint States a Claim of Violation of Intergovernmental Immunity Principles.........................................................................................................20

         A.   The Complaint States a Claim of Unlawful Regulation of the Federal Government ......................................................................20

         B.   The Complaint States a Claim of Unlawful Discrimination Against the Federal Government ...................................................................23

CONCLUSION..................................................................................................................25

# TABLE OF AUTHORITES

**Cases**

*Abel v. United States,*
    362 U.S. 217 (1960) ........................................................................................................21

*Antonyuk v. James,*
    120 F.4th 941 (2d Cir. 2024) .........................................................................................16

*Arizona v. United States,*
    567 U.S. 387 (2012) ...............................................................................................*passim*

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ...........................................................................................8, 12, 23

*Baker Botts LLP v. ASARCO LLC,*
    576 U.S. 121 (2015) ........................................................................................................14

*Berger v. State of New York,*
    388 U.S. 41 (1967) ...........................................................................................................3

*Branch v. Smith,*
    538 U.S. 254 (2003) ........................................................................................................17

*Buckman Co. v. Pls.' Legal Comm.,*
    531 U.S. 341 (2001) ........................................................................................................12

*City of New York v. United States,*
    179 F.3d 29 (2d Cir. 1999) ....................................................................................*passim*

*Contreras v. United States,*
    672 F.2d 307 (2d Cir. 1982) ...........................................................................................21

*CoreCivic, Inc. v. Governor of N.J.,*
    145 F.4th 315 (3d Cir. 2025) .............................................................................20, 22, 23

*Crosby v. Nat'l Foreign Trade Council,*
    530 U.S. 363 (2000) ..........................................................................................................9

*Daimler AG v. Bauman,*
    571 U.S. 117 (2014) ........................................................................................................15

*Davis v. Elmire Sav. Bank,*
    161 U.S. 275 (1896) ..........................................................................................................9

*Dawson v. Steager,*
    586 U.S. 171 (2019) .................................................................................................23, 24

*Doe v. ICE,*
    490 F. Supp. 3d 672 (S.D.N.Y. 2000) ........................................................................... 14, 17

*FCC v. NextWave Personal Commc'ns Inc.,*
    537 U.S. 293 (2003) .................................................................................................16

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n,*
    505 U.S. 88 (1992) ...................................................................................................13

*Goodyear Atomic Corp. v. Miller,*
    486 U.S. 174 (1988) .................................................................................................23

*Herrera-Inirio v. INS,*
    208 F.3d 299 (1st Cir. 2000) ....................................................................................16

*Hines v. Davidowitz,*
    312 U.S. 52 (1941) ................................................................................................. 2, 9

*Hodel v. Va. Surface Mining & Reclamation Ass'n,*
    452 U.S. 264 (1981) .................................................................................................19

*Hughes v. Oklahoma,*
    441 U.S. 322 (1979) .................................................................................................13

*In re Neagle,*
    135 U.S. 1 (1890) ......................................................................................... 11, 20, 22

*In re Trib. Co. Fraudulent Conv. Litig.,*
    946 F.3d 66 (2d Cir. 2019) .......................................................................................13

*International Shoe Co. v. Washington,*
    326 U.S. 310 (1945) .................................................................................................15

*Johnson v. Maryland,*
    254 U.S. 51 (1920) ...................................................................................................21

*Kansas v. Colorado,*
    533 U.S. 1 (2001) .....................................................................................................15

*Lamar, Archer & Cofrin, LLP v. Appling,*
    584 U.S. 709 (2018) .................................................................................................11

*Leslie Miller, Inc. v. Arkansas,*
    352 U.S. 187 (1956) .................................................................................................22

*Mayo v. United States,*
    319 U.S. 441 (1943) .............................................................................................. 2, 20

*McCarthy v. Dun & Bradstreet Corp.*,
   482 F.3d 184 (2d Cir. 2007) ................................................................................................8

*McCulloch v. Maryland*,
   17 U.S. (4 Wheat.) 316 (1819) ................................................................................9, 20, 22

*Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.*,
   467 U.S. 461 (1984) ..............................................................................................................13

*Murphy v. Nat'l Collegiate Athletic Ass'n*,
   584 U.S. 453 (2018) ........................................................................................................18, 19

*Nat'l Meat Ass'n v. Harris*,
   565 U.S. 452 (2012) ..............................................................................................................18

*Netograph Mfg. Co. v. Scrugham*,
   90 N.E. 962 (N.Y. 1910) ......................................................................................................15

*New York v. ICE*,
   431 F. Supp. 3d 377 (S.D.N.Y. 2019) .........................................................................14, 17

*New York v. ICE*,
   466 F. Supp. 3d 439 (S.D.N.Y. 2020), *vacated and remanded*, No. 20-2622, 2023 WL 2333979
   (2d Cir. Feb. 28, 2023) ........................................................................................................14

*New York v. Tanella*,
   374 F.3d 141 (2d Cir. 2004) ...........................................................................................11, 22

*Nielsen v. Preap*,
   586 U.S. 392 (2019) ................................................................................................................1

*North Dakota v. United States*,
   495 U.S. 423 (1990) ........................................................................................................20, 23

*Pasquantino v. United States*,
   544 U.S. 349 (2005) ..............................................................................................................14

*Printz v. United States*,
   521 U.S. 898 (1997) ........................................................................................................18, 19

*Pub. Utils. Comm'n of State of Cal. v. United States*,
   355 U.S. 534 (1958) ..............................................................................................................22

*Reno v. Condon*,
   528 U.S. 141 (2000) ..............................................................................................................19

*Ryan v. ICE,*
    974 F.3d 9 (1st Cir. 2020) ............................................................................... 15, 16

*Samantar v. Yousuf,*
    560 U.S. 305 (2010) ......................................................................................... 14, 16

*South Carolina v. Baker,*
    485 U.S. 505 (1988) ................................................................................................2

*State of New York v. Dep't of Justice,*
    951 F.3d 84 (2d Cir. 2020) ..................................................................... 10, 18, 19

*Tennessee v. Davis,*
    100 U.S. 257 (1879) ............................................................................................22

*Textile Workers Union of Am. v. Lincoln Mills of Ala.,*
    353 U.S. 448 (1957) ............................................................................................16

*Trump v. Vance,*
    591 U.S. 786 (2020) ............................................................................................20

*United States v. Alabama,*
    691 F.3d 1269 (11th Cir. 2012) ........................................................................12

*United States v. California,*
    921 F.3d 865 (9th Cir. 2019) ...................................................................... 19, 20

*United States v. City of Arcata,*
    629 F.3d 986 (9th Cir. 2010) ...................................................................... 21, 24

*United States v. Craft,*
    535 U.S. 274 (2002) ............................................................................................14

*United States v. Denedo,*
    556 U.S. 904 (2009) ............................................................................................15

*United States v. Fausto,*
    484 U.S. 439 (1988) ............................................................................................17

*United States v. Ferrara,*
    847 F. Supp. 964 (D.D.C. 1993), *aff'd,* 54 F.2d 825 (D.C. Cir. 1995) ...................20

*United States v. Fresno Cnty.,*
    429 U.S. 452 (1977) ............................................................................................22

*United States v. King Cnty.,*
    122 F.4th 740 (9th Cir. 2024) ...................................................................... 23, 25

*United States v. Locke,*
    529 U.S. 89 (2000) ..................................................................................................12

*United States v. South Carolina,*
    720 F.3d 518 (4th Cir. 2013) ...............................................................................12

*United States v. Washington,*
    596 U.S. 832 (2022) ..............................................................................................23

*Vazquez-Medrano v. Sessions,*
    726 F. App'x 92 (2d Cir. 2018) ...........................................................................21

*Velasquez-Hernandez v. ICE,*
    500 F. Supp. 3d 1132 (S.D. Cal. 2020) ..............................................................14

*Washington v. United States,*
    460 U.S. 536 (1983) ..............................................................................................23

*Wis. Dep't of Indus. v. Gould Inc.,*
    475 U.S. 282 (1986) .........................................................................................13, 24

**Constitutional Provisions**

U.S. Const. art. I § 8, cl. 4 ...............................................................................................2

U.S. Const. art. VI, cl. 2 ...................................................................................................2

**Statutes**

6 U.S.C. § 482 ...................................................................................................................2

8 U.S.C. § 1101 *et seq.* ...............................................................................................2, 9

8 U.S.C. § 1182 .................................................................................................................2

8 U.S.C. § 1225 .................................................................................................................2

8 U.S.C. § 1226 ........................................................................................................*passim*

8 U.S.C. § 1227 .................................................................................................................2

8 U.S.C. § 1228 .................................................................................................................2

8 U.S.C. § 1229 ..........................................................................................................10, 17

8 U.S.C. § 1231 .........................................................................................................2, 4, 9

8 U.S.C. § 1357 ........................................................................................................*passim*

8 U.S.C. § 1373 ..........................................................................................................4, 10

8 U.S.C. § 1644 ..........................................................................................................4, 10

Act of June 25, 1798, ch. 58, § 1, 1 Stat. 570 ................................................................21

Laken Riley Act,
    Pub. L. No. 119-1, 139 Stat. 3 (2025) (codified at 8 U.S.C. § 1226 *et seq.*) ............3

N.Y. Civ. Rights Law § 28 (the "POCA"). ................................................................*passim*

N.Y. Penal Law § 135 ................................................................................................. 7, 21

N.Y. Penal Law § 215 .........................................................................................................7

N.Y. Soc. Serv. Law § 459-a ..................................................................................... 6, 21

**Rules**

Federal Rule of Civil Procedure 12(b)(6) ........................................................................8

**Executive Orders**

N.Y. Comp. Codes R. & Regs. Tit. 9, § 8.170.1 ......................................................*passim*

N.Y. Comp. Codes R. & Regs. Tit. 9, § 8.170 .................................................1, 7, 11, 24

Protecting the American People Against Invasion,
    Executive Order No. 14,159 ................................................................................. 1, 3

**Other Authorities**

*Amici Br. of New York et al., Arizona v. United States,*
    No. 11-182, 2012 WL 1054493 (U.S. Mar. 26, 2012) ...........................................10

H.R. Conf. Rep. No. 104-725 ..........................................................................................12

Memorandum from Acting Director of ICE Todd M. Lyons, Civil Immigration Enforcement
    Actions In or Near Courthouses (May 27, 2025) ....................................................5

Memorandum from Acting Director of ICE Caleb Vitello, Interim Guidance: Civil Immigration
    Enforcement Actions in or Near Courthouses (Jan. 21, 2025) ................................5

Petition for a Writ of Certiorari,
    *United States v. California*, No. 19-532 (Oct. 22, 2019) ........................................20

"Protect Our Courts Act," Protecting Immigrants From Warrantless ICE Arrests When Attending Court Proceedings, NY Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our................................................................. 1, 12

S. Rep. No. 104-249 (1996) ...................................................................................................12

"U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers* (Mar. 24, 2017) ...........................................................................................3

*Wheely v. Richam* (1694) 92 Eng. Rep. 882, 882 (K.B.) ...............................................15

## INTRODUCTION

Under both the Constitution and the Immigration and Nationality Act ("INA"), the Executive Branch has "broad, undoubted power" to arrest and detain illegal aliens to effectuate their removal. *See Arizona v. United States*, 567 U.S. 387, 394 (2012). As the Supreme Court has explained, "deportable criminal aliens who are not detained continue to engage in crime and fail to appear for their removal hearings in large numbers." *Nielsen v. Preap*, 586 U.S. 392, 398 (2019).[1] That is why the INA not only authorizes but *requires* federal agents to detain illegal aliens who, based on their commission of certain crimes, pose a threat to public safety. *See* 8 U.S.C. § 1226(c)(1). That threat to public safety is also why, upon his inauguration, President Trump declared a national emergency at the southern border resulting from the unprecedented influx of illegal aliens. *See* Protecting the American People Against Invasion, Executive Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 20, 2025).

Notwithstanding the safety threats posed by illegal aliens, the State of New York has enacted a law designed to place extraordinary constraints on federal immigration authorities—with the conceded intent to "powerful[ly] rebuke" federal immigration enforcement.[2] That law, known as the "Protect Our Courts Act," prohibits federal authorities from civilly arresting almost anyone, anywhere, as long as they are on the way to or from a court proceeding in New York. *See* N.Y. Civ. Rights Law §§ 28.1, 28.6(c) (the "POCA"). An immigration officer who makes an arrest in violation of this law, even where he is required to do so under the INA, may be held civilly or criminally liable. *See id.* § 28.2-4. Executive Order 170.1 extends the POCA's prohibition to bar civil immigration arrests of anyone "within state facilities." *See* N.Y. Comp. Codes R. & Regs. Tit. 9, § 8.170.1. Further, through Executive Orders 170 and 170.1, New York prohibits federal immigration authorities from accessing any "information for the purpose of federal civil immigration enforcement" from New York officers or employees. *See id.*; *id.* § 8.170.

---

[1] Internal citations and quotations are omitted in this brief unless otherwise noted.

[2] *See* Senator Brad Holyman Applauds Signing of "Protect Our Courts Act," Protecting Immigrants From Warrantless ICE Arrests When Attending Court Proceedings, NY Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our.

As evident on their face, and as demonstrated in the United States' Complaint, these laws unconstitutionally impede federal officers from enforcing immigration laws, regulate where and how those officers may make civil arrests, and discriminatorily restrict disclosure of information only to federal immigration authorities.  *See* Complaint, ECF No. 1 ¶¶ 55-69 ("Compl.").  Yet New York has moved to dismiss the Complaint, principally asserting that the laws are valid exercises of its Tenth Amendment rights.  New York, however, has no right to issue hostile policies that interfere with federal immigration enforcement.  As that is precisely what New York has done, its motion to dismiss should be denied.

## BACKGROUND

### I.     Constitutional and Statutory Principles

"Federalism, central to the constitutional design, adopts the principle that both the National and State Governments have elements of sovereignty the other is bound to respect."  *Arizona*, 567 U.S. at 399.  Just as the Federal Government cannot commandeer a State, so too a State cannot enact laws that conflict with federal policy or regulate or discriminate against the Federal Government.  *See Hines v. Davidowitz*, 312 U.S. 52, 67 (1941); *South Carolina v. Baker*, 485 U.S. 505, 523 (1988); *Mayo v. United States*, 319 U.S. 441, 445 (1943).  When a state does so, the Supremacy Clause provides a clear rule:  federal law "shall be the supreme Law of the Land," and the state law must give way.  *See* U.S. Const. art. VI, cl. 2; *Arizona*, 567 U.S. at 399.

Applying these principles in the context of immigration, the Federal Government has exclusive authority to "establish an uniform Rule of Naturalization."  *See* U.S. Const. art. I § 8, cl. 4; *see also Arizona*, 567 U.S. at 394.  Congress has thus made laws governing the entry, admission, presence, status, and removal of aliens within the United States through the INA, 8 U.S.C. § 1101 *et seq.*, and other related laws (*e.g.*, 6 U.S.C. § 482(b)(2)).  *See Arizona*, 567 U.S. at 396 ("Congress has specified which aliens may be removed from the United States and the procedures for doing so.").  These laws codify the Federal Government's authority to arrest and detain illegal aliens, *see* 8 U.S.C. §§ 1182, 1225-28, 1231, 1357, and they provide for mandatory detention of illegal aliens who commit

certain crimes, *see id.* § 1226(c)(1).  Following President Trump's declaration of a national emergency resulting from illegal immigration, *see* Executive Order No. 14,159, 90 Fed. Reg. 8443, Congress enacted the Laken Riley Act, named for the nursing student killed by an alien who, after entering the United States illegally, committed additional crimes but was released before immigration authorities could intervene.  *See* Pub. L. No. 119-1, 139 Stat. 3 (2025) (codified at 8 U.S.C. § 1226 *et seq.*).  The Act expands the list of predicate crimes that trigger mandatory detention.  *See* 8 U.S.C. § 1226(c)(1)(E)(ii).  If the Federal Government fails to detain an alien as required under the Act, and the alien harms a state or its residents, the Act authorizes the relevant state to sue the Federal Government "to obtain appropriate injunctive relief."  *See id.* § 1226(f).

Responsibility for enforcing the immigration laws rests primarily with the U.S. Department of Homeland Security ("DHS") and two of its components—Immigration and Customs Enforcement ("ICE") and U.S. Customs and Border Protection ("CBP").  Congress provided these agencies several tools to carry out their duties under the INA.  As relevant here, the INA authorizes federal agents to make civil immigration arrests, with or without an administrative warrant.  *See id.* § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States."); *id.* § 1357(a)(2) (immigration officers "shall have power without warrant" to "arrest any alien who . . . is entering or attempting to enter the United States in violation of any [immigration] law or regulation . . . , or to arrest any alien in the United States, if . . . the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained").  When an administrative warrant is required, immigration officials "must establish probable cause to believe that the subject is an alien who is removable from the United States."  U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017).[3]

---

[3] In contrast to administrative warrants, judicial warrants are issued by an Article III judge and require the Government to show probable cause that the individual committed a criminal offense.  *See, e.g.*, *Berger v. State of New York*, 388 U.S. 41, 55 (1967).

In executing the immigration laws, federal agents rely on law enforcement partners in states and localities across the country. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system."). Several provisions of the INA reflect that expectation of collaboration. *See, e.g.*, 8 U.S.C. § 1357(g)(10)(A) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State[] to communicate with [federal immigration officials] regarding the immigration status of any individual"); *id.* § 1357(g)(10)(B) (providing that state and local officials may "cooperate with the [Federal Government] in the identification, apprehension, detention, or removal of" unlawful aliens). In particular, 8 U.S.C. § 1373(a) provides that "State" and "local government entit[ies] or official[s] may not prohibit, or in any way restrict, any government entity or official from sending to" federal immigration agencies "information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *See id.* § 1373(a). Similar provisions exist throughout the INA. *See id.* § 1373(b) ("[N]o person or agency may prohibit, or in any way restrict, a Federal, State, or local government entity from" "[s]ending" to or "requesting or receiving" from federal immigration authorities "information regarding the immigration status, lawful or unlawful, of any individual."); *id.* § 1644 (similar).

In turn, Section 1373(c) provides that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *See id.* § 1373(c). The Federal Government is also responsible for making resources available to states and localities regarding whether individuals who have been arrested for aggravated felonies are aliens. *See id.* § 1226(d)(1)(A). And the Federal Government designates liaisons with states and localities in connection with aliens charged with aggravated felonies. *See id.* §§ 1226(c)-(d)(1)(B), 1231(a).

## II. Agency Guidance on Civil Immigration Arrests

DHS and ICE have promulgated and revised guidelines providing for the safe and effective enforcement of civil immigration laws at particular locations. *See* Compl. ¶¶ 1-3. Most recently, on

May 27, 2025, ICE issued guidance addressing civil enforcement activities in or near courthouses. *See* Memorandum from Acting Director of ICE Todd M. Lyons, Civil Immigration Enforcement Actions In or Near Courthouses (May 27, 2025).[4]  The guidance explains that "[f]ederal, state, and local law enforcement agencies routinely engage in enforcement activities in or near courthouses because . . . [i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband," which "can reduce safety risks to the public, targeted alien(s), and ICE officers." *Id.* at 1.  The guidance further states that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE," such as by refusing to "transfer aliens directly to ICE custody." *Id.*

The guidance identifies five categories of aliens subject to civil enforcement actions at courthouses, including those who pose national security or other public safety threats, gang members, and aliens with criminal convictions. *See id.* at 2.  For aliens not in those categories, "such as family members or friends accompanying the target alien to court appearances," the guidance provides for "civil immigration enforcement action on a case-by-case basis considering the totality of the circumstances." *Id.*  Any enforcement action that takes place in or near a courthouse "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *Id.*  The action should be conducted with "substantial efforts to avoid unnecessarily alarming the public or disrupting court operations," and to "limit [ICE officers'] time at courthouses." *Id.* at 3; *see also id.* at 2 ("When practicable, ICE officers and agents will conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings."). Enforcement actions "should generally [be] avoid[ed]" in or near courthouses, including areas within those courthouses, "that are wholly dedicated to non-criminal proceedings (e.g. family court, small claims court)." *Id.* at 2.

_____

[4] This guidance superseded ICE's January 2025 interim guidance on courthouse arrests. *See* Memorandum from Acting Director of ICE Caleb Vitello, Interim Guidance: Civil Immigration Enforcement Actions in or Near Courthouses (Jan. 21, 2025).

III.    **Challenged Sanctuary Policies**

    A.  **Protect Our Courts Act**

Enacted on December 15, 2020, the POCA provides that "[a] person duly and in good faith attending a court proceeding in which such person is a party or potential witness, or a family or household member is a party or potential witness, is privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding, unless such civil arrest is supported by a judicial warrant or judicial order." *See* POCA § 28.1. The POCA defines "family or household member" as:

> (a) persons related by consanguinity or affinity; (b) persons legally married to one another;
> (c) persons formerly married to one another regardless of whether they still reside in the same household; (d) persons who have a child in common regardless of whether such persons are married or have lived together at any time; (e) unrelated persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household; (f) persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time . . . ; or (g) any other category of individuals deemed to be a victim of domestic violence as defined by the office of children and family services in regulation.

N.Y. Soc. Serv. Law § 459-a.

Under the POCA, a "civil arrest" is an arrest that is not (i) "for the sole or primary purpose of preparing the person subject to such arrest for criminal prosecution" for an alleged violation of state or federal criminal law; or (ii) "for contempt of the court in which the court proceeding is taking place or will be taking place." POCA § 28.6(a). Where an arrest is pursued in connection with an alleged violation of federal law, the POCA defines the arrest as criminal only if the federal law at issue carries a sentence of imprisonment and "an initial appearance before a federal judge, federal magistrate or other judicial officer, pursuant to the federal rules of criminal procedure that govern initial appearances." *Id.* As an example of how these provisions apply, under the POCA, an ICE agent cannot civilly arrest an illegal alien miles away from a New York courthouse if the alien is on his way to or from a court appearance for his friend.

Violating the POCA creates criminal and civil liability. Specifically, willfully arresting someone in violation of the POCA or a court order, or willfully assisting such an arrest, constitutes "contempt of the court and false imprisonment." *Id.* § 28.2. Under New York law, those crimes are punishable by up to four years in prison. *See* N.Y. Penal Law §§ 215.50, 215.51, 135.05, 135.10. As to civil liability, regardless of whether a contempt proceeding has been initiated, the POCA allows for civil suits by anyone subject to the arrest privilege and by the New York attorney general. POCA § 28.3.

### B. Executive Orders 170 & 170.1

On September 15, 2017, former New York Governor Andrew Cuomo signed Executive Order 170, "State Policy Concerning Immigrant Access to State Services," which prohibits state officers and employees from, among other activities, "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." N.Y. Comp. Codes R. & Regs. tit. 9, § 8.170. Executive Order 170 further provides that, "[n]otwithstanding such prohibition, this Order does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." *Id.*

On April 25, 2018, former Governor Cuomo amended Executive Order 170 by signing Executive Order 170.1, "State Policy Concerning Immigrant Access to State Services and Buildings." *See id.* § 8.170.1. Executive Order 170.1 provides that "[c]ivil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order authorizing them to take into custody the person who is the subject of such warrant, unless the civil arrest is related to a proceeding within such facility." *Id.* The Executive Order defines "State facility" to mean "any building, or part thereof, owned or leased by any Affected State Entity" and it in turn defines "Affected State Entities" to mean "all agencies and departments over which the Governor has executive authority," and "all public benefit corporations, public authorities, boards, and commissions for which the Governor appoints the Chair, Chief Executive, or the majority of Board Members, except the Port Authority of New York and New Jersey." *Id.* Under the Executive Order, for instance, an ICE agent cannot civilly arrest an illegal alien even in public areas of state-owned highway

rest stops, police barracks, or jails.  Finally, the Executive Order reiterates the policy under Executive

Order 170 prohibiting any state employee or officer from disclosing information to federal

immigration authorities "for the purpose of federal civil immigration enforcement, unless required by

law."  *See id.*

### IV.    Procedural History

The United States filed this action on June 12, 2025 against Defendants the State of New York

and, in their official capacities, New York Governor Kathleen Hochul, and New York Attorney

General Letitia A. James.  The Complaint raises three claims under the Supremacy Clause: preemption

(Count One); unlawful regulation of the Federal Government (Count Two); and unlawful

discrimination against the Federal Government (Count Three).  *See* Compl. ¶¶ 55-69.  The United

States seeks declaratory and injunctive relief preventing Defendants from further enforcing the

challenged laws.  *See id.*, Prayer for Relief ¶¶ A-D.  On August 4, 2025, Defendants moved to dismiss

the Complaint under Federal Rule of Civil Procedure 12(b)(6).  *See* Motion to Dismiss, ECF No. 11

("Motion").  Defendants do not dispute that the Court has jurisdiction over this case.  The United

States now opposes that motion.

### LEGAL STANDARD

To withstand a motion to dismiss under Rule 12(b)(6), a complaint need only contain

"sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."

*Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  The Court must accept as true all of the complaint's plausible

factual allegations and construe all reasonable inferences in favor of the plaintiff.  *Id.*; *see also McCarthy*

*v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007).

### ARGUMENT

As sufficiently alleged in the Complaint, the challenged New York laws violate the Supremacy

Clause in three ways.  First, they create unconstitutional obstacles to federal immigration enforcement

and are therefore conflict preempted.  *See* Compl. ¶¶ 55-60.  Second, the POCA and Executive Order

170.1 violate intergovernmental immunity principles by unlawfully regulating federal officers in the

performance of their official duties. *See id.* ¶¶ 61-65. Third, the Executive Orders violate intergovernmental immunity for the independent reason that their information-sharing restrictions discriminate against federal immigration authorities. *See id.* ¶¶ 66-69. Contrary to New York's assertions, the Tenth Amendment gives states no right to undermine, regulate, or discriminate against federal agents. Accordingly, New York's motion to dismiss should be denied.

## I. The Complaint States a Claim of Conflict Preemption

The Court should deny New York's motion to dismiss the conflict preemption claim in Count One because the Complaint sufficiently alleges interference with federal immigration enforcement, and New York cannot justify its interference under the Tenth Amendment—a theory the Second Circuit has already rejected. *See, e.g., City of New York v. United States*, 179 F.3d 29, 34-35 (2d Cir. 1999).

As the Supreme Court has long recognized, "the very essence of supremacy" empowers the Federal Government to "remove all obstacles to its action within its own sphere." *See McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 427 (1819). Accordingly, a state law is invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *E.g., Hines*, 312 U.S. at 67. A state may not take action that "either frustrates the purpose of the national legislation or impairs the efficiency of th[e] agencies of the federal government to discharge the duties for the performance of which they were created." *Davis v. Elmire Sav. Bank*, 161 U.S. 275, 283 (1896); *see also Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000) (similar).

### A. The Complaint Sufficiently Alleges Interference with Federal Immigration Enforcement

Through the INA, Congress established a comprehensive scheme by which the Federal Government enforces immigration laws throughout the Nation. *See* 8 U.S.C. § 1101 *et seq.*; *see also Arizona*, 567 U.S. at 395 (discussing the INA's "extensive and complex" scheme for the "governance of immigration and alien status"). That scheme requires that federal immigration authorities arrest, detain, and remove certain illegal aliens. *See* 8 U.S.C. §§ 1226(c)(1), 1231(a). And it gives those authorities broad discretion to determine the manner and location for effectuating civil immigration arrests. *See id.* §§ 1226, 1357(a); *see also Arizona*, 567 U.S. at 396 ("A principal feature of the removal

system is the broad discretion exercised by immigration officials."); *Amici Br. of New York et al.* at 3, *Arizona v. United States*, No. 11-182, 2012 WL 1054493 (U.S. Mar. 26, 2012) (noting that the Federal Government decides "not only who may be removed from the United States, but *how* such individuals should be identified, apprehended, and detained").  In particular, the INA authorizes immigration arrests with or without an administrative warrant, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2); contains no restrictions on where such arrests occur, *see id.* § 1357(a)(3), (e); and contemplates that immigration enforcement actions may occur at state courthouses and other state facilities, *see id.* § 1229(e)(1)-(2). *See also infra* at 16-17.

Additionally, the INA establishes a clear expectation of coordination between federal, state, and local jurisdictions, especially regarding the exchange of immigration-related information.  *See, e.g.*, 8 U.S.C. §§ 1226(d)(1)(A), 1357(g)(10)(B), 1373(a)-(b), 1644; *see also Arizona*, 567 U.S. at 411.  Indeed, the Second Circuit has twice confirmed the preemptive effect of Section 1373(a) of the INA, which "prohibits state and local governmental entities or officials" from "directly restricting the voluntary exchange of immigration information with the [Federal Government]."  *See City of New York*, 179 F.3d at 35; *see also State of New York v. Dep't of Justice*, 951 F.3d 84, 111-16 (2d Cir. 2020) (holding that 8 U.S.C. § 1373(a) does not violate the Tenth Amendment as applied to a federal funding requirement and finding insufficient reasons to support "facial unconstitutionality" of that provision).

The Complaint contains numerous allegations regarding the "intolerable obstacles" posed by the POCA and challenged Executive Orders to federal immigration enforcement.  *See* Compl. ¶ 6; *see also id.* ¶¶ 7-8, 10, 46-54, 57-59.  For example, the challenged laws "dictate where federal immigration officers can enforce civil immigration laws and prevent even the most basic coordination and information-sharing between New York law enforcement agencies and federal immigration officers." *Id.* ¶ 46.  "The civil-arrest restrictions" have caused "federal immigration authorities [to] refrain[] from apprehending aliens whom those authorities knew had scheduled appearances in New York court related to heinous crimes," thereby "chil[ling] federal immigration enforcement and jeopardiz[ing] public safety."  *Id.* ¶ 47.  Moreover, the POCA requires federal authorities to make the "often impossible" determination whether a person—who may be "literally anywhere" in the country—is on

his way to or from a New York courthouse and is a "family or house[hold] member" under the POCA *before* making a civil arrest. *See id.* ¶ 49.[5]  Indeed, the POCA would prevent a federal immigration agent from civilly arresting anyone who is traveling from across the country so long as that person claims to be on his way to a friend's court proceeding in New York. *See* POCA § 28.1.  And it would impose civil and criminal liability on that agent for making that arrest. *See id.* § 28.2-4.  But New York cannot chill federal operations by threatening federal officers with criminal liability for performing their official duties. *See In re Neagle*, 135 U.S. 1 (1890); *New York v. Tanella*, 374 F.3d 141, 147 (2d Cir. 2004).

As to New York's information-sharing restrictions, the Complaint provides numerous examples of the information that New York entities refuse to provide to ICE—including arrest reports, investigative reports, officer safety bulletins, and basic logistical information such as whether a wanted alien is physically present in a state facility—and explains how that refusal hinders ICE's ability to locate and apprehend criminal aliens in New York. *See* Compl. ¶¶ 51-53.[6]

---

[5] In response to these allegations, New York asserts that "the breadth of [the] POCA's restrictions, and purported uncertainty about how the statute would apply in hypothetical situations," are irrelevant here and "are properly considered by courts on an as-applied basis in proceedings seeking to enforce [the] POCA's protections." *See* Motion at 16-17.  This misses the point.  The United States does not rely on hypothetical applications of the POCA; it alleges in a concrete manner how the POCA has and continues to obstruct and chill federal immigration activities due to its facially unconstitutional restrictions.

[6] To be sure, the Executive Orders purport to allow New York officials to disclose information to federal immigration authorities if "required by law." *See* Executive Orders 170(B)(2) & 170.1.  But New York's position is that it cannot be *required* to provide information to federal authorities, and that New York employees at most may provide "only information about an individual's citizenship or immigration classification." *See* Motion at 19.  As alleged in the Complaint, however, there are several other kinds of information that Congress believed federal immigration authorities need to enforce immigration laws, including an alien's location and arrest records, which New York refuses to provide to those authorities. *See* Compl. ¶¶ 51-53.  Those kinds of information fit within Section 1373(a)'s reference to information "regarding [] citizenship or immigration status." *See* 8 U.S.C. § 1373(a); *Lamar, Archer & Cofrin, LLP v. Appling*, 584 U.S. 709, 717-18 (2018) (adopting broad construction of "regarding").  For example, information contained in arrest records bears directly on whether an alien is removable from the United States. *See* 8 U.S.C. § 1226(c).  And legislative history confirms that Congress enacted Section 1373 to ensure that state and local officials can "communicate with [federal immigration authorities] regarding the presence, whereabouts, or activities of illegal aliens," not merely their immigration status.  H.R. Conf. Rep. No. 104-725, at 383 (1996); *see also* S. Rep. No. 104-249, at 19-20 (1996).

Accepting these factual allegations as true and construing all reasonable inferences in the Government's favor—as the Court must in evaluating New York's motion to dismiss, *see Iqbal*, 556 U.S. at 678—Count One of the Complaint easily states a claim. *See* Compl. ¶¶ 55-60.

### B. The POCA Is Not Entitled to A Presumption Against Preemption

New York erroneously contends that the POCA is "presumed to be valid" under two separate theories, neither of which is persuasive. *See* Motion at 11.

First, New York characterizes the POCA as protecting "the State's compelling interest in its judicial system," which it says triggers a "presumption against preemption." *See id.* at 11-12. But the legislative history that New York cites demonstrates that the POCA is intended to restrict federal agents from making civil immigration arrests. *See id.* at 4-5 (explaining that the POCA was enacted in "respon[se] to . . . ICE's new policies"). Indeed, New York officials have lauded the POCA as a "rebuke" to the "Trump Administration and their immigration policies" and as a strategy to "bar[] ICE from making warrantless civil arrests of immigrants attending court proceedings."[7] *See* Compl. ¶ 31. Because the law intends to regulate immigration activities, which are "inherently federal in character," *see Buckman Co. v. Pls.' Legal Comm.*, 531 U.S. 341, 347-38 (2001), the presumption against preemption does not apply, *see United States v. Locke*, 529 U.S. 89, 108 (2000) ("[A]n 'assumption' of nonpre-emption is not triggered when the State regulates in an area where there has been a history of significant federal presence."). *See also United States v. South Carolina*, 720 F.3d 518, 529 (4th Cir. 2013) ("[T]he presumption against preemption does not apply here because immigration is an area traditionally regulated by the federal government."); *United States v. Alabama*, 691 F.3d 1269, 1296 (11th Cir. 2012) (refusing to apply presumption to state law "constitut[ing] a thinly veiled attempt to regulate immigration under the guise of contract law," and thus "imping[ing] on an area of core federal concern"); *see also In re Trib. Co. Fraudulent Conv. Litig.*, 946 F.3d 66, 82 (2d Cir. 2019) (refusing to apply

---

[7] *See* Senator Brad Holyman Applauds Signing of "Protect Our Courts Act," Protecting Immigrants From Warrantless ICE Arrests When Attending Court Proceedings, NY Senate (Dec. 15, 2020), https://www.nysenate.gov/newsroom/press-releases/2020/brad-hoylman-sigal/senator-brad-hoylman-applauds-signing-protect-our.

presumption to state-law bankruptcy claims due to the "history of significant federal presence" in regulating bankruptcy).

New York's characterization of the POCA is also irrelevant to the preemption analysis, which focuses on the effect of the state policy at issue. The Supreme Court has rejected state laws that even explicitly aimed to assist federal immigration enforcement because their effect was to muddle a chiefly federal arena. *See Arizona,* 567 U.S. at 402 (state law preempted even if it purportedly shares "the same aim as federal law"). It follows that the POCA's effect of thwarting federal immigration enforcement is preempted, irrespective of any contrary intent asserted by New York. *See Mich. Canners & Freezers Ass'n, Inc. v. Agric. Mktg. & Bargaining Bd.,* 467 U.S. 461, 477 (1984) (state statute establishing association to represent agricultural producers is preempted notwithstanding that both it and the federal Agricultural Fair Practices Act "share the goal of augmenting the producer's bargaining power"); *Wis. Dep't of Indus. v. Gould Inc.,* 475 U.S. 282, 286-87 (1986) (similar). Indeed, to simply accept New York's stated interest in managing its judicial system would be "at odds with the approach taken in nearly all [the Court's] Supremacy Clause cases" and "would enable state legislatures to nullify nearly all unwanted federal legislation by simply . . . articulating some state interest or policy—other than frustration of the federal objective—that would be tangentially furthered by the proposed state law." *Gade v. Nat'l Solid Wastes Mgmt. Ass'n,* 505 U.S. 88, 106 (1992); *see also Hughes v. Oklahoma,* 441 U.S. 322, 336 (1979) ("[W]hen considering the purpose of a challenged statute, this Court is not bound by [t]he name, description or characterization given it by the legislature or the courts of the State, but will determine for itself the practical impact of the law.").[8]

Second, New York asserts that the POCA is presumed valid because it purportedly "codifie[s] New York's 'very ancient' privilege protecting parties and witnesses from civil arrests in courthouses, and while traveling to and from court proceedings." Motion at 12. New York further asserts that this

---

[8] New York asserts that Executive Orders 170 and 170.1 "are likewise entitled to the presumption against preemption" because they "concern the use of state facilities and the activities of state employees." *See* Motion at 17. That is incorrect for the same reasons as above: the Executive Orders regulate immigration activities, and New York's contrary characterization of the Orders is irrelevant.

privilege was incorporated into the INA upon its enactment in 1952. *See id.* at 13-15. A district court in the Second Circuit recently rejected the latter argument, finding no likelihood "that a common law privilege against arrests by the [Federal Government] was incorporated into the INA." *See* Opinion and Order at 37, ECF No. 51, *African Communities Together v. Lyons*, No. 1:25-cv-6366 (S.D.N.Y. Sept. 12, 2025). This Court should reach the same conclusion for several reasons.[9]

For starters, New York's argument suffers a fatal foundational flaw: there has never been a common law privilege resembling the POCA's privilege from civil immigration arrests by the Federal Government. Although Congress typically is presumed to retain common-law rules except when it clearly intends not to, *see Baker Botts LLP v. ASARCO LLC*, 576 U.S. 121, 126 (2015), that principle only applies to common-law rules that were "long-established and familiar" at the time Congress passed the relevant law, *see Samantar v. Yousuf*, 560 U.S. 305, 320 & n.13 (2010). When there is "not much of a common-law background on the question," a supposed common-law rule cannot displace "broad statutory language" enacted by Congress. *United States v. Craft*, 535 U.S. 274, 288 (2002); *see also Pasquantino v. United States*, 544 U.S. 349, 359-60 (2005) (only "classic examples" or "closely analogous" cases lead to a presumption that Congress incorporated a common-law rule).

Here, in contrast to the POCA's broad privilege from civil arrests by federal immigration agents, historical cases show at most only a narrow common-law immunity from civil arrests made to obtain personal jurisdiction over a defendant in a civil action. *See Ryan v. ICE*, 974 F.3d 9, 21-22 (1st Cir. 2020) (discussing the origins of the privilege). Such immunity was an extension of the now-outdated principle that a state court's jurisdiction over a person rested on that person's physical

---

[9] Some district courts have concluded that the INA incorporates a courthouse arrest privilege. *See New York v. ICE*, 431 F. Supp. 3d 377, 392 (S.D.N.Y. 2019); *New York v. ICE*, 466 F. Supp. 3d 439, 446-47 (S.D.N.Y. 2020) (re-adopting prior opinion in the same case), *vacated and remanded*, No. 20-2622, 2023 WL 2333979 (2d Cir. Feb. 28, 2023); *Doe v. ICE*, 490 F. Supp. 3d 672, 692 (S.D.N.Y. 2000); *Velasquez-Hernandez v. ICE*, 500 F. Supp. 3d 1132, 1144-45 (S.D. Cal. 2020). Those decisions, which pre-date the POCA's enactment and arose in the distinct context of suits by states and noncitizens seeking to enjoin ICE policies on courthouse arrests, do not bind this Court and are incorrect for the reasons given herein. As noted, the court to most recently address this question concluded that the INA did not incorporate a courthouse arrest privilege. *See* Opinion and Order at 37, ECF No. 51, *African Communities Together v. Lyons*, No. 1:25-cv-6366 (S.D.N.Y. Sept. 12, 2025).

presence.  *See Daimler AG v. Bauman*, 571 U.S. 117, 125-26 (2014).  As courts no longer need a defendant's physical presence to obtain personal jurisdiction, *see, e.g.*, *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945), the primary rationale for the common-law privilege—to protect those who were otherwise not subject to a state's jurisdiction but for their physical appearance in that state's court—has disappeared, and thus the privilege no longer carries any force.  *See United States v. Denedo*, 556 U.S. 904, 911 (2009) (noting change in common-law rule when rationale has been superseded); *Kansas v. Colorado*, 533 U.S. 1, 10 (2001) (rejecting common-law rule that rested on unsound distinction).[10]

Additionally, even when the common-law privilege was in force, it never extended to civil immigration arrests by the Federal Government.  *See* Opinion and Order at 37.  New York identifies no American caselaw prior to the INA's enactment in 1952 applying the privilege to arrests by the Federal Government, let alone immigration arrests.  To the contrary, "the entirety of the pre-1952 case law pertaining to the common law privilege appears to have involved private civil suits," and there is "no clear historical precedent for extending the privilege to arrests on behalf of the sovereign." *Ryan*, 974 F.3d at 26; *see also* Opinion and Order at 34 (similar).[11]  Such arrests bear no more than a "faint resemblance" to the civil case-initiating arrests that gave rise to the common-law privilege.  *Ryan*, 974 F.3d at 27-28.  Thus, as the First Circuit concluded, there is no reason to believe that "Congress would have reflexively inferred that the privilege protected against . . . the civil immigration arrests that it was authorizing in the INA."  *See id.* at 26; *see also* Opinion and Order at 37 (similar).[12]

---

[10] The common-law privilege was also intended to avoid "disrupt[ing] the orderly operation of the courts."  *See Ryan*, 974 F.3d at 21.  But the privilege has never applied to criminal arrests, and there is no reason to believe that criminal arrests would be less disruptive to the functioning of courts than civil arrests.  *See id.* at 27.  This strongly suggests that protecting traveling witnesses and litigants was the more important of the privilege's rationales.  *See Netograph Mfg. Co. v. Scrugham*, 90 N.E. 962, 963 (N.Y. 1910) (explaining that "the obvious reason of" the courthouse arrest privilege "is to encourage voluntary attendance upon courts").

[11] The English version of the privilege did not apply to the royal sovereign.  *See Wheely v. Richam* (1694) 92 Eng. Rep. 882, 882 (K.B.) ("[C]ertainly no privilege is good against the king.").

[12] New York asserts that, under Second Circuit precedent, "the lack of historical evidence of disputes" about the scope of a common-law privilege "does not compel the inference that the [privilege] was improper."  *See* Motion at 15 (citing *Antonyuk v. James*, 120 F.4th 941 (2d Cir. 2024)).  But the question

For these reasons—the absence or obsolescence of any common-law privilege by the time the INA was enacted, and the inapplicability of the privilege at any time to federal arrests—the INA cannot be read to recognize and incorporate the sweeping privilege embodied in the POCA.

Finally, Congress in the INA spoke comprehensively to how the Federal Government will enforce federal immigration law, thus supplanting any prior common law to the contrary. *See Arizona*, 567 U.S. at 407; *see also Herrera-Inirio v. INS*, 208 F.3d 299, 307 (1st Cir. 2000) (because "Congress possesses plenary authority over immigration-related matters, it may freely displace or preempt state laws in respect to such matters"); *Textile Workers Union of Am. v. Lincoln Mills of Ala.*, 353 U.S. 448, 456 (1957) (when Congress enacts a policy, "by implication [it] reject[s] the common-law rule" to the contrary). Specifically, the INA authorizes immigration officials to make civil arrests, without judicial warrants and without geographical limitation. *See* 8 U.S.C. §§ 1226(a), 1357(a)(2) & (4)-(5); *see also* Opinion and Order at 44 (noting that the INA contains no "restriction on the location of an arrest"). When Congress intended limitations on that authority, it was explicit, and no such limitations in the INA even arguably resemble those in the POCA. *See* 8 U.S.C. § 1357(a)(2) & (4)-(5) (specifying limitations on civil arrests without an administrative warrant); *FCC v. NextWave Personal Commc'ns Inc.*, 537 U.S. 293, 302 (2003) (rejecting inference of exception to a statute when Congress "clearly and expressly" provided other exceptions).

Moreover, through a 2006 amendment to the INA to add 8 U.S.C. § 1229(e), Congress acknowledged the practice of conducting immigration enforcement actions at state courthouses. That section discusses "cases where an enforcement action leading to a removal proceeding was taken against an alien at . . . a courthouse (or in connection with that appearance of the alien at a courthouse)." *See* 8 U.S.C. § 1229(e)(1)-(2)(B). It goes on to list primarily state-law offenses, thereby demonstrating Congress's contemplation that immigration enforcement actions would occur at state

---

here is not whether the courthouse arrest privilege was "improper"; it is whether that privilege was so "long-established and familiar" that Congress can be presumed to have incorporated it. *See, e.g.*, *Samantar*, 560 U.S. at 320 & n.13. Moreover, the Second Circuit case that New York cites did not involve a preemption analysis, *see Antonyuk*, 120 F.4th at 954, and it thus has no bearing on the preemption analysis here.

courthouses. *See id.* § 1229(e)(2)(B) (listing proceedings in connection with child custody, domestic violence, sexual assault, trafficking, and stalking).[13]  This provision "suggests that Congress did anticipate at least some arrests occurring at courthouses." *See New York v. ICE*, 431 F. Supp. 3d 377, 393 (S.D.N.Y. 2019); *see also Doe v. ICE*, 490 F. Supp. 3d 672, 693 (S.D.N.Y. 2000) (similar).  Similarly, Section 1229(e) shows that Congress also anticipated immigration arrests occurring at other state facilities, as it refers to immigration enforcement actions at, for instance, domestic violence shelters, supervised visitation centers, and family justice centers. *See* 8 U.S.C. § 1229(e)(2)(A).[14]

Accordingly, the INA displaced any state common-law privilege against courthouse arrests by the Federal Government.

## C.  The Executive Orders Are Not Justified Under the Tenth Amendment

New York erroneously characterizes Executive Orders 170 and 170.1 as its prerogative under the Tenth Amendment. *See* Motion at 17, 20.  The anticommandeering doctrine prevents Congress from "compel[ling] the States to enact or enforce a federal regulatory program[,]" or "circumvent[ing] that prohibition by conscripting the State's officers directly." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see also Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 473 (2018).  But New York fails to identify any federal law that transgresses those limitations—i.e., that orders New York to adopt or implement a federal program. *Cf. Printz*, 521 U.S. at 903 (invaliding a federal law that required state officials to conduct background checks for firearm purchasers).  The Federal Government has not suggested that it could compel New York's active participation in immigration enforcement but instead seeks to prevent New York from interfering with federal authorities so that *they* may enforce

---

[13] Although this amendment was adopted after the INA's original enactment, the Court may consider it in interpreting the INA. *See, e.g., Branch v. Smith*, 538 U.S. 254, 281 (2003) ("Courts do not interpret statutes in isolation, but in the context of the corpus juris of which they are a part, including later-enacted statutes[.]"); *United States v. Fausto*, 484 U.S. 439, 453 (1988) ("[C]ourts frequently . . . interpret a statutory text in the light of surrounding texts that happen to have been subsequently enacted.").

[14] To the extent New York suggests that Section 1229(e) should be read as referring only to criminal arrests, *see New York*, 431 F. Supp. 3d at 393, that would make little sense given that Section 1229(e) refers to "an enforcement action leading to a removal proceeding," a phrase that on its face contemplates a civil arrest by immigration authorities rather than a criminal arrest by law-enforcement officials. *See Arizona*, 567 U.S. at 407 (the INA "instructs when it is appropriate to arrest an alien during the removal process").

federal immigration law.  And the Federal Government bears sole responsibility for its actions taken with respect to aliens pursuant to its regulatory authority.  *Cf.* 8 U.S.C. § 1226(f) (allowing states to sue the Federal Government for failing to detain aliens who harm a State or its residents).

New York nonetheless asserts that the Executive Orders "manage [the state's] internal affairs," and thus represent a "permissible decision not to assist federal immigration enforcement."  *See* Motion at 17, 21.  But a state may not escape preemption "just by framing" its laws in an artful way.  *See Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 464 (2012).  Further, the Second Circuit has rejected an analogous argument and found that the Tenth Amendment does not give states "the power to forbid even voluntary cooperation by state and local officials and workers in . . . a federal program."  *See City of New York*, 179 F.3d at 34; *see also New York v. Dep't of Justice*, 951 F.3d 84, 113 (2d Cir. 2020) ("It is doubtful that States have reserved power to adopt . . . immigration policies *contrary* to those preferred by the federal government") (emphasis in original).  Any such power would "turn the Tenth Amendment's shield against the federal government's using state and local governments to enact and administer federal programs into a sword allowing states and localities to engage in passive resistance that frustrates federal programs."  *City of New York*, 179 F.3d at 35.  Accordingly, while the Tenth Amendment allows states to regulate legitimate areas of local concern, they may not do so in a manner "that undermine[s] federal law."  *New York*, 951 F.3d at 113 (quoting *Arizona*, 567 U.S. at 416).

As the allegations in the Complaint demonstrate, New York is not standing aside passively to mind its own internal affairs.  It is actively thwarting immigration authorities by placing broad restrictions on whom immigration officials may arrest and where those arrests may occur, allowing for enforcement of those restrictions through civil and criminal liability, and preventing those officials from accessing information from New York officers—including officers who may wish to cooperate with the Federal Government.  *See City of New York*, 179 F.3d at 35 ("[S]tates do not retain under the Tenth Amendment an untrammeled right to forbid all voluntary cooperation by state or local officials with particular federal programs.").  If every state enacted similar laws, they would stymie federal immigration enforcement nationwide.  When a state's regulatory scheme collides with federal law in such fashion, the state law is preempted.  *See Hodel v. Va. Surface Mining & Reclamation Ass'n*, 452 U.S.

264, 289-90 (1981) (noting that it "is incorrect" to "assume that the Tenth Amendment limits congressional power to pre-empt or displace state regulation of private activities").

Finally, New York disregards that the Tenth Amendment is not implicated where, as here, the Federal Government seeks to regulate private actors—illegal aliens—by facilitating the enforcement of federal laws against those actors. *See Murphy*, 584 U.S. at 476-77; *see also New York*, 951 F. 3d at 114 n.27. New York similarly ignores the Supreme Court's recognition that Tenth Amendment concerns are lessened in the context of information-reporting regulations even though typically applicable to state and local governments. *See Printz*, 521 U.S. at 918 (distinguishing between "the forced participation of the States' executive in the actual administration of a federal program," which constitutes impermissible commandeering, and "the provision of information to the Federal Government," which does not); *see also id.* at 936 (O'Connor, J., concurring) (citing a reporting requirement that applies only to state and local law-enforcement agencies); *Reno v. Condon,* 528 U.S. 141, 151 (2000) (the Constitution does not prohibit federal laws that "do[] not require the States in their sovereign capacity to regulate their own citizens," but instead "regulate[] the States as the owners of databases"); *see also New York*, 951 F.3d at 112-14.[15]

Accordingly, the conflict preemption claim withstands dismissal.

## II.    The Complaint States a Claim of Violation of Intergovernmental Immunity Principles

The Complaint likewise states a claim that the POCA and Executive Orders are alternatively invalid under the intergovernmental immunity doctrine. *See* Compl. ¶¶ 61-65 (Count Two); *id.* ¶¶ 66-69 (Count Three). A state law violates intergovernmental immunity if it "regulates the United States

---

[15] In its July 17, 2025 pre-motion conference, this Court requested the United States' views on *United States v. California*, in which the Ninth Circuit affirmed the denial of a preliminary injunction as to a California law that prohibited state and local law enforcement from providing certain information to federal immigration authorities. *See* 921 F.3d 865, 872-73 (9th Cir. 2019). The court of appeals ultimately grounded its decision on the premise that California's law would be lawful "[e]ven if [it] obstructs federal immigration enforcement" in violation of preemption principles, *id.* at 888, or "discriminate[s] against federal immigration authorities," *id.* at 891, because California "has the right . . . to refrain from assisting with federal efforts," *id.* That holding is wrong for the same reasons that New York's similar Tenth Amendment argument fails. *See supra* at 17-19; *see also* Petition for a Writ of Certiorari at 24-31, *United States v. California*, No. 19-532 (Oct. 22, 2019) (providing further views of the United States).

directly or discriminates against the Federal Government or those with whom it deals." *See North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion). That prohibition applies even without preemptive legislation because the Supremacy Clause itself invalidates such state regulations: "intergovernmental immunity has independent bite, and courts must apply it to referee 'clashing sovereignty.'" *CoreCivic, Inc. v. Governor of N.J.*, 145 F.4th 315, 328 (3d Cir. 2025) (quoting *McCulloch*, 17 U.S. (4 Wheat.) at 430).

### A. The Complaint States a Claim of Unlawful Regulation of the Federal Government

It is well settled under the intergovernmental immunity doctrine that "the activities of the Federal Government are free from regulation by any state." *See Mayo*, 319 U.S. at 445; *see also McCulloch*, 17 U.S. (4 Wheat.) at 436 (States have no power to "in any manner control" the operations of the Federal Government); *Trump v. Vance*, 591 U.S. 786, 829-31 & n.5 (2020) (Alito, J., dissenting) (collecting cases showing that "two centuries of case law prohibit the States from taxing, regulating, or otherwise interfering with the lawful work of federal agencies, instrumentalities, and officers"). Thus, "even in the absence of a specific federal law, federal officers are immune from state interference with acts 'necessary and proper' to the accomplishment of their federal duties." *United States v. Ferrara*, 847 F. Supp. 964, 968 (D.D.C. 1993) (quoting *In re Neagle*, 135 U.S. 1), *aff'd* 54 F.2d 825 (D.C. Cir. 1995).

Applying these principles, the Complaint sufficiently pleads that the POCA and Executive Order 170.1 directly regulate the Federal Government by dictating where and how federal agents may undertake their statutorily mandated duties. *See, e.g.*, Compl. ¶¶ 46, 49, 63-65. The POCA prohibits those agents, absent a judicial warrant or order, from making civil immigration arrests—including when the INA *requires* that an alien be detained, *see, e.g.*, 8 U.S.C. § 1226(c)(1)—of individuals and their "family or household member[s]" "while going to, remaining at, and returning from" a New York court proceeding. POCA § 28.1. The POCA defines "family or household member[s]" to encompass a broad class of persons, including "unrelated persons" who have ever lived together, been in an "intimate" relationship, or who merely have "affinity" for one another. *See* N.Y. Soc. Serv. Law § 459-

a(2)(a), (e), (f).  Executive Order 170.1 extends the civil-arrest prohibition to any individuals "within state facilities."  *See* Executive Order 170.1(B).

The intent and effect of these provisions is to impose geographical limitations on immigration arrests where federal law provides none—at the risk of civil and criminal liability.  *See* POCA § 28.2-4 (penalty provisions); N.Y. Penal Law §§ 135.05, 10 (making false imprisonment a crime punishable by one to four years in jail).  But the INA imposes no geographical limitations on civil immigration arrests, *see* 8 U.S.C. §§ 1226(a), 1357(a)(2) & (4)-(5), nor does it require immigration agents to acquire a judicial warrant or order to effectuate such arrests.  Instead, civil immigration arrests are authorized pursuant to administrative warrants, and in some cases authorized even without an administrative warrant.  *See* 8 U.S.C. § 1226(a); *id.* § 1357(a)(2); *Vazquez-Medrano v. Sessions*, 726 F. App'x 92, 93 (2d Cir. 2018) (holding that warrantless arrest of alien did not violate 8 U.S.C. § 1357(a)(2)); *see also Abel v. United States*, 362 U.S. 217, 233 (1960) (acknowledging the "overwhelming historical legislative recognition of the propriety of administrative arrest for deportable aliens" (citing, among others, Act of June 25, 1798, ch. 58, § 1, 1 Stat. 570, 570-71 ("[I]t shall be lawful for the President of the United States . . . to order all such aliens as he shall judge dangerous to the peace and safety of the United States . . . to depart out of the territory of the United States[.]"))).

The Constitution does not allow states like New York to impose such limitations on federal officers.  *See Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920) (States cannot "control the conduct of [individuals] . . . acting under and in pursuance of the laws of the United States"); *see also, e.g.*, *United States v. City of Arcata*, 629 F.3d 986, 991 (9th Cir. 2010) ("By constraining the conduct of federal agents and employees, the ordinances seek to regulate the government directly.").  Nor does the Constitution tolerate states chilling federal activities through criminally punishing federal officers for carrying out their lawful, and in some cases mandatory, official duties.  *See Tanella*, 374 F.3d at 147 (discussing federal officers' immunity from state prosecution); *Neagle*, 135 U.S. at 41 (finding state law displaced whenever it imposes intolerable burdens on a federal officer's attempts to protect federal interests or execute federal law); *Tennessee v. Davis*, 100 U.S. 257, 272-63 (1879) (highlighting the dangers of subjecting federal officers to state prosecutions).

21

The POCA and Executive Order 170.1 are invalid under intergovernmental immunity principles for the independent reason that they substantially interfere with federal operations. *See CoreCivic, Inc.*, 145 F.4th at 327 (finding that a state law "directly regulates the federal government by substantially interfering with a core federal function"); *see also Pub. Utils. Comm'n of State of Cal. v. United States*, 355 U.S. 534, 543 (1958) (holding that a law barring federal officials from exercising their "discretion" to hire shipping contractors without state approval violates intergovernmental immunity where the restriction would have delayed shipments, seriously hampering the military missions they served); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (explaining that states cannot require federal officers to "desist from performance until they satisfy a state officer"). As demonstrated above, New York's laws prevent immigration officers from fully executing their duties under the INA, *see supra* at 9-11, 17-18, thereby "directly regulat[ing] the federal government twice over," *CoreCivic, Inc.*, 145 F.4th at 327. If such laws were replicated throughout the country, they would "destroy the federal function" of immigration enforcement. *United States v. Fresno Cnty.*, 429 U.S. 452, 463 n.11 (1977). The Framers of our Constitution "did not intend" for federal operations to "depend on the discretion of the state governments." *McCulloch*, 17 U.S. (4 Wheat.) at 327, 362.

New York has no meaningful rebuttal to this straightforward application of intergovernmental immunity principles. Indeed, New York concedes that the POCA and Executive Order 170.1 "regulate," yet it asserts that the laws merely "regulate the permissible activities in or near state courthouses and in state facilities by prohibiting disruptive civil arrests that impair the functioning of the State's courts." *See* Motion at 22. But this Court should "see the law for what it really is"—an attempt to "dictate the manner in which the federal [immigration] function is carried out." *CoreCivic, Inc.*, 145 F.4th at 329 (alteration in original) (quoting *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 181 n.3 (1988)). New York further insists that its laws do not "restrict[] ICE agents from conducting their immigration enforcement activities across the State, in non-sensitive and non-protected places[.]" *See* Motion at 22. That is belied by the POCA's plain text, which privileges those with only the remotest connection to parties or potential witnesses to court proceedings—a connection of which immigration authorities would typically have no reason to know—and prevents their arrest anywhere in the state

so long as they are going to or returning from those proceedings. *See* POCA § 28.1. New York also claims that the POCA and Executive Order 170.1 do not burden federal activities. *See* Motion at 23. But that attempt to dispute the Complaint's allegations must be rejected at this stage. *See Iqbal*, 556 U.S. at 678. And, in any event, the broad scope of the POCA, coupled with the chilling effect of its civil and criminal penalties, indeed works a grave harm on federal enforcement activities. *See* Compl. ¶¶ 46, 47, 49, 50, 63-65; *see also supra* at 9-11.

For these reasons, Count Two of the Complaint withstands dismissal.

### B.  The Complaint States a Claim of Unlawful Discrimination Against the Federal Government

As alleged in Count Three, the challenged Executive Orders violate intergovernmental immunity principles because they discriminate against the Federal Government. *See* Compl. ¶¶ 66-69. A state may not "treat[] someone else better than it treats" the Federal Government—or even just a part of it. *See Washington v. United States*, 460 U.S. 536, 544-45 (1983); *North Dakota*, 495 U.S. at 434-36. That includes "singling out the Federal Government for unfavorable treatment[,]" *United States v. Washington*, 596 U.S. 832, 839 (2022), and imposing any discriminatory burden on the Federal Government, *see Dawson v. Steager*, 586 U.S. 171, 171 (2019).[16] Courts presume that discriminatory state laws are invalid absent clear congressional authorization. *See Washington*, 596 U.S. at 839; *see also United States v. King Cnty.*, 122 F.4th 740, 757 (9th Cir. 2024) (finding unlawful discrimination where a County Ordinance directed local officials to ensure that private operators who leased space from the County's airport did not service ICE charter flights).

The challenged Executive Orders facially target federal immigration authorities in ways that do not apply to any other person or entity. Executive Order 170 provides that "no State officers or employees . . . shall disclose information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." Executive Order 170(B)(2). And Executive Order 170.1 incorporates that restriction and further provides that "[c]ivil arrests by federal

---

[16] The principles of the intergovernmental tax immunity doctrine apply to the general intergovernmental immunity doctrine. *See North Dakota*, 495 U.S. at 434-39.

immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order." Executive Order 170.1(B). These provisions thus treat federal immigration authorities less favorably than anyone else, including any other law enforcement entity—exactly what intergovernmental immunity principles forbid. *See Dawson*, 586 U.S. at 177.

New York's arguments to the contrary are unavailing. Although it concedes that the Executive Orders "are directed towards civil immigration enforcement activities," New York argues that the Orders are not discriminatory because they make no exemptions for non-federal actors engaged in the same conduct. *See* Motion at 24. In support, New York cites a provision of the INA that authorizes qualified local officials to perform federal immigration enforcement functions pursuant to a written agreement. *Id.* (citing 8 U.S.C. § 1357(g)). That is a red herring, and in any event, misses the point. At the outset, the Executive Orders facially single out "federal immigration authorities." *See* Executive Orders 170(B)(2) & 170.1(B). But even if the Orders were construed to apply to anyone engaged in federal immigration enforcement, forbidding the sharing of information *only* "for the purpose of federal civil immigration enforcement," Executive Orders 170(B)(2) & 170.1, or the use of state facilities only for "[c]ivil arrests by federal immigration authorities," Executive Order 170.1(B), would still constitute unlawful discrimination. *See Wis. Dep't of Indus.*, 475 U.S. at 289 ("It is the conduct being regulated . . . that is the proper focus of concern."). These Executive Orders unquestionably "single out" federal immigration activities for disfavored treatment because the Orders do not prevent others not engaged in immigration enforcement from receiving information from state officers or conducting civil arrests within state facilities. *See Dawson*, 586 U.S. at 178; *see also City of Arcata*, 629 F.3d at 991 ("The cities' differential treatment of identical conduct based on the actor's status as a federal agent or employee fits squarely within the [discrimination] framework.").

Finally, New York argues that invalidating the discriminatory provisions of its policies would create a back-end anticommandeering problem. *See* Motion at 24-25. But New York cannot seriously contend that actively discriminating against the Federal Government is constitutionally protected inaction. Rather, if New York chooses to share information with other law enforcement authorities, it cannot withhold the same from ICE. *See King Cnty.*, 122 F.4th at 758. Just as there is no "threat of

24

unconstitutional commandeering when ICE uses county highways to transport immigration detainees from one place to another just because the county owns its highways," *id.*, there is no such threat when ICE accesses information already collected by a state and its localities.

The United States therefore has sufficiently pled a claim of discrimination in Count Three.

## CONCLUSION

For the foregoing reasons, this Court should deny the motion to dismiss.


Dated: September 19, 2025                Respectfully submitted,

                                         BRETT A. SHUMATE
                                         Assistant Attorney General, Civil Division

                                         YAAKOV M. ROTH
                                         Principal Deputy Assistant Attorney General
                                         Civil Division

                                         ERIC J. HAMILTON
                                         Deputy Assistant Attorney General
                                         Civil Division
                                         Federal Programs Branch

                                         JOHN A. SARCONE III
                                         Acting United States Attorney
                                         Northern District of New York

                                         ALEXANDER K. HAAS
                                         Director

                                         JACQUELINE COLEMAN SNEAD
                                         Assistant Director

                                         */s/ Cristen C. Handley*
                                         Cristen C. Handley (MO Bar. No. 69114)
                                         Elisabeth J. Neylan (N.Y. Bar Reg. No. 6125736)
                                         Trial Attorneys
                                         United States Department of Justice
                                         Civil Division, Federal Programs Branch
                                         1100 L St. NW
                                         Washington, DC 20005
                                         Tel:  (202) 305-2677
                                         Fax:  (202) 616-8460

25

E-mail:  Cristen.Handley@usdoj.gov

*Attorneys for the United States*

26