## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff*, v. THE STATE OF NEW YORK, *et al.*, *Defendants*. | Case No. 1:25-CV-00744 Judge Mae Avila D'Agostino |

### PROPOSED BRIEF OF FEDERATION FOR AMERICAN IMMIGRATION REFORM AS *AMICUS CURIAE* IN SUPPORT OF PLAINTIFF AND IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Jonathon P Hauenschild
FEDERATION FOR AMERICAN IMMIGRATION REFORM
25 Massachusetts Ave., NW, Suite 330
Washington, DC 20001
(202) 328-7004
jhauenschild@fairus.org

Counsel for *Amicus Curiae*
Federation for American Immigration Reform

## TABLE OF CONTENTS

INTEREST OF *AMICUS CURIAE* ................................................................................................ 1

SUMMARY OF ARGUMENT ........................................................................................................ 1

ARGUMENT .................................................................................................................................... 2

I. The Defendants' Sanctuary Policies are Preempted ............................................................ 2

   A. The Sanctuary Policies are conflict-obstacle preempted. ....................................................... 4

   B. The Sanctuary Policies are conflict-impossibility preempted. ........................................... 7

II. The Tenth Amendment does not Shield New York's Sanctuary Policies Because States Delegated Authority over Immigration and Naturalization to the Federal Government ................. 9

CONCLUSION ................................................................................................................................ 11

### INTEREST OF *AMICUS CURIAE*[1]

*Amicus curiae* Federation for American Immigration Reform (FAIR) is a non-profit 501(c)(3) public interest organization dedicated to informing the public about the effects of both unlawful and lawful immigration, and to defending in court the interests of Americans in limiting overall immigration, enhancing border security, and ending illegal immigration.

FAIR has been involved in more than 100 legal cases since 1980, either as a party or as *amicus curiae*. The decision in this case will likely have an impact on the ability of the executive branch of the federal government to identify and deal efficiently, fairly, and safely with an illegal alien population estimated to exceed 18 million people in the United States. *Amicus* FAIR has direct and vital interests in defending the executive branch's ability to address the current illegal alien crisis and in State and local officials' ability to cooperate with federal immigration law enforcement.

### SUMMARY OF ARGUMENT

New York's sanctuary policies impede and interfere with federal immigration enforcement and were designed to do just that. By barring federal officials from arresting certain illegal immigrants and by prohibiting state officials from sharing immigration-related information with federal officers, the policies stand as an obstacle to that cooperation among federal, state, and local law enforcement which it has been the purpose of Congress to facilitate. The policies also make it more difficult for the federal government to achieve another, very obvious, purpose of Congress:

---

[1] No counsel for a party in this case authored this brief in whole or in part, and no such counsel or party made a monetary contribution intended to fund the preparation of this brief. No person other than *amicus curiae*, its members, or its counsel made a monetary contribution to the preparation or submission of this brief.

enforcement of the immigration laws it has passed. As obstacles to both of these congressional purposes, the policies violate the Supremacy Clause of the Constitution.

The Defendants' sanctuary policies require officials to withhold information about the location of removable aliens from federal officials, in violation of federal anti-harboring provisions. The policies thus violate the Supremacy Clause by making it impossible for officials to obey both them and federal law.

The Tenth Amendment is no defense. The Constitution has delegated to the federal government the power to control the admission and expulsion of aliens, and has prohibited, through the Supremacy Clause, states from adopting measures that conflict with federal law.

## ARGUMENT

### I.     The Defendants' Sanctuary Policies are Preempted

The Constitution provides that "Congress shall have Power . . . [t]o establish an uniform Rule of Naturalization." U.S. CONST. art. I, § 8, cl. 4. When read together with the Necessary and Proper clause, the Constitution grants Congress plenary power over the admittance of aliens into, and the conditions of their lawful presence in, the United States. *Id*. at cl. 18. The plenary power of Congress in this arena has long been affirmed by the Supreme Court. *See, e.g.*, *De Canas v. Bica*, 424 U.S. 351, 354 (1976) ("Power to regulate immigration is unquestionably exclusively a federal power."); *Hines v. Davidowitz*, 312 U.S. 52, 62 (1941) ("The supremacy of the national power in the general field of foreign affairs, including power over immigration, naturalization and deportation, is made clear by the Constitution . . . ."); *Truax v. Raich*, 239 U.S. 33, 42 (1915) ("The authority to control immigration—to admit or exclude aliens—is vested solely in the Federal Government.").

Contrary to Defendants' assertions, Congress does not need a "clear statement" to preempt State laws and regulations when the Constitution clearly delegates the authority in question to Congress. ECF 11-1 at pp. 11-17. The Framers well understood the threats associated with the *lack* of uniform rules. As Alexander Hamilton noted, the authority to establish a uniform rule of naturalization "must necessarily be exclusive, because if each state had power to describe a distinct rule, there could not be a uniform rule." THE FEDERALIST NO. 32 (Alexander Hamilton), 250-51 (John C. Hamilton, ed., 1998).

Under the Supremacy Clause, U.S. CONST. art. VI, cl. 2, state laws may be preempted by federal law. Preemption may be either express or implied, and implied preemption includes both conflict preemption and field preemption. A state statute is conflict preempted if compliance with both that statute and federal law is impossible. *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-377 (2015), *citing California v. ARC America Corp.*, 490 U.S. 93 (1989), *Fla. Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43 (1963). *See also*, *Coalition for Competitive Electricity v. Zibelman*, 906 F.3d 41, 49 (2nd Cir. 2018) (reciting standards for field and conflict preemption). A state law, including an immigration-related one, is conflict preempted if it "stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *De Canas*, 424 U.S. at 363 (quoting *Hines*, 312 U.S. at 67), *Coalition for Competitive Electricity*, 906 F.3d at 55 (internal citations omitted). "[U]nder the Supremacy Clause, from which our pre-emption doctrine is derived, 'any state law, however clearly within a State's acknowledged power, which interferes with or is contrary to federal law, must yield.'" *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 108 (1992) (quoting *Felder v. Casey*, 487 U.S. 131, 138 (1988)), *Jackson v. Roberts (In re Jackson)*, 972 F.3d 25, 34 (2nd Cir. 2020).

3

Defendants promulgated or adopted the policies expressly to frustrate the enforcement of the Immigration and Naturalization Act (INA). [2] The Protect Our Courts Act (POCA), for example, criminalizes federal law enforcement's arrest of any person "attending a court proceeding in which such person is a party or potential witness, or a family or household member is a part of potential witness." N.Y. Civil Rights Law § 28.2(1). It criminalizes federal law enforcement by subjecting "any person" to contempt of court and false imprisonment charges for seeking to detain, subject to a civil warrant, any person previously described. *Id*. at (2). Similarly, Executive Order 170 prohibits state and local employees, including law enforcement officials, from inquiring "about an individual's immigration status" and disclosing "information to federal authorities for the purpose of federal civil immigration enforcement." N.Y. Exec. Order 170 (Sept. 15, 2017).[3]

### A. The Sanctuary Policies are conflict-obstacle preempted.

Underlying the doctrine of obstacle preemption is the necessity of cooperation between state and federal sovereignties for our federal system to function properly. As the Second Circuit has explained:

> A system of dual sovereignties cannot work without informed, extensive, and cooperative interaction of a voluntary nature between sovereign systems for the mutual benefit of each system. The operation of dual sovereigns thus involves mutual dependencies as well as differing political and policy goals. Without the Constitution, each sovereign could, to a degree, hold the other hostage by selectively withholding voluntary cooperation as to a particular program(s). The potential for deadlock thus inheres in dual sovereignties, but the Constitution has resolved that problem in the Supremacy Clause, which bars states from taking actions that frustrate federal laws and regulatory schemes.

---

[2] *See* New York Attorney General, *Guidance Concerning Local Authority Participation In Immigration Enforcement and Model Sanctuary Provisions* (Jan. 19, 2017, updated Nov. 28, 2018), https://ag.ny.gov/sites/default/files/sanctuary_guidance_and_supplements.pdf.
[3] Available at https://www.governor.ny.gov/sites/default/files/atoms/files/EO%20%23170.pdf.

4

*City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999) (internal citations omitted) (holding that 8 U.S.C. § 1373 is constitutional).

By design, Defendants' Sanctuary Policies frustrate the INA in two of its central purposes—not only the obvious purpose that immigration law be enforced, but the federal-state cooperation Congress intended to foster in that enforcement.

As the Supreme Court has recognized, "consultation between federal and state officials is an important feature of the immigration system." *Arizona*, 567 U.S. at 411. For example, in passing the Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Pub. L. 104-208, 110 Stat. 3009 (IIRIRA), which includes 8 U.S.C. § 1373, Congress sought unimpeded communication among federal, state, and local governments in sharing immigration status information, as well as unobstructed cooperation in ascertaining the whereabouts of illegal aliens. The Senate Judiciary Committee Report accompanying IIRIRA makes this general purpose clear:

> Effective immigration law enforcement requires a cooperative effort between all levels of government. The acquisition, maintenance, and exchange of immigration related information by State and Local agencies is consistent with, and potentially of considerable assistance to, the Federal regulation of immigration and the achieving of the purposes and objectives of the Immigration and Nationality Act.

S. Rep. No. 104-249, at 19-20 (1996) (emphasis added), quoted in *City of New York*, 179 F.3d at 32-33. Thus, in drafting § 1373, Congress sought to foster a cooperative effort among local, state, and federal law enforcement in the enforcement of immigration law.

Shortly before enacting IIRIRA, Congress enacted the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. 104-193, 110 Stat. 2105 (PRWORA). Entitled "Communication between State and local government agencies and Immigration and Naturalization Service," section 434 of this law (codified at 8 U.S.C. § 1644), is nearly identical to § 1373. *E.g.*, *City of New York*, 179 F.3d at 31-32. This provision of PRWORA forbids any

5

prohibitions or restrictions on the ability of state or local governments to send to or receive from the federal government information about the immigration status, lawful or unlawful, of an alien in the United States. Going further than the Senate Judiciary Committee Report accompanying IIRIRA, in the Conference Report accompanying PRWORA, Congress made clear its intent in passing § 1644: to bar any restriction on State and local government entities in their communications with ICE, including about the whereabouts of illegal aliens, which obviously includes the time of their release from detention.

> This provision is designed to prevent any State or local law, ordinance, executive order, policy, constitutional provision, or decision of any Federal or State court that prohibits or in any way restricts any communication between State and local officials and the INS. The conferees believe that immigration law enforcement is as high a priority as other aspects of Federal law enforcement, and that illegal aliens do not have the right to remain in the United States undetected and unapprehended.

H.R. Rep. No. 104-725, at 383 (1996) (Conf. Rep.), quoted in *City of New York*, 179 F.3d at 32.

Another federal statute also has the purpose of fostering cooperation in immigration enforcement. In 8 U.S.C. § 1357(g), Congress made clear that no agreement is needed for state and local officers or employees "to communicate with [federal immigration authorities] regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States." § 1357(g)(10)(A). Likewise, Congress has refused to require any formal agreement for state and local officers or employees to "cooperate with [federal immigration authorities] in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States." § 1357(g)(10)(B).

Defendants' Sanctuary Policies frustrate, and are intended to frustrate, federal enforcement of immigration law. By design, the policies keep ICE in the dark about an alien's place of birth, country of origin, place of home and work addresses, place of employment, incarceration status, and other information of the kind contemplated by PRWORA, which ICE

6

depends on to conduct enforcement operations. New York Civil Rights Law § 28*2(1), New York Exec. Order No. 170 at B. Because the Sanctuary Policies by their terms, both criminalize federal immigration officials' actions and mandate noncooperation with federal enforcement of immigration laws, they thwart the congressional purpose of fostering such cooperation.

### B. The Sanctuary Policies are conflict-impossibility preempted.

In addition to being obstacle preempted, the Sanctuary Policies require that officials in New York violate the federal anti-harboring statute, section 274(a) INA, codified at 8 U.S.C. § 1324. ECF 1 at ¶¶ 7-8, 32-40, 46-54.

> **Bringing in and Harboring Certain Aliens**
> **(a) Criminal penalties.—**
>
> (1) (A) Any person who—
> …
> (iii) knowing or in reckless disregard of the fact that an alien has come to, entered, or remains in the United States in violation of law, conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, such alien in any place, including any building or any means of transportation; . . .
>
> (v) (I) engages in any conspiracy to commit any of the preceding acts, or (II) aids or abets the commission of any of the preceding acts, shall be punished as provided in subparagraph (B).
>
> (B) A person who violates subparagraph (A) shall, for each alien in respect to whom such a violation occurs—
> …
> (ii) in the case of a violation of subparagraph (A)(ii), (iii), (iv), or (v)(II), be fined under title 18, United States Code, imprisoned not more than 5 years, or both . . . .

The INA defines "person" when used in Title II as "an individual or an organization." 8 U.S.C. § 1101(b)(3). "The term 'organization' means, but is not limited to, an organization, corporation, company, partnership, association, trust, foundation or fund; and includes a group of persons, whether or not incorporated, permanently or temporarily associated together with joint action on any subject or subjects." 8 U.S.C. § 1101(a)(28). Thus, § 1324 applies to municipal corporations

and unincorporated areas alike, which, under the INA's sweeping definition, are organizations, and thus persons.

By preventing local law enforcement from providing the information or cooperation that ICE requests in the course of enforcing federal immigration laws, New York's policies compel local officials to "conceal[], harbor[], or shield[] from detection" aliens in "any place, including any building" (or to attempt to do so) in violation of 8 U.S.C. § 1324(a)(1)(a)(iii). For example, when ICE seeks to arrest or detain an illegal alien in State or Local custody, and local authorities refuse to cooperate, as mandated by Defendants' policies, the local authorities are thereafter "shielding" the alien's presence, and therefore the alien, "from detection." *See* New York Civil Rights Law § 28*2(1)-(3), New York Exec. Order 170 (Sept. 15, 2017, amended Exec. Order 170.1, April 25, 2018). Also, if ICE seeks to detain an illegal alien in a safe location, like a court house, and state or local officials bar either the immigration officials or otherwise prevent the arrest, as mandated by Defendants' sanctuary policies, they are "conceal[ing]" the alien "in a[] building" at any time the alien is at that address. Even if state or local officials claim that receiving a Form I-247A (INS Immigration Detainer Notice of Action form notifying them enforcement of an alien's removability)[4] from ICE does not give it the requisite knowledge of an alien's unlawful presence, the form includes a probable cause determination by the U.S. Department of Homeland Security that the alien is removable, thus at the very least making law enforcement's noncompliance in "reckless disregard" of the alien's unlawful presence. *See*, e.g., Exec. Order 170 & 170.1 (Barring officials from complying with civil immigration arrest warrants unless "accompanied by a judicial warrant or judicial order authorizing them to take

---

[4] Sample form available at https://www.ice.gov/sites/default/files/documents/Document/2017/I-247A.pdf.

into custody the person who is the subject of such warrant").

Accordingly, the Defendants' sanctuary policies compel local law enforcement to violate the federal anti-harboring statute. In doing so, they make obedience to both federal and state law an impossibility, and they are, therefore, conflict preempted. *E.g., Oneok,* 575 U.S. at 377; *Coalition for Competitive Electricity*, 906 F.3d at 55.

## II. The Tenth Amendment does not Shield New York's Sanctuary Policies Because States Delegated Authority over Immigration and Naturalization to the Federal Government

Defendants attempt to justify their sanctuary policies under the Tenth Amendment, suggesting that the Complaint should be dismissed on this basis. *E.g.*, ECF 11-1 at pp. 2, 17, 20-21. The Tenth Amendment, however, reserves only "powers not delegated to the United States by the Constitution, nor prohibited by it to the States." U.S. Const. amend. X. Thus, when a party invokes the Tenth Amendment against a federal enactment, courts must ask whether the law (or action) in question was enacted "within the powers granted [the United States] under the Constitution." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991), *see also*, *New York v. United States*, 505 U.S. 144, 155 (1992) ("In some cases the Court has inquired whether an Act of Congress is authorized by one of the powers delegated to Congress in Article I."). If Congress acts within its constitutional powers, through the Supremacy Clause, "Congress may impose its will on the States." *Gregory*, 501 U.S. at 460. *See also Tafflin v. Levitt*, 493 U.S. 455, 458 (1990) (holding that States possess "sovereignty concurrent with that of the Federal Government, subject only to limitations imposed by the Supremacy Clause"). In other words, no state has a power reserved in the Tenth Amendment to take measures that conflict with federal laws that conform to the Constitution, because the Constitution, through the Supremacy Clause, prohibits any such power to the states.

9

The power to regulate immigration is an attribute of sovereignty and derives from constitutional provisions empowering the federal government to regulate foreign commerce, foreign relations, and national security. *See, e.g.*, *Hernandez v. Mesa*, 589 U.S 93, 104 (2020) (recognizing that governance and investigation of Border Patrol conduct is a matter "relating to the conduct of foreign relations" and the Executive Branch "has the lead role in foreign policy"), *Trump v. Hawaii*, 585 U.S. 667, 702 (2018) (holding that immigration related decisions "implicate relations with foreign powers or involve classifications defined in the light of changing political and economic circumstances"); *Arizona*, 567 U.S. at 395 ("The Constitution grants the federal government an 'undoubted power over the subject of immigration and the status of aliens'"); *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-589 (1952) ("[A]ny policy toward aliens is vitally and intricately interwoven with contemporaneous policies in regard to the conduct of foreign relations, the war power, and the maintenance of republican form of government"); *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542-43 (1950) (holding that the right to control immigration and naturalization "stems not alone from legislative power but is inherent in the executive power to control the foreign affairs of the nation.").

Thus, the power to regulate both naturalization and immigration is delegated by the Constitution to the United States. *United States v. Wong Kim Ark*, 169 U.S. 649, 701 (1898), *citing Chirac v. Lessee of Chirac*, 15 U.S. (2 Wheat.) 259 (1817) ("The power, granted to Congress by the Constitution, 'to establish an uniform rule of naturalization,' was long ago adjudged by this court to be vested exclusively in Congress"). Because the Constitution delegates power over naturalization and immigration to the federal government, and the State's policies are preempted by federal law made pursuant to that power, the Tenth Amendment does not reserve the power to make those policies to the State of New York.

## CONCLUSION

For the reasons set forth above, Defendants' motion to dismiss should be denied.

Dated: September 26, 2025　　　　　Respectfully submitted,

　　　　　　　　　　　　　　　　　　s/ Jonathon P. Hauenschild
　　　　　　　　　　　　　　　　　　Jonathon P Hauenschild
　　　　　　　　　　　　　　　　　　FEDERATION FOR AMERICAN IMMIGRATION REFORM
　　　　　　　　　　　　　　　　　　25 Massachusetts Ave., NW, Suite 330
　　　　　　　　　　　　　　　　　　Washington, DC 20001
　　　　　　　　　　　　　　　　　　(202) 328-7004
　　　　　　　　　　　　　　　　　　jhauenschild@fairus.org

　　　　　　　　　　　　　　　　　　Counsel for *Amicus Curiae*
　　　　　　　　　　　　　　　　　　Federation for American Immigration Reform