**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

**UNITED STATES OF AMERICA,**

        **Plaintiff,**

  **vs.**             **1:25-CV-744**
                  **(MAD/PJE)**
**STATE OF NEW YORK; KATHLEEN HOCHUL,**
*Governor of New York, in her Official Capacity*; **and**
**LETITIA A. JAMES,** *Attorney General of New*
*York, in her Official Capacity*,

        **Defendants.**
_____

| APPEARANCES: | OF COUNSEL: |
|---|---|
| **U.S. DEPARTMENT OF JUSTICE** | **CRISTEN CORI HANDLEY, ESQ.** |
| **CIVIL DIVISION** | **ELISABETH NEYLAN, ESQ.** |
| 1100 L. Street NW | |
| Washington, DC 20005 | |
| Attorneys for the United States | |
| | |
| **OFFICE OF THE NEW YORK** | **LINDA FANG, AAG** |
| **STATE ATTORNEY GENERAL** | |
| 28 Liberty Street | |
| New York, New York 10005 | |
| Attorneys for the State of New York, | |
| Kathleen Hochul, and Letitia James | |

**Mae A. D'Agostino, U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

### I. INTRODUCTION

  The United States of America commenced this action on June 12, 2025, seeking to enjoin

provisions of New York's Protect Our Courts Act ("POCA") (Ch. 322, Laws of 2020), and

Executive Orders 170 and 170.1 (9 N.Y.C.R.R. §§ 8.170, 8.170.1). *See* Dkt. No. 1. The United

States alleges that these state laws and executive orders are preempted by federal law and violate

the intergovernmental immunity doctrine. *See id.* On August 4, 2025, Defendants moved to dismiss the complaint, which is currently before the Court. *See* Dkt. No. 11-1.[1]

## II. BACKGROUND

### A.    Constitutional and Statutory Background

Pursuant to the United States Constitution, the Federal Government has exclusive authority to "establish an uniform Rule of Naturalization." U.S. Const. art. I, § 8, cl. 4; *see also Arizona v. United States*, 567 U.S. 387, 394 (2012). Congress has thus made laws governing the entry, admission, presence, status, and removal of aliens within the United States through the Immigration and Nationality Act of 1952 ("INA"), 8 U.S.C. § 1101 *et seq.*, and other related laws.

Responsibility for enforcing the immigration laws rests primarily with the United States Department of Homeland Security ("DHS") and two of its components – Immigration and Customs Enforcement ("ICE") and United States Customs and Border Protection ("CBP"). Congress has provided these agencies several tools to carry out their duties under the INA. As relevant here, the INA authorizes federal agents to make civil immigration arrests, with or without an administrative warrant. *See* 8 U.S.C. § 1226(a) ("On a warrant issued by the Attorney General, an alien may be arrested and detained pending a decision on whether the alien is to be removed from the United States"); *id.* § 1357(a)(2) (providing that immigration officers "shall have power without warrant" to "arrest any alien who ... is entering or attempting to enter the United States in

---

[1] Also submitted in support of Defendants' motion to dismiss are amicus briefs from the following individuals/organizations: (1) the Legal Aid Society, Immigrant Defense Project, Sanctuary for Families, New York County Defender Services, LatinoJustice PRLDEF, Neighborhood Defender Service of Harlem, Make the Road New York, and Brooklyn Defender Services (Dkt. No. 38); (2) eight former New York Judges and Justices (Dkt. No. 39); (3) Law and History Professors (Dkt. No. 40); and (4) nineteen New York District Attorneys (Dkt. No. 41). The Federation for American Immigration Reform submitted an amicus brief in support of the United States. *See* Dkt. No. 61.

violation of any [immigration] law or regulation ..., or to arrest any alien in the United States, if ... the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained"). When an administrative warrant is required, immigration officials "must establish probable cause to believe that the subject is an alien who is removable from the United States." U.S. Immigr. & Customs Enf't, Policy No. 10074.2, *Issuance of Immigration Detainers by ICE Immigration Officers*, § 2.4 (Mar. 24, 2017).

In executing the immigration laws, federal agents often rely on law enforcement partners in state and localities across the country. *See Arizona*, 567 U.S. at 411 ("Consultation between federal and state officials is an important feature of the immigration system"). Several provisions of the INA reflect this expectation of collaboration. *See, e.g.*, 8 U.S.C. § 1357(g)(10)(A) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State ... to communicate with the Attorney General regarding the immigration status of any individual, including reporting knowledge that a particular alien is not lawfully present in the United States"); *id.* § 1357(g)(1)(B) (providing that no formal agreement is required "for any officer or employee of a State or political subdivision of a State ... to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States"). Moreover, Section 1373(a) provides that State and local government entities "may not prohibit, or in any way restrict, any government entity or official from sending to, or receiving from, the Immigration and Naturalization Service information regarding the citizenship or immigration status, lawful or unlawful, of any individual." *Id.* § 1373(a); *see also* 8 U.S.C. §§ 1373(b) & 1644.

In turn, Section 1373(c) provides that federal immigration authorities "shall respond to an inquiry by a Federal, State, or local government agency, seeking to verify or ascertain the

citizenship or immigration status of any individual within the jurisdiction of the agency for any purpose authorized by law, by providing the requested verification or status information." *Id.* § 1373(c). The United States is also required to provide investigative resources for State and local authorities "to determine whether individuals arrested by such authorities for aggravated felonies are aliens." *Id.* § 1226(d)(1)(A).

## B.    Agency Guidance on Civil Immigration Arrests

DHS and ICE have promulgated and revised guidelines providing for the enforcement of civil immigration laws at particular locations. *See* Dkt. No. 1 at ¶¶ 1-3. Most recently, on May 27, 2025, ICE issued guidance addressing civil enforcement activities in or near courthouses. *See* Memorandum from Acting Director of ICE Todd M. Lyons, *Civil Immigration Enforcement Action In or Near Courthouses*, dated May 27, 2025, *available at* https://tinyurl.com/389vfxsj (last visited Nov. 12, 2025).[2] The guidance explains that "[f]ederal, state, and local law enforcement agencies routinely engage in enforcement activities in or near courthouses because ... [i]ndividuals entering courthouses are typically screened by law enforcement personnel to search for weapons and other contraband," which "can reduce safety risks to the public, targeted alien(s), and ICE officers." *Id.* at 1. The guidance further states that "enforcement activities in or near courthouses are often required when jurisdictions refuse to cooperate with ICE," such as by refusing to "transfer aliens directly to ICE custody." *Id.*

---

[2] This guidance superseded ICE's January 2025 interim guidance on courthouse arrests, which expressly acknowledged and abided by state-law protections and restrictions on civil arrests in or near courthouses. *See* Memorandum from Acting Director of ICE Caleb Vitello, *Interim Guidance: Civil Immigration Enforcement Actions In or Near Courthouses*, dated Jan. 21, 2025, *available at* https://tinyurl.com/tcfsdt5a (last visited Nov. 12, 2025). In that interim guidance, ICE specifically recognized that a civil immigration arrest may be carried out in or near a courthouse in certain cases only "where such action is not precluded by laws imposed by the jurisdiction in which the enforcement action will take place." *Id.* at 2.

The guidance identifies five categories of aliens subject to civil enforcement actions at courthouses, including those who pose national security or other public safety threats, gang members, and aliens with criminal convictions.  *See id.* at 2.  For aliens not in those categories, "such as family members or friends accompanying the target alien to court appearances," the guidance provides for "civil immigration enforcement action on a case-by-case basis considering the totality of the circumstances." *Id.*  Any enforcement action that takes place in or near a courthouse "should, to the extent practicable, continue to take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exits." *Id.*  The guidance further explains that any such enforcement action should be conducted with "substantial efforts to avoid unnecessarily alarming the public or disrupting court operations," and to "limit [ICE officers'] time at courthouses." *Id.* at 3; *see also id.* at 2 ("When practicable, ICE officers and agents will conduct civil immigration enforcement actions against targeted aliens discreetly to minimize their impact on court proceedings").  Enforcement actions "should generally [be] avoid[ed]" in or near courthouses, including areas within those courthouses, "that are wholly dedicated to non-criminal proceedings (e.g. family court, small claims court)." *Id.* at 2.

## C.    Challenged Policies

### 1. Protect Our Courts Act

Prior to 2017, ICE generally prohibited its officials from engaging in civil enforcement action at courthouses except in "very limited circumstances." *New York v. U.S. Immigration & Customs Enf't*, 466 F. Supp. 3d 439, 441 (S.D.N.Y. 2020).  ICE departed from that policy in 2017, after the start of the first Trump administration.  *See id.* at 442 (recounting ICE's changed policy).  As a result of this policy change, civil immigration arrests at state courthouses in New York

increased some 1,200% over three years. *See* Assembly's Memorandum in Support for ch. 322 (2020), at 8.

In response to the impact of these arrests, on December 15, 2020, the New York State Legislature enacted POCA, with the stated purpose to protect "the operations of [the State's] judicial system," and "to promote public safety." POCA amended the Civil Rights Law to provide that "[a] person duly and in good faith attending a court proceeding in which such person is a party or potential witness, or a family or household member is a party or potential witness, is privileged from civil arrest while going to, remaining at, and returning from, the place of such court proceeding, unless such civil arrest is supported by a judicial warrant or judicial order authorizing such civil arrest." N.Y. Civ. Rights Law § 28(1). The POCA defines "family or household member" as follows:

(a) persons related by consanguinity or affinity;

(b) persons legally married to one another;

(c) persons formerly married to one another regardless of whether they still reside in the same household;

(d) persons who have a child in common regardless of whether such persons are married or have lived together at any time;

(e) unrelated persons who are continually or at regular intervals living in the same household or who have in the past continually or at regular intervals lived in the same household;

(f) persons who are not related by consanguinity or affinity and who are or have been in an intimate relationship regardless of whether such persons have lived together at any time. Factors that may be considered in determining whether a relationship is an "intimate relationship" include, but are not limited to: the nature or type of relationship, regardless of whether the relationship is sexual in nature; the frequency of interaction between the persons; and the duration of the relationship. Neither a casual acquaintance nor

ordinary fraternization between two individuals in business or social contexts shall be deemed to constitute an "intimate relationship"; or

(g) any other category of individuals deemed to be a victim of domestic violence as defined by the office of children and family services in regulation.

N.Y. Soc. Serv. Law § 459-a(2).

Under the POCA, a "civil arrest" is an arrest that is not (i) "for the sole or primary purpose of preparing the person subject to such arrest for criminal prosecution" for an alleged violation of state or federal criminal law; or (ii) for contempt of the court in which the proceeding is taking place or will be taking place[.]" N.Y. Civ. Rights Law § 28(6)(a)(i-ii). Where an arrest is pursued in connection with an alleged violation of federal law, the POCA defines the arrest as criminal only if the federal law at issue carries a sentence of imprisonment "and for which federal law requires an initial appearance before a federal judge, federal magistrate or other judicial officer, pursuant to the federal rules of criminal procedure that govern initial appearances." *Id.* § 28(6)(a)(i)(B).

Violating the POCA creates potential criminal and civil liability. Specifically, wilfully arresting someone in violation of the POCA or a court order, or wilfully assisting such an arrest, constitutes "contempt of the court and false imprisonment." *Id.* § 28(2). Under New York law, those crimes are punishable by up to four years in prison. *See* N.Y. Penal Law §§ 215.50, 215.51, 135.05 & 135.10. As to civil liability, regardless of whether a contempt proceeding has been initiated, the POCA allows for civil suits by anyone subject to the arrest privilege and by the New York Attorney General. *See id.* § 28(3).

### 2. Executive Orders 170 & 170.1

On September 15, 2017, former New York State Governor Andrew Cuomo signed Executive Order 170, titled "State Policy Concerning Immigrant Access to State Services," which prohibits state officers and employees from, among other activities, "disclos[ing] information to federal immigration authorities for the purpose of federal civil immigration enforcement, unless required by law." 9 N.Y.C.R.R. § 8.170(B)(2). Executive Order 170 further provides that, "[n]otwithstanding such prohibition, this Order does not prohibit, or in any way restrict, any state employee from sending to, or receiving from, federal immigration authorities, information regarding the citizenship or immigration status, lawful or unlawful, of any individual, as required by law." *Id.*

On April 25, 2018, former Governor Cuomo issued Executive Order 170.1, titled "State Policy Concerning Immigrant Access to State Services and Buildings." *Id.* § 8.170.1. Executive Order 170.1 provides that "[c]ivil arrests by federal immigration authorities may only be executed within state facilities when accompanied by a judicial warrant or judicial order authorizing them to take into custody the person who is the subject of such warrant, unless the civil arrest is related to a proceeding within such facility." *Id.* § 8.170.1(B). The Executive Order defines "state facility" as "any building, or part thereof, owned or leased by any Affected State Entity" and, in turn, defines "Affected State Entities" as "(i) all agencies and departments over which the Governor has executive authority, and (ii) all public benefit corporations, public authorities, boards, and commissions for which the Governor appoints the Chair, Chief Executive, or the majority of the Board Members, except the Port Authority of New York and New Jersey." *Id.* § 8.170.1(A).

**D.     Procedural History**

      *1. Prior Judgment Enjoining ICE's Courthouse Arrests*

In 2019, the State of New York and Kings County District Attorney Eric Gonzalez commenced an action in the U.S. District Court for the Southern District of New York to enjoin ICE's changed policy of permitting civil immigration arrests of noncitizens and their family members in state courthouses. *See State of New York v. Immigration & Customs Enf't*, 431 F. Supp. 3d 377 (S.D.N.Y. 2019) ("*State of New York I*"). The suit asserted claims under the Administrative Procedures Act and the Tenth Amendment.

The district court denied ICE's motion to dismiss, concluding that a common law privilege against civil courthouse arrests existed, and expressly rejected ICE's claim that the federal immigration laws had abrogated that common law privilege. *See id.* at 392-93. Following discovery, upon the parties' cross motions for summary judgment, Judge Rakoff found that ICE's policy of conducting civil courthouse arrests was "illegal" because it exceeded ICE's statutory authority, which did not include the power to conduct civil courthouse arrests. *See State of New York v. U.S. Immigration & Customs Enf't*, 466 F. Supp. 3d 439, 449-50 (S.D.N.Y. 2020) ("*State of New York II*"). The court then permanently enjoined "ICE from conducting any civil arrests on the premises or grounds of New York State courthouses, as well as such arrests of anyone required to travel to a New York State courthouse as a party or witness to a lawsuit." *Id.*

ICE appealed to the Second Circuit but "formally revoked" the enjoined policy before the appeal was heard. *See State of New York v. U.S. Immigration & Customs Enf't*, No. 20-2622, Dkt. No. 122 (2d Cir.). Upon the request of the parties, the Second Circuit dismissed the appeal "as moot and/or waived," vacated the judgment below, and directed that the trial court dismiss the case. *See State of New York v. U.S. Immigration & Customs Enf't*, No. 20-2622, 2023 WL 2333979, *1 (2d Cir. Feb. 28, 2023).

The New York State Legislature enacted POCA after the district court's grant of summary judgment in the plaintiffs' favor and before the Second Circuit dismissed ICE's appeal.

### 2. *This Lawsuit*

The United States commenced this action on June 12, 2025, against Defendants the State of New York and Governor Kathy Hochul and Attorney General Letitia James, in their official capacities. *See* Dkt. No. 1. The complaint raises three separate claims under the Supremacy Clause of the United States Constitution: preemption (count one); unlawful regulation of the federal government (count two); and unlawful discrimination against the federal government (count three). *See id.* at ¶¶ 55-69. The United States seeks declaratory and injunctive relief preventing Defendants from further enforcing the challenged laws. Currently before the Court are Defendants' motion to dismiss and the United States' opposition thereto.

## III. DISCUSSION

### A.    Standard of Review

A motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) tests the legal sufficiency of the party's claim for relief. *See Patane v. Clark*, 508 F.3d 106, 111-12 (2d Cir. 2007) (citation omitted). In considering the legal sufficiency, a court must accept as true all well-pleaded facts in the pleading and draw all reasonable inferences in the pleader's favor. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (citation omitted). This presumption of truth, however, does not extend to legal conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009) (citation omitted). Although a court's review of a motion to dismiss is generally limited to the facts presented in the pleading, the court may consider documents that are "integral" to that pleading, even if they are neither physically attached to, nor incorporated by

reference into, the pleading. *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir. 2006)

(quoting *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002)).

 To survive a motion to dismiss, a party need only plead "a short and plain statement of the

claim," Fed. R. Civ. P. 8(a)(2), with sufficient factual "heft to 'sho[w] that the pleader is entitled to

relief.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (citation omitted).  Under this

standard, the pleading's "[f]actual allegations must be enough to raise a right of relief above the

speculative level," *see id.* at 555 (citation omitted), and present claims that are "plausible on

[their] face," *id.* at 570.  "The plausibility standard is not akin to a 'probability requirement,' but it

asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at

678 (citation omitted).  "Where a complaint pleads facts that are 'merely consistent with' a

defendant's liability, it 'stops short of the line between possibility and plausibility of the

'entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).  Ultimately, "when the allegations

in a complaint, however true, could not raise a claim of entitlement to relief," *Twombly*, 550 U.S.

at 558, or where a plaintiff has "not nudged [its] claims across the line from conceivable to

plausible, the [] complaint must be dismissed[,]" *id.* at 570.

## B. Count One: Preemption

 In its complaint, the United States first alleges that POCA and the Executive Orders create

unconstitutional obstacles to federal immigration enforcement and are therefore conflict

preempted.  *See* Dkt. No. 1 at ¶¶ 55-60.  Specifically, the United States contends that POCA and

Executive Order 170.1 "purport to dictate the locations in which immigration officers perform

their federal functions, including in public areas and areas far from courthouses, thereby impeding

those officers' ability to discharge their official duties." *Id.* at ¶ 57 (citing 8 U.S.C. §§ 1226a,

1226(c), 1231(a), 1357; 18 U.S.C. §§ 372, 1071).  Further, the United States alleges that

"Executive Orders 170 and 170.1 frustrate the expectation of collaboration reflected in the immigration laws ... by barring state and local officials from sharing information with federal immigration officials – even when they wish to do so." *Id.* at ¶ 59.  In their motion to dismiss, Defendants argue that federal immigration laws do not contain any clear statement of congressional intent to displace the State's police powers or longstanding common-law protections against civil courthouse arrests and, therefore, POCA and the Executive Orders are not conflict preempted.  *See* Dkt. No. 11-1 at 17-27.

### 1. General Principles of Preemption

Federal law can preempt state law in three ways: express preemption, conflict preemption, or field preemption.[3]  *See Murphy v. Nat'l Collegiate Athletic Ass'n*, 584 U.S. 453, 477 (2018). Each type of preemption works the same way: "Congress enacts a law that imposes restrictions or confers rights on private actors; a state law confers rights or imposes restrictions that conflict with the federal law; and therefore the federal law takes precedence and the state law is preempted." *Id.*

Certain rules of preemption flow from federalism.  First, given Congress' limited powers, preemption of a state law must be based in the Constitution or a validly enacted federal law, not "some brooding federal interest." *Virginia Uranium, Inc. v. Warren*, 587 U.S. 761, 767 (2019) (citation omitted); *see also Kansas v. Garcia*, 589 U.S. 191, 202 (2020).

Second, a federal law only has preemptive effect if it regulates private individuals, whether alone or in conjunction with regulation of States.  *See Murphy*, 584 U.S. at 477-78.  This is so because Congress may only legislate upon individuals, as is reflected in the Framers' debates during the Constitutional Convention and their deliberate rejection of a plan that would have

---

[3] Here, the United States relies on the theory of conflict preemption.

allowed Congress to legislate on States.  *See New York v. United States*, 505 U.S. 144, 164-66 (1992).

Third, courts assume that Congress does not preempt lightly.  *See Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991).  Although Congress may legislate in areas traditionally regulated by States, preemption analysis "assume[s] that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)).

### 2. Conflict Preemption

Conflict preemption involves "'cases where compliance with both federal and state regulations is a physical impossibility,'" *McHenry Cnty. v. Raoul*, 44 F.4th 581, 591 (7th Cir. 2022) (quoting *Arizona*, 567 U.S. at 399), and where the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941).  "Physical impossibility" is not at issue in this case; the question is whether the POCA and Executive Orders "obstruct[] congressional purposes." *McHenry Cnty.*, 44 F.4th at 591.

Courts must use their judgment, "informed by examining the federal statute as a whole and identifying its purpose and intended effects," to determine whether a state statute or regulation is conflict preempted.  *See Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).  The text is the north star when interpreting statutes.  "Extrinsic materials" like legislative history "have a role in statutory interpretation only to the extent that they shed a reliable light on the enacting Legislature's understanding of otherwise ambiguous terms." *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005).

A court should not find conflict preemption "unless that was the clear and manifest purpose of Congress." *Arizona*, 567 U.S. at 400. "The challenger must show that applying the state law would do 'major damage' to clear and substantial federal interests." *C.Y. Wholesale, Inc. v. Holcomb*, 965 F.3d 541, 547 (7th Cir. 2020) (citation omitted); *see also Crosby*, 530 U.S. at 373 ("What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects"). "In preemption analysis, courts should assume that 'the historic police powers of the States' are not superseded 'unless that was the clear and manifest purpose of Congress.'" *Arizona*, 567 U.S. at 400 (quotation and other citation omitted). Merely because a state law "inconveniences" the federal government does not render it preempted — the repugnance must be "so direct and positive that the two acts cannot be reconciled or consistently stand together." *Goldstein v. California*, 412 U.S. 546, 554-55 (1973).

### a. POCA

Initially, the Court finds that the provisions of POCA challenged here are presumed valid because they concern the State's right to manage its "judicial systems for the decision of legal controversies" – a core feature of its inherent sovereignty. *Atl. Coast Line R.R. v. Bhd. of Locomotive Eng'rs*, 398 U.S. 281, 285, 287 (1970) (explaining that states reserved power to maintain "judicial systems for the decision of legal controversies" and referring to "the fundamental constitutional independence of the States and their courts"); *see also Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9, 30 (1st Cir. 2020) (holding that "the operation of a functioning judiciary is unmistakably a fundamental exercise of state sovereignty").

POCA's provisions prohibit civil arrests of parties and potential witnesses, except where such arrests are authorized by a judicial warrant or order, "while going to, remaining at, and

14

returning from" state court proceedings. *See* N.Y. Civ. Rights Law § 28(1). These protections were enacted to protect the State's "compelling" interest in its judicial system. *See Gregory*, 501 U.S. at 472. As Defendants note, POCA's legislative history contains ample evidence of the serious impairments experienced by the State's judicial system from disruptive civil courthouse arrests that were intended to be remedied by POCA. The Legislature further determined that public safety is enhanced by protecting parties and witnesses from civil arrests in connection with their attendance at court proceedings, to encourage victims and witnesses to come forward to participate in the justice system. *See* Assembly Memorandum in Support, Bill Jacket for ch. 322 (2020), at 8; *see also City of Chicago v. Sessions*, 888 F.3d 272, 280 (7th Cir. 2018) (noting that fear among immigrant communities that any contact with government officials "will bring the scrutiny of federal immigration authorities" may deter crime reporting). Indeed, ICE's own prior policies urging discretion in conducting enforcement activities expressly acknowledged the potential that such activities may "deter[] individuals from reporting crimes and from pursuing actions to protect their civil rights." Memorandum from Director John Morton, *Prosecutorial Discretion: Certain Victims, Witnesses, and Plaintiffs*, dated June 17, 2011, *available at* https://www.ice.gov/doclib/foia/prosecutorial-discretion/certain-victims-witnesses-plaintiffs.pdf (last visited Nov. 12, 2025).

The Court also agrees with Defendants that the challenged provisions of POCA are separately presumed to be valid because they codified New York's "very ancient" privilege protecting parties and witnesses from civil arrests in courthouses, and while traveling to and from court proceedings. *See Parker v. Marco*, 136 N.Y. 585, 589 (1893); *Person v. Grier*, 66 N.Y. 124, 125 (1876) ("It is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home"). Although the

United States argues that no such privilege existed, *see* Dkt. No. 60 at 23, by the beginning of the twentieth century, "the exemption of persons from the writ of arrest and of summons while attending upon courts of justice, either as witnesses or suitors," was "firmly rooted in the jurisprudence of the United States." *Hale v. Wharton*, 73 F. 739, 740 (C.C.W.D. Mo. 1896) (collecting cases); *Stewart v. Ramsay*, 242 U.S. 128, 129 (1916) ("The true rule, well founded in reason and sustained by the greater weight of authority, is that suitors, as well as witnesses, coming from another state or jurisdiction, are exempt from the service of civil process while in attendance upon court, and during a reasonable time in coming and going").

The Court concludes, as discussed in detail by Judge Rakoff in *State of New York I*, 431 F. Supp. 3d at 388-92, that a common law privilege against civil courthouse arrests exists. Case law and contemporary commentaries indicate that such a privilege derives from English common law. This privilege emerged at a time when civil arrest was commonplace, because a civil action was commenced by way of civil arrest of the defendant. In Blackstone's Commentaries on the Laws of England, "on which early U.S. courts heavily relied in incorporating English common law into the laws of the several states and the United States," *State of New York I*, 431 F. Supp. 3d at 388, Blackstone describes the privilege as follows:

> "Suitors, witnesses, and other persons, necessarily attending any courts of record upon business, are not to be arrested during their actual attendance, which includes their necessary coming and returning. And no arrest can be made in the king's presence, nor within the verge of his royal palace, nor in any place where the king's justices are actually sitting."

*Id.* (quoting 3 William Blackstone, Commentaries on the Laws of England 289 (1768)); *see also, e.g.*, *Meekins v. Smith*, 126 Eng. Rep. 363, 363 (1791) ("[A]ll persons who had relation to a suit which called for their attendance, whether they were compelled to attend by process or not, (in

which number bail were included) were [e]ntitled to privilege from arrest eundo et redeundo [going and returning], provided they came bona fide").  The rationales underpinning the existence of the privilege illustrate that it existed as much for the benefit of the courts as it did for the benefit of the individual: To permit arrest to be made in court or while persons were coming or returning "'would give occasion to perpetual tumults,'" *State of New York I*, 431 F. Supp. 3d at 389 (quoting *Orchard's Case*, 38 Eng. Rep. 987, 987 (1828)), discourage witnesses from coming forward voluntarily, *id.* (citing *Walpole v. Alexander*, 99 Eng. Rep. 530, 530 (1782)), and "'was altogether inconsistent with the decorum which ought to prevail in a high tribunal,'" *id.* (quoting *Orchard's Case*, 38 Eng. Rep. at 978).

Case law and contemporary commentaries further illustrate that by at least the mid-nineteenth century, the privilege was firmly established in New York common law.  Indeed, David Graham's Treatise on the Practice of the Supreme Court of the State of New York noted in 1836 that "[a]s a general rule, every person who has any relation to a suit, whether his presence be compulsory or not, is exempt from arrest, eundo, morando, et redeundo [going, staying, and returning]." David Graham, Treatise on the Practice of the Supreme Court of the State of New York 129 (2d ed. 1836); *see also, e.g.*, *Hopkins v. Coburn*, 1 Wend. 292, 293 (N.Y. Sup. Ct. 1828) ("The defendant, as a suitor, was undoubtedly privileged from arrest"); *Sandford v. Chase*, 3 Cow. 381, 382 (N.Y. Ct. for Correction of Errors 1824) ("The privilege of a witness should be absolute.  An arrest should not be valid even for the purpose of giving jurisdiction to the Court out of which the process issues; more especially where the witness is attending from a foreign state"); *Norris v. Beach*, 2 Johns. 294, 294 (N.Y. Sup. Ct. 1807) (same).  Even after service of process had largely replaced civil arrest as the chief means of initiating a civil action, the New York Court of Appeals confirmed the continued vitality of the privilege in the context of service of process,

noting that "[i]t is the policy of the law to protect suitors and witnesses from arrests upon civil process while coming to and attending the court and while returning home." *Person*, 66 N.Y. at 125.  Much like the English courts before it, the Court of Appeals found that the privilege was necessary "[to] the administration of justice," because in its absence "[w]itnesses might be deterred, ... parties prevented from attending, and delays might ensue or injustice be done." *Id.* at 126; *see also Parker v. Marco*, 136 N.Y. 585, 589 (1893) (finding the privilege "is not simply a personal privilege, but ... is also the privilege of the court, and is deemed necessary for the maintenance of its authority and dignity and in order to promote the due and efficient administration of justice") (citations omitted).

The Court further agrees with Judge Rakoff that "[t]he continuing availability of the common law privilege, and its breadth, is shown by the fact that even after the former kind of civil arrest had become obsolete, and before regulatory civil arrests had become common, ... the highest court of New York ... continued to apply the privilege even when the intrusion was not an actual arrest but only a disruptive service of process." *State of New York I*, 431 F. Supp. 3d at 389. The continued vitality of the common law privilege is made manifest when one examines "the policy objectives cited for hundreds of years by English and American courts to justify" it.  *Id.* at 391.  As discussed above, the privilege evolved as a means to encourage parties, as well as witnesses, to appear in court voluntarily and to enable the proper, expeditious, and uninterrupted functioning of courts.  These policy objectives apply equally — if not with greater force — to modern-day civil immigration arrests and compel this Court to conclude, as Judge Rakoff did, that the common law privilege against civil arrests in and around courthouses (and traveling to and from courthouses) persisted in the common law of New York State at the time POCA was

18

enacted. *Id.* As such, this fundamental privilege cannot be assumed to have disappeared simply with the passage of time.[4]

The United States fares no better with its argument that the common law privilege does not apply to civil arrests conducted by the government. *See* Dkt. No. 60 at 24 & n.11. The United States relies on *Ryan v. U.S. Immigration & Customs Enf't*, 974 F.3d 9 (1st Cir. 2020), which found that "the entirety of the pre-1952 case law pertaining to the common law privilege appears to have involved private civil suits," and there is "no clear historical precedent for extending the privilege to arrests on behalf of the sovereign." *Id.* at 24 (quoting *Ryan*, 974 F.3d at 26). "Thus, as the First Circuit concluded, there is no reason to believe that 'Congress would have reflexively inferred that the privilege protected against ... the civil immigration arrests that it was authorizing in the INA.'" *Id.* (quoting *Ryan*, 974 F.3d at 26). Respectfully, the Court disagrees with the reasoning of the First Circuit in *Ryan*.[5]

As discussed above, the privilege belongs not to the parties, but to the court itself. *See Stewart*, 242 U.S. at 130 ("The privilege which is asserted here is the privilege of the court, rather

---

[4] In urging the Court to reach a different result, the United States relies on *African Communities Together v. Lyons*, ___ F. Supp. 3d ___, 2025 WL 2898389 (S.D.N.Y. Oct. 7, 2025). The Court finds the United States' reliance on this case unpersuasive. The suit there was concerned with the distinct issue of whether ICE had statutory authority to conduct civil immigration arrests at *federal* immigration courthouses, and thus did not implicate the weighty federalism interests and questions before this Court. Nor did the court pass on the dispositive question before this Court of whether the INA "reflects Congress's clear and manifest purpose" to preempt state law. *See id.* at *18; *see also City of Milwaukee v. Illinois*, 451 U.S. 304, 316 (1981) (noting that a more stringent standard applies to determine whether federal statutory law displaces state common law as compared with federal common law).

[5] The Court notes that the First Circuit in *Ryan* did not reach the question of whether the INA reflects Congress' clear and manifest purpose to preempt state common law because the district court did not address this argument in its analysis. *See Ryan*, 974 F.3d at 29. As such, this Court's ruling is not in tension with the First Circuit's holding in *Ryan*. *See Doe v. U.S. Immigration & Customs Enf't*, 490 F. Supp. 3d 672, 692 n.3 (S.D.N.Y. 2020).

than of the defendant") (citation omitted).  The United States and the *Ryan* court neglect to consider the underlying policy which drives the privilege.  "The essence of the privilege is the sanctity of the court.  It is 'founded in the necessities of the judicial administration, which would be often embarrassed, and sometimes interrupted, if the suitor might be vexed with process while attending upon the court.'" *Velazquez-Hernandez*, 500 F. Supp. 3d at 1145 (quoting *Stewart*, 242 U.S. at 130).  The privilege, consistent with the constitutional right of access to the court, "enables the citizen to prosecute his rights without molestation, and procure the attendance of such as are necessary for their defence and support." *Halsey v. Stewart*, 4 N.J.L. 366, 369 (N.J. 1817).  This "great object in the administration of justice" is "obstructed" if parties are liable to be civilly arrested or served while attending court.  *See id.* at 368.  The United States' position and the holding in *Ryan* wholly ignores this purpose.  "Civil arrest — whether by a private individual or by the government — runs afoul of this privilege of the court.  The Executive may have sovereign power over immigration enforcement, but the Executive does not have sovereign power over the court." *Velazquez-Hernandez*, 500 F. Supp. 3d at 1145.[6]

Finally, the Court finds unpersuasive the United States' argument that the absence of cases applying the common law privilege to civil immigration courthouse arrests supports the inference that such arrests were outside the privilege.  As Defendants note, the more likely explanation is that civil immigration arrests, which were not commonplace until more recently, simply did not occur in state courthouses in light of settled common law protections and because ICE's own policies previously counseled against such arrests.  Additionally, the states were responsible for

---

[6] Moreover, contrary to the United States' position, there is authority that supports the fact that the privilege applied to arrests initiated by the sovereign. *See Ex Parte Russel*, 19 Ves. Jun. 163, 166 (1812) (holding that debtor to the Crown "cannot be arrested by the Crown any more than by a subject" while attending bankruptcy proceedings and ordering the debtor be released from Crown custody).

enforcing immigration matters through most of the nineteenth century. *See* Gerald L. Neuman, *The Lost Century of American Immigration Law (1776-1885)*, 93 COLUM. L. REV. 1833, 1839-84 (1993); *see also New York v. Miln*, 36 U.S. 102, 132 (1837) (holding that immigration regulation fell within police powers that "rightfully belonged to the state"). It was not until 1888 that Congress created a civil deportation regime. *See* Act of Sept. 13, 1888, ch. 1015, § 13, 25 Stat. 476, 479; Act of Oct. 19, 1888, ch. 1210, 25 Stat. 565, 566-67. In practice, however, before 1920, "few people were actually excluded or deported." Lindsay Nash, *Inventing Deportation Arrests*, 121 MICH. L. REV. 1301, 1333 (2023). It was not until during and after World War II that the federal government began to expand its use of civil deportation. *See id.* at 1341-52. And, even after World War II, civil arrests in and around courthouses were exceedingly uncommon. It was not until 2017, when the policy changed and arrests in and around New York State courthouses increased "by a remarkable 1700 percent and more." *State of New York I*, 431 F. Supp. 3d at 380. As such, the Court views the absence of caselaw applying the privilege in this particular context not as a reflection of the fact that the privilege no longer exists; rather, the Court views this absence as a reflection that prior administrations viewed the privilege, possessed by a co-equal branch of government, as something so well established and sacrosanct to even consider such actions.

Of course, ICE agents conducting these arrests act under authority of federal law, not New York law. The ultimate question then is whether the federal immigration statute, which is silent on this issue, incorporates the common law privilege, here applicable to the courts of New York, which was codified in statute through POCA. Defendants argue that it does, while the United States argues that the INA preempted and, therefore, invalidated any potential common law privilege, which means that POCA is preempted as well.

"'[S]tatutes which invade the common law ... are to be read with a presumption favoring the retention of long-established and familiar principles, except when a statutory purpose to the contrary is evident.'" *United States v. Texas*, 507 U.S. 529, 534 (1993) (quotation omitted). "In order to abrogate a common-law principle, the federal statute at issue must 'speak directly' to the question addressed by the common law." *Id.* (quotation omitted). This is so because, under such circumstances, "Congress does not write upon a clean slate." *Id.* In determining whether a statute "invades" or enters a field addressed by common law, courts look to whether the purpose and rationale of the common law apply to the statutory context in which Congress was legislating. *See Pasquantino v. United States*, 544 U.S. 349, 360, 368-72 (2005).

Additionally, where state law is involved, federalism concerns must be considered. Thus, when determining whether federal law preempts state common law, the Court is admonished to "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *City of Milwaukee*, 451 U.S. at 316 (quotation and other citations omitted). "'If Congress intends to alter the usual constitutional balance between the States and the Federal Government, it must make its intention to do so unmistakably clear in the language of the statute.'" *Gregory*, 501 U.S. at 460 (quotation and other citation omitted). Absent evidence of such a "clear and manifest purpose," therefore, the presumption against pre-emption cautions against a judicial determination that state law — including state common law — was superseded by federal action. *See Wyeth v. Levine*, 555 U.S. 555, 565 (2009).

Against this backdrop, the Court turns to the INA. The Court finds no question that the purpose and rationale of the common-law rule against civil courthouse arrest applies to the statutory context in which Congress was legislating. The privilege goes back to at least the

fifteenth century and persisted for hundreds of years thereafter in English and American common law.  Congress enacted the INA in 1952, only twenty years after the Supreme Court reiterated the privilege in *Lamb v. Schmitt*, 285 U.S. 222, 225 (1932) ("[T]he due administration of justice requires that a court shall not permit interference with the progress of a cause pending before it, by the service of process in other suits").

When Congress enacted the INA, it did so against the backdrop of New York's longstanding common law privilege.  And yet, nothing in the INA evinces any congressional intent – let alone a clear and manifest one – to displace the State's settled common law privilege or its exercise of police powers over the management of its courts.  In support of their preemption argument, the United States contends that "the INA authorizes immigration officials to make civil arrests, without judicial warrants and without geographical limitations." Dkt. No. 60 at 25 (citing 8 U.S.C. §§ 1226(a), 1357(a)(2) & (4)-(5)).  Moreover, the United States notes that "[w]hen Congress intended limitations on that authority, it was explicit, and no such limitations in the INA even arguably resemble those in the POCA." *Id.* (citing 8 U.S.C. § 1357(a)(2) & (4)-(5)).

Although the INA confers broad authority to make warrantless immigration arrests, *see* 8 U.S.C. §§ 1226(a), 1357(a), those sections are silent as to whether such arrests are permitted in courthouses.  Thus, the statutes on their face do not indicate that Congress intended to abrogate the common-law privilege.  *See Pasquantino*, 544 U.S. at 359 (holding that Congress must clearly state its intent to abrogate the common law) (citation omitted).  Additionally, in 8 U.S.C. § 1357(a), Congress not only authorized immigration officers to conduct arrests, but provided for certain restrictions and permissions on where immigration enforcement could take place.  It permitted immigration officers to enter private lands within twenty-five miles of the border to make such arrests, but prohibited access to dwellings, 8 U.S.C. § 1357(a)(3), and within a

reasonable distance of the border, permitted officers to board any vessel, railway car, aircraft, conveyance or vehicle, *id.* These provisions reflect a concern with the location of arrest, just as the common-law rule does. Congress' use of explicit language authorizing ICE activity on otherwise protected private property in certain locations shows that it knows how to speak clearly when it intends to displace conflicting protections. *See Velazquez-Hernandez*, 500 F. Supp. 3d at 1143-44 (noting that Congress granted permission to immigration officers "to enter private lands" close to the border but did not expressly authorize arrests in courthouses). This congressional silence has led several courts to reach the same conclusion reached here today by this Court – that the INA did not preempt, but rather incorporated, longstanding state common-law protections against civil courthouse arrests. *See id.*; *see also State of New York I*, 431 F. Supp. 3d at 392; *Doe*, 490 F. Supp. 3d at 692 ("Because the INA provides *no* indication that Congress intended to abrogate the common law privilege against civil courthouse arrests – let alone an 'unmistakenly clear' one – the Court concludes that 'the statute incorporates the privilege'") (emphasis in original); *Washington v. U.S. Dep't of Homeland Sec.*, 614 F. Supp. 3d 863, 879 n.21 (W.D. Wash. 2020) ("Defendants have not identified any provision of the INA indicating a Congressional intent to displace the state common-law privilege").

The United States also contends that, "through a 2006 amendment to the INA to add 8 U.S.C. § 1229(e), Congress acknowledged the practice of conducting immigration enforcement actions at state courthouses." Dkt. No. 60 at 25. The United States argues that this "section discusses 'cases where an enforcement action leading to a removal proceeding was taken against an alien at ... a courthouse (or in connection with that appearance of the alien at a courthouse).' ... It goes on to list primarily state-law offenses, thereby demonstrating Congress's contemplation

24

that immigration enforcement actions would occur at state courthouses." *Id.* (quotation and other citation omitted).  The Court disagrees.

Section 1229(e) provides that if an enforcement action leading to a removal proceeding takes place at "a courthouse (or in connection with that appearance of the alien at a courthouse) if the alien is appearing in connection with a protection order case, child custody case, or other civil or criminal case relating to domestic violence, sexual assault, trafficking, or stalking in which the alien has been battered or subject to extreme cruelty or if the alien is described in subparagraph (T) or (U) of section 1101(a)(15) of this title," the Notice to Appear must include a statement that Section 1367 of the INA has been complied with.  Section 1367, in turn, prohibits the Departments of Justice, Homeland Security, and State from making an adverse determination of admissibility or credibility using information furnished solely by various people who battered or subjected the noncitizen or noncitizen's child to extreme cruelty.  *See* 8 U.S.C. § 1367.

Although a "courthouse" is one of the locations specified in Section 1229(e)(2), the thrust of Section 1229(e) is not on the location where civil immigration enforcement is permitted, but on limiting the use of information against noncitizen victims – obtained during "domestic violence, sexual assault, trafficking, or stalking" proceedings – by an immigration judge or hearing officer to make an adverse determination of deportability.  Section 1229 falls far short of providing the clear and manifest congressional purpose necessary to supplant the common-law privilege.  At most, this Section amounts to an acknowledgment "that courthouse arrests were occurring and an attempt to provide those subject to such arrests with certain protections ... – a far cry from the 'unmistakably clear' language necessary to abrogate the common law privilege." *Doe*, 490 F. Supp. 3d at 693.  As other courts have recognized, "it would turn this statutory provision – which is intended to *protect* noncitizens subject to courthouse arrests – on its head to find in it a clear and

manifest congressional purpose to abrogate the common law privilege against civil courthouse arrests." *Doe*, 490 F. Supp. 3d at 693 (citation and emphasis omitted); *see also State of New York I*, 431 F. Supp. 3d at 393 ("[I]t would be odd to view a provision meant to encourage aliens' attendance at court as evidence of Congressional intent to allow ICE to undermine that very objective"); *Velazquez-Hernandez*, 500 F. Supp. 3d at 1144.

Moreover, Congress enacted Section 1229(e) in 2006, over fifty years after the original INA. *See* Violence Against Women and Department of Justice Reauthorization Act, P.L. 109–162, January 5, 2006, 119 Stat. 2960. "[T]he views of a subsequent Congress form a hazardous basis for inferring the intent of an earlier one." *United States v. Price*, 361 U.S. 304, 313 (1960) (citation omitted). "When a later statute is offered as 'an expression of how the ... Congress interpreted a statute passed by another Congress ... a half century before,' 'such interpretation has very little, if any, significance.'" *Bilski v. Kappos*, 561 U.S. 593, 645 (2010) (Stevens, J., concurring) (quoting *Rainwater v. United States*, 356 U.S. 590, 593 (1958)). For these reasons, the Court agrees with Defendants and the other courts that have found that Section 1229(e) "falls short of providing the clear and manifest congressional purpose necessary to supplant the common law privilege." *Doe*, 490 F. Supp. 3d at 693; *see also Velazquez-Hernandez*, 500 F. Supp. 3d at 1144; *State of New York I*, 431 F. Supp. 3d at 393 (holding that "the provision is plausibly viewed as a prophylactic against ICE actions that target aliens based on their participation in judicial proceedings; ... it would be odd to view a provision meant to encourage aliens' attendance at court as evidence of Congressional intent to allow ICE to undermine that very objective. For these reasons, section 1229(e) of the INA does not demonstrate that Congress

unambiguously intended to displace the state common law privilege against courthouse civil arrests").[7]

Accordingly, the Court grants Defendants' motion to dismiss the United States' preemption claim as it relates to POCA.

### b. Executive Orders 170 and 170.1

In its complaint, the United States contends that Executive Orders 170 and 170.1 "'stand as an obstacle to the accomplishment and execution' of the federal immigration laws and are therefore conflict preempted." Dkt. No. 1 at ¶ 57. The United States argues that Executive Order 170.1 purports to dictate the locations in which immigration officers perform their federal functions, including public areas, thereby impeding those officers' ability to discharge their official duties. *See id.* (citations omitted). Further, the United States alleges that "Executive Orders 170 and 170.1 frustrate the expectation of collaboration reflected in the immigration laws, *see, e.g.*, 8 U.S.C. §§ 1373(a)-(b), 1644, 1357(g)(10)(A)-(B), by barring state and local officials from sharing information with federal immigration officials – even when they wish to do so." *Id.* at ¶ 59. Defendants contend that the Executive Orders do not pose any obstacle to federal law and, therefore, this aspect of the United States' preemption claim must be dismissed. *See* Dkt. No. 11-1 at 23-27.

----

[7] The Court also finds that the United States is not aided by its complaints regarding the breadth of POCA's restrictions and purported uncertainty about how the statute would apply in hypothetical situations. *See, e.g.*, Dkt. No. 1 at ¶ 49. These criticisms do not further Plaintiff's preemption claim because they have no bearing on the relevant question of whether the INA contains the requisite clear statements of congressional intent to displace state law. Questions about how POCA would apply in particular situations, and whether federal officials may be immune from liability in certain cases, *see id.* at ¶ 64, do not render the statute facially invalid. Rather, such questions are properly considered by courts on an as-applied basis in proceedings seeking to enforce POCA's protections, based on "'actual conduct and not with respect to hypothetical situations at the periphery of the statute's scope.'" *VIP of Berlin, LLC v. Town of Berlin*, 593 F.3d 179, 189 (2d Cir. 2010) (quotation omitted).

Settled federalism principles and the Tenth Amendment generally empower the States to control the use of their own facilities, manage their internal affairs, and direct the control of their officials without federal interference. *See, e.g.*, *Adderley v. State of Fla.*, 385 U.S. 39, 47 (1966) ("The State, no less than a private owner of property, has power to preserve the property under its control for the use to which it is lawfully dedicated"); *New York*, 505 U.S. at 175-76 (holding that Congress lacks the power to compel States to take title to property); *City of New York v. United States*, 179 F.3d 29, 36 (2d Cir. 1999) (holding that "the right to set the duties of office for state-created officials and to regulate the internal affairs of governmental bodies" is "surely" within the State's sovereign powers). Here, Executive Orders 170 and 170.1, which concern the use of state facilities and the activities of state employees, are likewise entitled to the presumption against preemption.

As Defendants note, Executive Order 170.1 was tailored to ensure that New York's facilities, such as hospitals, schools, and government offices, can operate and be accessed by residents without undue disruption posed by civil arrests unrelated to state business. *See* 9 N.Y.C.R.R. § 8.170.1(B) & preamble (explaining the order is intended to counter the "chilling effect" caused by immigration enforcement activities that prevents residents from accessing state benefits and services); *see also City of Philadelphia v. Sessions*, 309 F. Supp. 3d 289, 297-300 (E.D. Pa. 2018), *rev'd in part on other grounds*, 916 F.3d 276 (3d Cir. 2019) (recounting "credible" testimony of city official that residents are less likely to use city services if they worry that they may be exposed to ICE enforcement action as a result). And, Executive Order 170 directs the actions of state employees and officials in the performance of their duties and generally instructs them to avoid participating in federal civil immigration enforcement unless required by law. *See* 9 N.Y.C.R.R. § 8.170(B). Specifically, Executive Order 170 instructs state officials not

to inquire about immigration status unless that information is relevant to state business or to the enforcement of state laws, and directs state employees to refrain from sharing personal, non-immigration status information about residents obtained for state business reasons for civil immigration purposes.  *See id.* § 8.170(B)(2)-(3).  The Executive Order also prohibits state law enforcement officers from using state resources and personnel for enforcing federal civil immigration offenses.  *See id.* § 8.170(B)(3)(b).

The Court agrees with Defendants that the United States' preemption challenges to these Executive Orders fail because neither executive order conflicts with federal law.  Just as the general INA civil arrest provisions do not expressly authorize federal officials to undertake enforcement actions in state courthouses, the INA is similarly silent as to whether civil immigration arrests may take place in state facilities where a State has exercised its sovereign prerogative in restricting the use of its facilities for such activities.  *See, e.g.*, *United States v. Illinois*, No. 25-cv-1285, 2025 WL 2098688, *21-23 (N.D. Ill. July 25, 2025) (holding that state-law provisions that, among other things, restricted access of federal immigration officials to local law enforcement facilities for immigration enforcement activities, were not preempted by the INA).

Similarly, Executive Order 170 is not preempted because no provision of the INA obligates state officials to provide federal immigration authorities with personal information about its residents.  Courts have consistently upheld similar information-sharing restrictions against conflict preemption challenges.  *See id.* (rejecting preemption challenge asserted against state and local laws prohibiting disclosure of information about residents to federal officials); *County of Ocean v. Grewal*, 475 F. Supp. 3d 355, 380-82 (D.N.J. 2020), *aff'd*, 8 F.4th 176 (3d Cir. 2021) (holding that New Jersey's executive order prohibiting information sharing was not preempted by

the INA); *United States v. California*, 921 F.3d 865, 890 (9th Cir. 2019) ("finding no

constitutional infirmity in" a state law prohibiting the provision of an immigrant's release date and

non-public personal information).

The statutes cited by the United States, 8 U.S.C. §§ 1373 and 1644,[8] *see* Dkt. No. 1 at ¶

59, which relate to information-sharing between state and federal officials, do not give rise to a

conflict. These statutes reach only information about an individual's citizenship or immigration

classification (*e.g.*, lawful permanent resident, visa holder, asylum seeker), and not all personal

information about an individual. *See Illinois*, 2025 WL 2098688, at *10-13; *California*, 921 F.3d

at 891-92 (holding that 8 U.S.C. § 1373 does not cover address, employment status, or release

date); *Ocean Cnty. Bd. of Comms. v. Attorney Gen. of State of New Jersey*, 8 F.4th 176, 181-82

(3d Cir. 2021). Regardless, Executive Order 170 adheres to the terms of Sections 1373 and 1644,

as it expressly incorporates the statutory language of those federal law provisions, stating that the

order does not restrict the sharing of "information regarding the citizenship or immigration status,

lawful or unlawful, of any individual, as required by law." 9 N.Y.C.R.R. § 8.170(b)(2). Since

Sections 1373 and 1664 only prohibit restrictions on sharing information regarding citizenship or

immigration status, and because the Executive Order does not prohibit the sharing of such

information, these statutes clearly do not preempt this Executive Order.[9]

---

[8] Courts have generally held that the relevant provisions in Sections 1373 and 1644 have no meaningful difference and have analyzed them together. *See, e.g.*, *County of Ocean*, 475 F. Supp. 3d at 371-72 & n.13.

[9] In its response to the motion to dismiss, the United States argues that "the Second Circuit has twice confirmed the preemptive effect of Section 1373(a) of the INA, which 'prohibits state and local governmental entities or officials' from 'directly restricting the voluntary exchange of immigration information with the [Federal Government].'" Dkt. No. 60 at 19 (citing *City of New York v. United States*, 179 F.3d 29, 35 (2d Cir. 1999); *State of New York v. Dep't of Justice*, 951 F.3d 84, 111-16 (2d Cir. 2020)). However, neither of the cases on which the United States relies

(continued...)

Nor does 8 U.S.C. § 1357(g) provide a basis for preemption. That provision gives the States and local governments the option to enter into agreements with federal immigration officials to assist with immigration enforcement. *See* 8 U.S.C. § 1357(g). Courts, however, have consistently found that similar state and local policies, which withhold state cooperation for federal immigration enforcement activities, are not preempted by this provision. *See, e.g.*, *McHenry Cnty.*, 44 F.4th at 592 ("Federal immigration enforcement might have been frustrated by the California law, but 'the choice of a state to refrain from participation cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal'") (quotation omitted); *California*, 921 F.3d at 876-88 (holding a California law that, among other things, prohibited sharing information about a person's release date, is not preempted by the INA because the INA does not mandate such cooperation); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all"); *Illinois*, 2025 WL 2098688, at *22-23 (same).

Fundamentally, the United States fails to identify any federal law mandating that state and local officials generally assist or cooperate with federal immigration enforcement efforts. Nor could it. No such federal laws exist because the Tenth Amendment prohibits Congress from conscripting state and local officials and resources to assist with federal regulatory schemes, like immigration enforcement. *See Printz v. United States*, 521 U.S. 898, 935 (1997) (holding that a statute requiring local officials to conduct background checks for firearms purchases contravened

---

[9](...continued)
concerned preemption. Rather, these cases dealt with the issue of whether the certification condition of Section 1373 was unconstitutional under the anticommandeering doctrine of the Tenth Amendment. *See State of New York*, 951 F.3d at 1111-16; *see also City of New York*, 179 F.3d at 35. As such, the United States' contention that the Second Circuit has addressed the preemptive effect of Section 1373 is entirely without merit.

the Tenth Amendment).  Indeed, in *Printz*, the Supreme Court invalidated a federal law on Tenth

Amendment grounds where the law required state actors "to perform discrete, ministerial tasks,"

provide "information that belongs to the State and is available to them only in their official

capacity," and "examin[e] databases and records that only state officials have access to." *Id.* at

930, 932 n.17.[10]

It may be, as the United States contends, that Congress had "the expectation of

collaboration" between federal, state, and local authorities when it enacted the federal immigration

laws.  *See* Dkt. No. 1 at ¶ 59.[11]  But a hope, however fervent, that federal-state cooperation will

occur does not empower the federal government to conscript the States; were it otherwise, the

anticommandeering doctrine would cease to exist.  As the Ninth Circuit explained, "when

questions of federalism are involved, we must distinguish between expectations and requirements.

In this context, the federal government was free to *expect* as much as it wanted, but it could not

*require* California's cooperation without running afoul of the Tenth Amendment." *California*, 921

F.3d at 891 (emphasis in original); *see also McHenry Cnty.*, 44 F.4th at 591-92 ("Congress may

have hoped or expected that States would cooperate with" federal immigration enforcement, but

"States are not bound by that hope or expectation" in light of the Tenth Amendment).  Here, New

_____

[10] Some courts have even questioned whether 8 U.S.C. § 1373 is itself unconstitutional under the Tenth Amendment.  *See California*, 921 F.3d at 892 n.19 (citing cases).

[11] The United States repeatedly conflates the INA's codification of comity with a requirement that States facilitate federal immigration enforcement.  This is incorrect.  Comity by definition is not a legal requirement.  *See Hilton v. Guyot*, 159 U.S. 113, 163-64 (1895); *Comity*, Merriam-Webster, https://www.merriam-webster.com/dictionary/comity ("[T]he informal and voluntary recognition by courts of one jurisdiction of the laws and judicial decisions of another").  The INA provides avenues for States to work with the federal government on immigration enforcement but uses voluntary language to confirm that any assistance the States may provide is their choice.  *See, e.g.*, 8 C.F.R. § 287.7(a) (referring to detainers as "requests").

York's permissible decision not to assist federal immigration enforcement in its endeavors is not an obstacle to that enforcement effort.

For the reasons set forth above, the Court grants Defendants' motion to dismiss the United States' preemption claim as it relates to the Executive Orders.

**C.    Counts Two and Three: Intergovernmental Immunity**

The United States' final two claims concern intergovernmental immunity. *See* Dkt. No. 1 at ¶¶ 61-69. Rooted in the Constitution's Supremacy Clause, U.S. Const. art. VI, cl. 2, the intergovernmental immunity doctrine traces back to the Supreme Court's foundational federal decision, *McCulloch v. Maryland*, 17 U.S. 316 (1819). There, the Supreme Court found Maryland's attempt to tax the Bank of the United States unconstitutional where Maryland imposed no comparable tax on other banks within the State. *See id.* at 436-37. Over time, the intergovernmental immunity doctrine came to be understood as prohibiting state laws that "either regulate the United States directly or discriminate against the Federal Government" or those with whom it deals (*e.g.*, contractors). *See United States v. Washington*, 596 U.S. 832, 838 (2022) (citing *North Dakota v. United States*, 495 U.S. 423, 435 (1990)).[12]

As the Supreme Court has instructed, in considering claims of intergovernmental immunity, courts must adopt "a functional approach" that "accomodat[es] the full range of each sovereign's legislative authority." *North Dakota*, 495 U.S. at 435 (citations omitted).

---

[12] The key difference between intergovernmental immunity and preemption is that the former applies irrespective of congressional direction. Immunity flows directly from the Supremacy Clause itself. As such, in a world without federal legislation, intergovernmental immunity would still invalidate offending state regulations. Because intergovernmental immunity is such a powerful constraint on states, basic federalism and separation-of-powers principles limit its application to the clearest state intrusions on federal sovereignty: direct regulations on the federal government itself and anti-federal discrimination. Preemption, by contrast, "'provid[es] Congress with the power to preempt state legislation if it so intends.'" *Treasurer of N.J. v. U.S. Dep't of Treasury*, 684 F.3d 382, 406 (3d Cir. 2012) (quotation omitted).

Additionally, "the question whether a state regulation discriminates against the Federal Government cannot be viewed in isolation.  Rather, the entire regulatory system should be analyzed to determine whether it is discriminatory 'with regard to the burdens that result.'" *Id.* (quotation omitted).

The United States argues in count two that POCA and Executive Order 170.1 violate intergovernmental immunity principles by unlawfully regulating federal officials in the performance of their official duties.  *See* Dkt. No. 1 at ¶¶ 61-65.  It further claims that both Executive Orders violate this doctrine in that their information-sharing restrictions unlawfully discriminate against federal immigration authorities.  *See id.* at ¶¶ 66-69.  Neither argument is persuasive.

### 1. Unlawful Regulation of the Federal Government

In its direct regulation claim, the United States contends that POCA and Executive Order 170.1 impermissibly "dictate where federal agents can effectuate arrests, including in public areas, and require immigration officers to obtain judicial warrants where Congress has expressly authorized administrative warrants." Dkt. No. 1 at ¶ 63.

Among other things, the intergovernmental immunity doctrine bars States from directly regulating the federal government.  *See McHenry Cnty.*, 44 F.4th at 592 (citing *North Dakota*, 495 U.S. at 434).  Direct regulation can take many forms, including taxing the federal government or prohibiting the federal government from taking a particular action.  *See id.* (citations omitted); *see also Hancock v. Train*, 426 U.S. 167, 180 (1976); *United States v. New Mexico*, 455 U.S. 720, 733 (1982).  The crux of the inquiry, however, is whether the state law directly regulates the federal government.  *See Texas v. U.S. Dep't of Homeland Sec.*, 123 F.4th 186, 206 (5th Cir. 2024) ("[T]he key question is whether state law seeks to improperly 'control' the employee's

34

federal duties, or whether the law only 'might affect incidentally the mode of carrying out the employment — as, for instance, a statute or ordinance regulating the mode of turning at the corners of streets'") (quoting *Johnson v. Maryland*, 254 U.S. 51, 56-57 (1920)).

Here, to the extent that these provisions apply to state-owned facilities, New York "is acting as a proprietor, not a regulator." *Texas*, 123 F.4th at 205 (footnote omitted).  New York is not attempting to regulate federal agents and it is not prohibiting the federal government from enforcing immigration law.  *See id.*  Rather, it is simply defining, as a proprietor, what activities are not permissible in state-owned facilities.  Such conduct does not run afoul of the intergovernmental immunity doctrine.  *See id.*; *see also City of Chicago v. Sessions*, 888 F.3d 272, 282 (7th Cir. 2018), *vacated in part on other grounds*, 2018 WL 4268817 (7th Cir. June 4, 2018) (noting that "nothing in this case involves any affirmative interference with federal law enforcement at all, nor is there any interference whatsoever with federal immigration authorities. The only conduct at issue here is the refusal of the local law enforcement to aid in civil immigration enforcement through informing the federal authorities when persons are in their custody and providing access to those persons at the local law enforcement facility").

Accordingly, the Court finds that the complaint has failed to allege a plausible claim of direct regulation in violation of the intergovernmental immunity doctrine.

### 2. Unlawful Discrimination Against the Federal Government

Count three of the complaint alleges that both Executive Orders violate intergovernmental immunity for the independent reason that their information-sharing restrictions discriminate against federal immigration authorities.  *See* Dkt. No. 1 at ¶¶ 66-69.

State law may not discriminate against the federal government by setting it apart for less favorable treatment based on its federal governmental status.  *See Washington*, 596 U.S. at 839.

"A state law or regulation discriminates against the federal government if it treats comparable classes of federal and state employees differently, advantaging the state employees," *Nwauzor v. GEO Grp., Inc.*, 127 F.4th 750, 763 (9th Cir. 2025) (citing *Dawson v. Steager*, 586 U.S. 171, 175-76 (2019)), and "no 'significant differences between the two classes' justify the differential treatment," *Dawson*, 586 U.S. at 175 (quotation and other citation omitted); *see also McHenry Cnty.*, 44 F.4th at 594 ("Differential treatment is critical ...."). However, a comparator is necessary; "the mere fact that the [state law] touches on an exclusively federal sphere is not enough to establish discrimination." *McHenry Cnty.*, 44 F.4th at 594 (citing *California*, 921 F.3d at 881).

This is where the United States' claim fails. The challenged policies certainly affect the federal government as the primary enforcer of civil immigration law. The policies specifically prohibit the sharing of certain information with federal immigration authorities, except where otherwise required by law. But the United States never identifies a comparator. The United States does not identify any state or local government entity that might be entitled to the information it is prevented from obtaining because of the Executive Orders. *See Illinois*, 2025 WL 2098688, at *25 (finding that the state and city policies that prohibited state and city employees from sharing information with federal officials for purposes of civil immigration enforcement did not violate the intergovernmental immunity doctrine where the United States failed to identify a comparator). Absent such a comparator, this claim must be dismissed.

It is unlikely that a comparator exists, for the United States concedes that only the federal government is authorized to enforce civil immigration law. However, the fact that a law affects an exclusively federal domain is not evidence of discrimination, and failure to identify a comparator ends the inquiry. *See McHenry Cnty.*, 44 F.4th at 594; *Washington*, 460 U.S. at 544-

45 ("The State does not discriminate against the Federal Government and those with whom it deals unless it treats someone else better than it treats them").  The mere fact that the Executive Orders touch on an exclusively federal sphere is not enough to establish discrimination.  *See McHenry Cnty.*, 44 F.4th at 594 (citation omitted); *see also California*, 921 F.3d at 881 (explaining that intergovernmental immunity "is not implicated when a state merely references or even singles out federal activities in an otherwise innocuous enactment").

The complaint also fails to allege that the Executive Orders impose a burden on the federal government in a way the intergovernmental immunity doctrine considers problematic.  Unlike most discrimination cases in which a state affirmatively levies a tax or cost on the federal government, *see, e.g.*, *Washington*, 596 U.S. at 838-39, the Executive Orders here simply decline to ease the burden of civil immigration enforcement by permitting state and local government agents to assist.  "The State's refusal to cooperate in the immigration context — a possibility contemplated by the relevant federal statutes — does not constitute discrimination against the federal government." *McHenry Cnty.*, 44 F.4th at 594 n.7.

Accordingly, the Court finds that the complaint has failed to allege a plausible claim of unlawful discrimination against the United States.

**D.    Tenth Amendment and Anticommandeering**

Federal preemption and intergovernmental immunity are also bounded by the anticommandeering doctrine.  Although recognized long after the Founding Era, anticommandeering "is simply the expression of a fundamental structural decision incorporated into the Constitution, *i.e.*, the decision to withhold from Congress the power to issue orders directly to the States." *Murphy*, 584 U.S. at 470.  Centered on the principle of voluntariness, the anticommandeering doctrine holds that "[t]he Federal Government may not compel the States to

enact or administer a federal regulatory program." *New York*, 505 U.S. at 188.  Nor can it conscript state or local officers directly, *Printz*, 521 U.S. at 935, or coerce States to action through improper influence, *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 578 (2012).  This holds true no matter how strong the federal interest at play.  *See New York*, 505 U.S. at 178.  Therefore, while Congress has many enumerated powers, and may even overtake state law, it may not wield States as federal tools.  In this way, anticommandeering is a bulwark against abuse of government power.  It also promotes political accountability by enabling voters to distinguish which sovereign is responsible for a specific policy, and "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 584 U.S. at 473-74.

Insofar as POCA and the Executive Orders can be read to restrict certain federal activities in state courthouse and facilities, or to treat the federal government differently, it does so only as part of implementing New York's permissible choice not to participate in federal civil immigration enforcement.  *See McHenry Cnty.*, 44 F.4th at 594 n.7; *California*, 921 F.3d at 980. Invalidating the challenged laws in this case based on intergovernmental immunity principles "would imply that [New York] *cannot* choose to discriminate against federal immigration authorities by refusing to assist their enforcement efforts – a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 891 (emphasis in original).

As the complaint makes abundantly clear, commandeering is the entire purpose of this lawsuit.  The United States' own allegations make plain its desire to commandeer New York's resources to aid in federal immigration efforts.  For example, the United States details its preference for effectuating civil arrests "in the safe and controlled environments of [state] government facilities" and claims that having information about noncitizens' "scheduled

appearances" in state court proceedings makes it easier for federal officials to locate and apprehend noncitizens. *See* Dkt. No. 1 at ¶¶ 47, 50. The United States further contends that "[t]hese restrictions further prevent New York officials from disclosing even basic logistical information, such as whether an alien wanted for violations of civil immigration laws has been screened by security or is physically present in a state facility, because such information could be construed as 'for the purpose of civil immigration enforcement' under the Executive Orders." *Id.* at ¶ 53. As the complaint acknowledges, these state facilities are "safe and controlled" only because *state officials* have "screened [entrants] for weapons or other contraband." *Id.* at ¶ 3. And, information about "scheduled appearances," *id.* at ¶ 47, is available only because *state officials* have assembled and published court calendars – all in service of the safe and orderly operations of the *State's* judicial system. Notably, ICE's own policies expressly provide that enforcement activities "in or near courthouses should ... take place in non-public areas of the courthouse, be conducted in collaboration with court security staff, and utilize the court building's non-public entrances and exists." Memorandum from Acting Director of ICE Todd M. Lyons, *Civil Immigration Enforcement Action In or Near Courthouses*, dated May 27, 2025, *available at* https://tinyurl.com/389vfxsj (last visited Nov. 12, 2025). But adherence to such protocols would plainly conscript state court officers to expend state time and resources, for instance, to grant ICE agents access to "non-public areas" and "non-public entrances," in order to help ICE enforce the federal civil immigration laws.

Compelling New York to allow federal immigration authorities to reap the benefits of the work of state employees is no different than permitting the federal government to commandeer state officials directly in furtherance of federal objectives. As explained, the Executive Orders and POCA reflect Defendants' decision to not participate in enforcing civil immigration law – a

decision protected by the Tenth Amendment and not preempted by the INA.  Finding that these same provisions constitute discrimination or impermissible regulation would provide an end-run around the Tenth Amendment.  It would allow the federal government to commandeer states under the guise of intergovernmental immunity – the exact type of direct regulation of states barred by the Tenth Amendment.  *See California*, 921 F.3d at 891; *Illinois*, 2025 WL 2098688, at *27; *McHenry Cnty. v. Raoul*, 574 F. Supp. 3d 571, 582 (N.D. Ill. 2021), *aff'd sub nom. McHenry Cnty.*, 44 F.4th 581; *United States v. New Jersey*, No. 20-cv-1364, 2021 WL 252270, *13 (D.N.J. Jan. 26, 2021).

The United States argues that "the Tenth Amendment is not implicated where, as here, the Federal Government seeks to regulate private actors – illegal aliens – by facilitating the enforcement of federal laws against those actors." Dkt. No. 60 at 28 (citing *Murphy*, 584 U.S. at 476-77; *New York*, 951 F.3d at 114 n.27).  The Court disagrees.  Although the INA and the New York provisions both implicate noncitizens, POCA and the Executive Orders govern how New York and its localities can interact with the federal government, not the activities of private individuals.  *See California*, 921 F.3d at 889 n.15 (rejecting similar argument raised by the United States).

Invalidating New York's protections against civil immigration arrests of residents participating in state court proceedings and accessing state facilities for state services would mean that "state participation in [immigration enforcement] efforts would no longer be voluntary." *New Jersey*, 2021 WL 252270, at *13.  Where, as here, the Tenth Amendment permits a state to decline to assist with federal immigration efforts, that state's determination that its interests are best served by not permitting its resources to be conscripted for federal immigration enforcement cannot be invalidated merely by recasting that otherwise permissible choice under the

intergovernmental immunity lens. *See Illinois*, 2025 WL 2098688, at *27 (holding that invalidating state policies reflecting Illinois' "decision to not participate in enforcing civil immigration law" under intergovernmental immunity "would provide an end-run around the Tenth Amendment"); *California*, 921 F.3d at 889-90. To hold to the contrary would improperly elevate the concerns of the federal sovereign over that of a State and deprive New York of its essential ability to protect its sovereign interests in the face of undue federal interference.

Accordingly, the Court finds that, for this additional reason, Defendants' motion to dismiss must be granted.

## IV. CONCLUSION

After carefully reviewing the entire record in this matter, the parties' submissions, and the applicable law, the Court hereby

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 11) is **GRANTED**; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: November 17, 2025
Albany, New York

Mae A. D'Agostino
U.S. District Judge